```
1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
2                        CENTRAL DIVISION

3    DAN WHITFIELD and GARY FULTS,
                                    No. 4:20CV00466 KGB
4                   Plaintiffs,

5    v.

6    JOHN THURSTON, In his          Wednesday, May 27, 2020
     Official Capacity as           Little Rock, Arkansas
7    Secretary of State for the     9:16 a.m.
     State of Arkansas,
8                        Defendant.

9    TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION/TRIAL
            BEFORE THE HONORABLE KRISTINE G. BAKER,
10                  UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:
12
     On Behalf of the Plaintiffs:
13
            MR. JAMES C. LINGER, Attorney at Law
14             Law Offices of James C. Linger
               1710 South Boston Avenue
15             Tulsa, Oklahoma  74119-4810

16          MR. WILLIAM WHITFIELD HYMAN, Attorney at Law
               King Law Group
17             300 North Sixth Street
               Fort Smith, Arkansas  72908

18

19   On Behalf of the Defendant:

20          MR. NICHOLAS JACOB BRONNI, Solicitor General
            MR. VINCENT MOORE WAGNER, Deputy Solicitor General
21          MR. DYLAN L. JACOBS, Assistant Solicitor General
            MR. MICHAEL ALLEN MOSLEY, Assistant Attorney General
22             Arkansas Attorney General's Office
               323 Center Street, Suite 200
23             Little Rock, Arkansas  72201-2610

24          Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
25   transcription.
```

1

2

**I N D E X**

3    Opening Statement
         By Mr. Linger......................................11
4        By Mr. Bronni......................................21

5

6    PLAINTIFFS' WITNESSES:     Direct     Cross     Redirect     Recross

7    Daniel Whitfield                      24         82           89
     Gary Fults                            90         118
8    Sandra Furrer              130        143        150
     Roderick Talley           153        163        165
9    Lee Jarrod Evans          165        172
     Richard Winger                        176        188/201      200

10

11   DEFENDANT'S WITNESS:

12   Meghan Cox                            208        219

13

14   Closing Argument
         By Mr. Linger.....................................228
15       By Mr. Bronni.....................................237
         By Mr. Linger (Rebuttal)..........................252

16

17   EXHIBITS RECEIVED:

18   Plaintiffs' 1 through 12.............................23
     Plaintiffs' 13......................................141

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2        **[Reporter's Note.  This proceeding was conducted by**

3    **telephone.  The audio at times was distorted and/or inaudible.]**

4            THE COURT:  Good morning.  We are on the record in

5    Case No. 4:20CV466.  It is Dan Whitfield and Gary Fults versus

6    Arkansas Secretary of State John Thurston.  We are here this

7    morning for a hearing and a consolidated trial on the merits.

8        Counsel for plaintiffs, please introduce yourselves for our

9    record.  Let me know if we are waiting on anyone this morning.

10           MR. LINGER:  Your Honor, this is James Linger, counsel

11   for the plaintiffs.  I believe Mr. Whit Hyman is also here as

12   counsel for the plaintiffs.  And we have six witnesses.  I

13   believe they are on the line.  If it would be all right with the

14   Court, I would like to inquire if they are on the line right

15   now.

16           THE COURT:  All right.

17           MR. LINGER:  The first witness is Dan Whitfield, if he

18   would acknowledge he is present, please.

19           MR. WHITFIELD:  Good morning.  I am present.  My name

20   is Daniel Whitfield.

21           MR. LINGER:  And the second witness is Gary Fults.

22           MR. FULTS:  Yes.  I'm here.

23           MR. LINGER:  Third, we have Sandra Furrer.

24           MS. FURRER:  I'm here.  And it's pronounced Furrer.

25           MR. LINGER:  Furrer.  Sorry.  And then, next, Roderick

1    Talley.

2            MR. TALLEY:  Yes.  I'm here.

3            MR. LINGER:  Lee Evans.

4            MR. EVANS:  Yes.  I'm here.

5            MR. LINGER:  And Richard Winger.  Mr. Winger?

6        Well, we'll check on that, Your Honor.  We had him as our

7    last witness.

8            THE COURT:  All right.  Mr. Linger, are we waiting on

9    anyone else?

10           MR. LINGER:  No, Your Honor.

11           THE COURT:  All right.  Counsel for defendant, Mr.

12   Thurston, you may proceed to introduce yourselves, please.  And

13   let me know who else is on the line.  Also, let me know if we're

14   waiting on anyone.

15           MR. BRONNI:  Good morning, Your Honor.  This is

16   Nicholas Bronni, solicitor general of Arkansas.  On the line

17   with me is Vincent Wagner, Dylan Jacobs and Michael Mosley.

18   Then I understand Meghan Cox, who is one of our witnesses, is

19   also on the line, if she can acknowledge that she's on.

20           MS. COX:  Yes.  I'm present.

21           MR. LINGER:  Pardon me.  I apologize for speaking out

22   of turn, but Richard Winger is here.

23           THE COURT:  Thank you, Mr. Winger.  And thank you, Ms.

24   Cox.

25       Mr. Bronni, are we waiting on anyone else to join the call?

1          MR. BRONNI:  We are not, Your Honor.

2          THE COURT:  All right.  With respect to our witnesses,

3    I know that many of the exhibits, and even certain aspects of

4    the testimony, have been stipulated to by the parties.  Does

5    anybody wish to invoke the rule with respect to testimony that

6    the Court is going to receive today?  I don't recall if that

7    point was covered in the stipulations and in the materials that

8    counsel provided prior to the hearing.  If it was, please remind

9    me if there's an agreement.

10         Mr. Linger.

11         MR. MOSLEY:  Your Honor, this is Mike Mosley.  Pardon

12   me, Your Honor.

13         THE COURT:  You may proceed, Mr. Mosley.

14         MR. MOSLEY:  This is Mike Mosley.  And I would like to

15   invoke the rule to exclude witnesses Furrer, Evans and Talley.

16   And I think everybody else can stay.

17         THE COURT:  All right.  Mr. Linger, what's your

18   position with respect to the names that Mr. Mosley has recited?

19         MR. LINGER:  Well, they are neither parties or expert

20   witnesses.  However, I think it will make it a little bit

21   difficult, because if the rule is invoked as to them -- and this

22   is the first notice that I've had that that was going to be done

23   -- then they are going to have to get out of the conference call

24   and then come back when they are ready to testify.  Our intent

25   was to call witnesses in the order that I called them recently

1    and as are listed on our exhibit and witness list, which was

2    Document No. 17 filed in the case.

3              THE COURT:  All right.  Just procedurally, Mr. Linger,

4    what we've done with other hearings that we've conducted by

5    telephone is, if the witness will drop off the line, then we,

6    Ms. Washington, my courtroom deputy, who is here in court with

7    me, listening in, will reach out to the witness when it's time

8    for them to testify and can contact them by telephone and ask

9    them to call back in to the line.  Then, once they have joined

10   the call, we'll proceed with their testimony.  That's how we've

11   done it in the past.  That's worked efficiently.

12             MR. LINGER:  Do you want their numbers right now, or

13   would it be good to give Ms. Washington their telephone numbers

14   so that she can contact them?

15             THE COURT:  Mr. Linger, if you have access to an email

16   or if you have an assistant or someone there who can help you,

17   just email Ms. Washington those numbers.

18             MR. LINGER:  All right.  Well, Mr. Hyman is handling

19   Roderick Talley and Lee Evans, so I would ask him to email those

20   to Ms. Washington.  I will have my legal assistant email Sandra

21   Furrer's telephone number to Ms. Washington.

22             THE COURT:  All right.  And my understanding, Mr.

23   Mosley, is that Ms. Cox is also serving as an expert.  Is that

24   right?

25             MR. MOSLEY:  Yes, Your Honor.

1          THE COURT:  All right.

2          MS. FURRER:  I have a question.  This is Sandy Furrer.

3     Do I need to hang up now?

4          THE COURT:  So, Ms. Furrer, Mr. Talley and Mr. Evans,

5     if you all will hang up from the call, Ms. Washington, my

6     courtroom deputy, will reach you by telephone and ask you to

7     call back in when it's time for your testimony.

8          MS. FURRER:  Okay.

9          THE COURT:  So just stay loose this morning and stay

10    available.  She will reach out to you when we're ready.  Thank

11    you.

12         MS. FURRER:  Okay.

13         THE COURT:  All right.  Thank you.

14      All right.  Mr. Linger and Mr. Mosley -- I'm not certain,

15    Mr. Mosley, if you are going to handle all of the proceedings

16    today.  But I'll direct my questions to both of you.  Does

17    either side wish to present an opening statement, or do we want

18    to begin proof and then do a closing statement at the end?  I am

19    open to whatever the parties have agreed to.  If the parties

20    have not agreed, I will certainly set the schedule after hearing

21    from both sides.

22         MR. MOSLEY:  Your Honor, I don't want to step in front

23    of Mr. Linger.  But I think -- go ahead, Jim.  Go ahead.  I'm

24    sorry.

25         MR. LINGER:  Your Honor, I had indicated earlier --

1    your law clerk had wanted to know about our position on Mr.

2    Kopitke.  And I had indicated that I would give a brief

3    statement as to Mr. Kopitke's intent to try to intervene in the

4    case; and then, after that, if the secretary of state's office

5    has something they want to say on that.  And then I think we can

6    have a brief opening statement.

7                THE COURT:  All right.  So let me, just for the

8    record, make clear.  Mr. Lax, Jared Lax, my law clerk, emailed

9    counsel to let them know of a communication that the Court

10    received by email from Mr. Kopitke.  I'm not sure if I'm

11    pronouncing his last name correctly.  He emailed and reached out

12    to the Court with respect to this litigation asking for

13    permission to intervene.  The Court directed him to file a

14    formal motion with the clerk's office in this case requesting

15    intervention.  Mr. Kopitke has not filed a formal motion as of

16    the last time I checked this docket.  I will say he reached out

17    late last night to Mr. Lax, again by email, and asked for a

18    conference with Mr. Lax.  We have not yet responded to that most

19    recent email from Mr. Kopitke.  It came in after business hours

20    yesterday.

21         Clearly, this hearing has been noticed and is of public

22    record on the docket.  And the procedure by which Mr. Kopitke

23    needs to proceed is to follow the rules, and the rules require

24    anyone who wishes that sort of relief to file their own motion.

25         So I'll hear from you, Mr. Linger.  And then I'll hear from

1    counsel for defendant to the extent you wish to address the

2    issue as well.  You may proceed.

3         MR. LINGER:  Your Honor, Mr. Kopitke is an independent

4    candidate for president of the United States.  He is from

5    Michigan.  There are four important points that should be noted

6    in that regard.  An independent candidate for president in

7    Arkansas only is required to have a thousand petition signatures

8    while any other independent candidate in Arkansas for statewide

9    office must have 10,000 signatures.

10        Secondly, an independent candidate for president in

11   Arkansas has until August 3rd, at noon, which is the first

12   Monday in August, to file his or her petitions, while an

13   independent candidate for any other statewide office in Arkansas

14   must file the petition by noon on May 1st.

15        Third, there is no petition limit for president.  You can

16   have as much time as you want under Arkansas law to petition as

17   an independent presidential candidate.

18        THE COURT:  Mr. Linger, I'm going to stop you just one

19   second.  I'm going to ask everyone who is on the line, unless

20   you are speaking, to mute your phones.  Put us on mute so we

21   can't hear your background noise or your feedback.

22        Mr. Linger, if you would, please kindly repeat your second

23   and third points.  I'm not sure if you have us on speakerphone

24   or not, but it sounds to me like you may be looking away from

25   your phone's microphone when you are speaking.  We're having a

1  hard time hearing you.  You are sort of fading in and out.

2          MR. LINGER:  All right, Your Honor.  I have taken it

3  off speakerphone and am speaking directly into the speaker now.

4          THE COURT:  Thank you so much.

5          MR. LINGER:  My second point as to Mr. Kopitke is that

6  an independent presidential candidate in Arkansas has until the

7  first Monday in August to turn in the petition, which would be

8  August 3rd this year, while an independent statewide candidate

9  for anything other than president has until May 1st at noon

10 only.

11     The third point is that if you are an independent candidate

12 for president in Arkansas, there is no 90-day or one year or any

13 sort of limitation on how long you can petition, while if you

14 are an independent statewide candidate in Arkansas for any

15 office other than president, you are limited to only 90 days,

16 and then 90 days must be the 90 days right before May 1st.

17     Then the final point to be made as to Mr. Kopitke is as far

18 as I know -- and I think I spoke to Mr. Wagner yesterday about

19 this.  As far as we know, he hasn't done any petitioning at all

20 in Arkansas.  So those are the four things I would just like the

21 Court to note.

22          THE COURT:  All right.  I appreciate it.  And,

23 clearly, so that the record is clear, when and if he files a

24 motion to intervene, I will certainly hear from the parties to

25 the lawsuit with respect to his motion before ruling on it.  But

1    at this point, I just have an informal email inquiry.  I don't

2    consider that a motion.  He's been directed as to what he needs

3    to do to file a formal motion.  So the onus is on him to follow

4    the rules.  And that's what we expect of anyone, whether they

5    have legal counsel or not, to abide by both the local rules and

6    the Federal Rules of Civil Procedure in regard to the

7    proceedings.

8        All right.  Counsel for defendant, do you wish to say

9    anything with respect to this issue related to the request for

10   intervention?

11          MR. BRONNI:  Your Honor, it's Nicholas Bronni.  I

12   think Mr. Linger sort of hit the high points, that we are

13   talking about different dates and different numbers here.  Aside

14   from that, I think we'll wait to see if he files a motion with

15   the Court and then respond to that in time.

16          THE COURT:  All right.  Let's move on then to

17   openings, if anyone wishes to give an opening.  Mr. Linger.

18          MR. LINGER:  Yes, Your Honor.  On behalf of the

19   plaintiffs, this case is both a facial and as-applied challenge

20   to non-presidential independent ballot access in Arkansas.

21       Now, I think there has been considerable litigation on this

22   point.  The Eighth Circuit in 2017 in the *Moore v. Martin* case

23   listed a history of independent challenges to Arkansas laws that

24   have been held unconstitutional [inaudible] later.  In that

25   regard, you have to look also at the 2018 decision by Judge

1    Moody [inaudible], which held previous independent petitioning

2    requirements unconstitutional to a certain extent, and then the

3    decision last year [inaudible] in *Moore v. Thurston* [inaudible].

4    That was particularly important because we look at the first

5    thing that I think the Court has to look to is that consistently

6    these things have been analyzed -- ballot access laws for

7    independents have been analyzed under a form of strict scrutiny

8    but have recognized this has an effect on voter [inaudible] --

9            THE COURT:  Mr. Linger, I'm not sure if we just have a

10   bad connection or what.  Our situation is that we're dropping

11   about every third word.

12           MR. LINGER:  Your Honor, perhaps it would be better if

13   I called in on my cell phone.  Mr. Hyman said he is sort of

14   having a hard time hearing me also.

15           THE COURT:  All right.  That's fine.  We'll pause for

16   a moment.  You can hang up the line, and you can call back in.

17   When you are back in, just announce yourself, and we'll proceed.

18           MR. LINGER:  All right.  I will do that right now,

19   Your Honor.

20       Hello?

21           THE COURT:  Mr. Linger, are you back on the line?

22           MR. LINGER:  I am back on the line.  Is this any

23   better, Your Honor?

24           THE COURT:  It is much better.  Thank you very much.

25           MR. LINGER:  All right.  Good.  Anyway, I don't know

1    if you want me to repeat what I said.  I'm just saying this is a

2    facial and as-applied challenge.  I think there are aspects of

3    the law that are facially unconstitutional, but it's

4    particularly as applied here that I think the law is

5    unconstitutional as to non-presidential independent candidates

6    and ballot access in Arkansas.  I said whether it is intentional

7    or unintentional, I think Arkansas's ballot access laws tend to

8    protect incumbents and impede electoral competition.

9         The first thing we look at, I think, because we have to

10   look at it not just in an application this year but in each

11   aspect of the law, the party filing period, which is in about

12   from the 4th to the 11th this year, back in November, everybody

13   who wants to run, whether they are a major party candidate, a

14   new party, or nominated by convention or independent candidates,

15   must make the decision approximately one year before the

16   election.  And that's particularly bad for independents, where I

17   think the state has less of an interest in regulating them than

18   party candidates, because the independent candidates will only

19   appear on the general election ballot.

20        And most people, as the Court, the Eighth Circuit and the

21   Supreme Court has recognized, do not even look to independent

22   candidates until they find out who the political parties are

23   going to be nominating.  So this is particularly difficult to

24   begin with for independent candidates.  And there's no reason to

25   connect the party filing period to when independent candidates

1    have to decide they are going to run, a year before the

2    election.

3        Then we have to go to the next point, which is the 90-day

4    petitioning period.  This applies to all independent candidates

5    except for president of the United States, and it applies not to

6    initiative petitions.  It's unique.  And that 90 days, they

7    can't even start in November.  They have to wait until around

8    February 1st to begin petitioning.  And that has caused a

9    particular problem because it makes it susceptible to bad

10   weather or to disease, like the coronavirus.  And that's

11   something I think that is foreseeable that it could be a

12   problem.  And it has been recognized by some courts to be a

13   factor to consider.

14       Then, also, like I said, that 90-day period has to be right

15   before May 1st.  That has particular application in this year

16   because it's in February, March and April when the petitioning

17   must occur for independent candidates for any office in

18   Arkansas, other than president, that the coronavirus really

19   started getting bad.  And I think, as the testimony is going to

20   be, as shown in the declarations and all, and the testimony

21   today, it really started to pick up.  By the end of February, it

22   was getting really bad.  Then, of course, we have to look at the

23   deadline.  May 1st at noon, everything has to be turned in at

24   that time, as opposed to like August 3rd for an independent

25   presidential candidate.

1      Once again, I think in Judge Moody's decision, which was

2   left in place by the Eighth Circuit last year in the *Moore v.*

3   *Thurston* decision, he allowed not only the party filing period,

4   he said that an independent candidate could file on that day,

5   but he also noted that in the past May 29th had been all right,

6   there hadn't been a problem having a later deadline and there,

7   in fact, was no sort of conflict or anything with verifying

8   other petitions if it was as late as July the 6th.  So that is

9   the next thing.

10      And we also are showing, and I think the evidence is simply

11   overwhelming, that Arkansas does not suffer from any sort of

12   overcrowded ballot, not just from independent candidates.  But

13   from even in the major party, a lot of times offices -- people

14   file for an office, and there isn't even an opposing candidate

15   from the other party.

16      And I think the equal protection argument here is

17   particularly important because why is it necessary to have such

18   an early deadline and have only a 90-day period when there isn't

19   a 90-day petitioning period applied to, for example, independent

20   presidential candidates?  So that's possibly necessary to

21   prevent fraud or an overcrowded ballot or anything, but the

22   state has not shown any [inaudible] for that.

23      In this case we have six witnesses.  Because of the

24   stipulations that were entered into, Mr. Whitfield and Mr. Fults

25   will be called first.  They already have, by stipulation, their

1  direct testimony by way of their declarations:  Mr. Whitfield in

2  Exhibit 1, Exhibit 9, the supplemental; and Mr. Fults in his

3  Exhibit 2 and his Exhibit 10.  These are -- and 7.  Those

4  witnesses will begin by cross-examination, if so chosen, by the

5  secretary of state.

6      We then have Ms. Furrer, Mr. Talley and Mr. Evans, who will

7  be regular witnesses for me to have to put on to talk about

8  their experience in regard to petitioning and particularly the

9  problems they have had this year and the effect of the

10  coronavirus on them.

11      And, finally, we will have the testimony of Richard Winger.

12  His exhibit where his declaration is is Exhibit 3 and also the

13  exhibits attached thereto.  He will testify in regard to the law

14  as compared to other states, the effect [inaudible].  And he

15  will particularly talk about the fact that in review of Meghan

16  Cox's declaration certain things and that she left out a number

17  of important things, for example, like emphasizing that in

18  Arkansas anybody can sign -- any registered voter can sign a

19  petition for an independent candidate.  But she forgot to

20  mention [inaudible].  And she also said that any independent --

21  there wasn't a limitation that only independents sign the

22  petition.  But, in fact, there's no state that says that only

23  independents can sign the petition.  She also said that

24  out-of-state circulators can be used in Arkansas.  But that's

25  the way it is in 48 states.  That's nothing unusual about that.

1    She also said that no petitions have to be notarized.  Well,

2    that's the way it is in [inaudible] at present.  Also said

3    [inaudible] circulators -- [inaudible].

4         Then, finally, another point that he will make is that he

5    compares Utah about petitioning [inaudible].  But she forgot to

6    mention that Republican candidates or Democratic candidates

7    [inaudible] if they can meet a certain level of support

8    [inaudible].  And she also didn't mention [inaudible], which I

9    think is very relevant, that an independent candidate there for

10   statewide office only need obtain 1,000 petition signatures.

11        Because of previous litigation [inaudible] Eastern District

12   of Arkansas and the Eighth Circuit Court of Appeals precedent, I

13   think the Court ought apply [inaudible] strict scrutiny

14   [inaudible], declare the law unconstitutional both facially and

15   as applied in this case because of the extreme and unexpected

16   effects of the coronavirus on petitions.  So we will ask that

17   relief from the Court.

18        Then, as to injunctive relief, that is a harder question

19   that is clear.  If you'll look at other courts and petitions,

20   they all give some sort of relief.  The effect, based on the

21   testimony, is that it substantially and critically reduced the

22   ability to collect the signatures.  Therefore, we ask for the

23   appropriate relief.

24            THE COURT:  All right.  Mr. Linger, because I want

25   everyone to have a very clear record in this case, I'm going to

1    make the point again.  And I'm going to sound like I'm beating

2    the same drum most likely today.  But about every third word,

3    again, was being dropped.  So I think I understand your

4    arguments with respect to this.  You are asking -- I want to

5    make sure that I understand the final point with respect to

6    injunctive relief, if you would just repeat that for me.  I know

7    Eastern District of Arkansas and Eighth Circuit precedent,

8    you've pointed me in that direction.  I understand you believe

9    it's strict scrutiny.  And I understand, at least in part, the

10   coronavirus issues are definitely front and center with respect

11   to your arguments.  Repeat for me what you said about injunctive

12   relief at the very end.

13              MR. LINGER:  What we're asking, Your Honor -- I would

14   suggest that I think the least disruptive thing for the Court to

15   do would be to set, after determining the effect of the

16   coronavirus on petitioning this year, to reduce the number of

17   signatures that would be required.  If you look at it, I would

18   say that I think somewhere between 20 to 30 percent would be

19   reasonable under these circumstances, because the testimony,

20   that you can see from the declarations and supplemental

21   declarations of Mr. Whitfield and Mr. Fults, is that sometime at

22   the end of February and the beginning of March everything just

23   went to pieces.  There was an extreme effect.  And a lot of it

24   had to do with people being afraid -- not just people signing

25   petitions, but people who were [inaudible], and therefore more

1   than two-thirds of the time was severely damage.  This is

2   because we only have a 90-day period.

3       A number of the cases that we have cited have something

4   like either -- one of the independent candidates [inaudible]

5   reduced, like in Illinois, I note it was a case where Mr.

6   Kopitke was allowed to enter into, in that case, the federal

7   judge there reduced the signature requirement down and I believe

8   extended the deadline.  That can be done here since we have --

9   no ballot is going to be printed until, earliest, in late August

10  for the general election.

11      So I think the Court can look at reducing the number of

12  signatures, extending the deadline for more time or finding that

13  there's been a sufficient modicum of support already shown by

14  Mr. Whitfield and Mr. Fults to be put on the ballot.

15      I think those are various injunctive options that the Court

16  could do in crafting a remedy for injunctive relief.

17      I do note, once again, last I heard, Mr. Whitfield and Mr.

18  Fults still had not heard a response from the secretary of

19  state's office as to how many of their signatures were valid.

20          THE COURT:  All right.

21          MR. LINGER:  Thank you, Your Honor.

22          THE COURT:  Who is speaking, just for our record?

23  It's awfully hard to pick up voices, if you will please identify

24  yourself when you start to speak.  I think this may be Mr.

25  Mosley, but I'm not certain.  I want to make certain that our

1    record is clear.

2          MR. MOSLEY:  No, Your Honor.  I was not speaking.

3    This is Mike Mosley.

4          THE COURT:  All right.  Did someone just speak or want

5    a turn to speak?

6          MR. MOSLEY:  Your Honor, our Solicitor General

7    Nicholas Bronni is going to respond.

8          THE COURT:  All right.

9          MR. MOSLEY:  Your Honor, respectfully, somebody

10   apparently is not muted because I'm hearing an echo down a hall

11   it sounds like.

12         THE COURT:  Will everyone please check your phones to

13   make sure that you are muted when you are not speaking.

14       All right.  Mr. Linger, did that conclude your presentation

15   with respect to opening?  Mr. Linger?  Mr. Linger, if you are

16   speaking, I'm not hearing you.  You might check and make sure

17   you are off of mute.  If it's a bad connection, take a moment to

18   hang up and call back in.

19       Go ahead, sir.

20         MR. LINGER:  Your Honor, if you can hear me, this is

21   James Linger.  I muted my phone, and I just unmuted it.  So if

22   Mr. Bronni is going to start speaking, I will mute my phone

23   again.

24         THE COURT:  I just wanted to make sure that I didn't

25   interrupt you and that that concluded your presentation with

1    respect to opening.  You were finished.  Correct?

2              MR. LINGER:  Yes, Your Honor.  Yes, Your Honor.

3              THE COURT:  You may mute your phone again.

4         Mr. Bronni, you may proceed when you are ready.

5              MR. BRONNI:  Thank you, Your Honor.  I'll try and

6    speak a little bit more slowly so the court reporter can hear me

7    since I actually get an echo on my end as well.

8         Your Honor, this case presents a straightforward issue.

9    Does the Constitution require Arkansas to exempt plaintiffs from

10   plainly constitutional ballot access requirements.  The answer

11   to that question is clearly an unambiguous no.  Nothing that

12   anybody says today will change that.

13        In challenging Arkansas's ballot access regime, as Mr.

14   Linger just explained [inaudible].  First, they argue that they

15   should not have to demonstrate a modicum of support or,

16   alternatively, requiring them to collect signatures from just

17   half a percent of registered voters is just wrong.  Second,

18   plaintiffs claim that May 1st is simply too early to collect

19   signatures.  Third, they claim 90 days is just not enough time.

20   And, fourth, plaintiffs argue that they are entitled to a

21   special candidate filing period different from every other

22   candidate [inaudible].  Those claims all fail because Arkansas's

23   ballot access isn't demanding [inaudible].  Indeed, the United

24   States Supreme Court, the Eighth Circuit and countless other

25   federal courts have repeatedly upheld more demanding

1   requirements.

2        Again, nothing that plaintiffs say or that will be

3   presented today can change that fact, recognizing that

4   plaintiffs argue, instead, that COVID-19 has suddenly rendered

5   Arkansas's regime unconstitutional.  That argument fares no

6   better.  The states are not required to modify otherwise

7   constitutional ballot access laws in response to unusual or

8   exigent circumstances.

9            THE COURT:  Mr. Bronni, I hate to interrupt you.  But

10  if you would repeat that point with respect to COVID-19, it was

11  difficult to pick up on our end.  I want to make sure, again, we

12  have a good record from both sides.

13           MR. BRONNI:  Sure, Your Honor.  What I was saying is

14  that recognizing the weakness of their facial claim, plaintiffs,

15  instead, have argued that COVID-19 has suddenly rendered

16  Arkansas's ballot access regime unconstitutional.  But that

17  argument, frankly, fares no better because states are not

18  required to modify otherwise constitutional ballot access laws

19  in response to unusual or exigent circumstances.

20       Moreover, plaintiffs' argument also fails because pandemic

21  or not, a reasonably diligent candidate could meet Arkansas's

22  requirements.  Indeed, Arkansas's signature threshold is already

23  so far below the constitutionally permissible maximum of 5

24  percent that it already accounts for unusual circumstances.  And

25  it is undisputed that despite the pandemic, other independent

1    candidates have met Arkansas's requirements.  And, again,

2    nothing said today by plaintiffs or anyone else will change that

3    fact.  Therefore, at the conclusion of this proceeding, this

4    Court should find for the secretary and deny plaintiffs' request

5    for relief.  Thank you, Your Honor.

6             THE COURT:  Thank you, Mr. Bronni.

7         All right.  Mr. Linger, plaintiffs may call their first

8    witness.  And if I'm understanding this correctly, plaintiffs

9    are calling Mr. Whitfield, who has submitted two sworn

10   declarations, Exhibits 1 and 9, which come in by agreement as

11   his direct testimony.  Is that right, Mr. Linger?

12            MR. LINGER:  Yes, Your Honor.  And what I would like

13   to do at this point, just for the record, is since it was agreed

14   by the parties, to offer into evidence Plaintiffs' Exhibits 1

15   through 12.

16            THE COURT:  All right.  My understanding is that those

17   exhibits come in by agreement.  Is that right, counsel for

18   defendant?

19            MR. MOSLEY:  Your Honor, this is Mike Mosley.  And

20   that's correct.

21        (Plaintiffs' Exhibits 1 through 12 received in evidence.)

22            MR. LINGER:  With that, Your Honor, Mr. Whitfield's

23   direct testimony is set forth in Plaintiffs' Exhibits 1 and 9

24   that have been admitted into evidence, so the defendant would

25   start out cross-examining him.

1          THE COURT:  All right.  Mr. Whitfield, are you on the

2     line?

3          MR. WHITFIELD:  Yes, ma'am.

4          THE COURT:  I'm going to ask you to raise your right

5     hand.  Ms. Washington is going to administer an oath to you.

6          **DANIEL WHITFIELD, PLAINTIFFS' WITNESS, DULY SWORN**

7          THE COURT:  Thank you, Mr. Whitfield.

8       Counsel for defendant, you may proceed with cross.

9          MR. MOSLEY:  Thank you, Your Honor.  This is Mike

10    Mosley.  I'm going to try to go slow.  If there's any point

11    where I'm cutting out, please let me know.  And the other thing,

12    respectfully, Judge -- and I don't mean to beat a dead horse.

13    But has everyone muted?  Okay.

14                          CROSS-EXAMINATION

15    BY MR. MOSLEY:

16    Q.   Mr. Whitfield, how are you this morning?

17    A.   I'm well.  Thank you.  I did want to point out real quickly

18    that it is very probable that the feedback is happening from the

19    judge's line not being muted, and we're hearing the feedback

20    from the courtroom.

21    Q.   Okay.  Well, Mr. Whitfield, I'll try to go slow.  And we'll

22    just take our time.  Okay?

23    A.   Yes, sir.

24    Q.   I'm Mike Mosley.  And I'm one of the attorneys representing

25    the secretary of state.

1   A.    Good morning.

2   Q.    I noticed in paragraph 3 of your declaration, your original

3   one, that you state that the petition signature deadline is too

4   early.  Is that one of your claims here?

5   A.    Paragraph No. 3 on my original declaration, yes, sir.

6   Q.    Okay.  But let's just be clear here.  You did, in fact,

7   meet that petition signature deadline.  Correct?  I meant the

8   candidate filing deadline.  Correct?

9   A.    I filed on November 4th at approximately 12:06 p.m. and was

10  the sixth candidate to file, sir.

11  Q.    So you had no problem doing your filing to be a candidate

12  in November.

13  A.    Correct, sir.  The point of that is more that it is

14  unconstitutional for a person to have to decide that they want

15  to run for an office more than, well, I guess, approximately one

16  year before the actual election date.

17  Q.    I understand what your attorney's legal argument is.  I'm

18  asking you if you filed on time, and you said you did.  Is it

19  your understanding that Mr. Fults as well filed his candidate

20  filing papers on time in 2019?

21  A.    That is my understanding, sir.

22  Q.    Have you ever run for any office before this election

23  cycle?

24  A.    No, sir.

25  Q.    Have you ever participated in a candidate campaign before

1    this election cycle?

2    A.    No, sir.

3    Q.    What do you do for a living?

4    A.    I'm an information service intern at J.B. Hunt corporate

5    headquarters during the week.  And on the weekends, I deliver

6    pizzas for Domino's for about the last five years while I am a

7    full-time student.  So I'm pretty busy most of the time.

8    Q.    Do you go to the University of Arkansas in Fayetteville?

9    A.    I will be starting the University of Arkansas Fayetteville

10   in this fall semester, sir.

11   Q.    And what's your planned course of study?

12   A.    I had gotten my associates of applied science magna cum

13   laude.  And I will be changing computer science most likely to

14   information services.  And then, after I finish my information

15   services, hopefully with a minor in history, I'll be pursuing my

16   law degree.

17   Q.    So you said one of the things that you do on the weekends,

18   you deliver pizza.  Is that correct, sir?

19   A.    Yes, sir.  It's nice to be a working-class American.

20   Q.    Certainly.  I am not in any way disparaging you.  I agree

21   with you, sir.  I clean a credit union on the weekends, if

22   that's worth anything to you.  I've done that since 1994.  I

23   agree with you.  It's good to be a working-class American.  My

24   question, though, is this.  In delivering pizzas, have you still

25   been doing that through March and April and May?

1   A.    No, sir.  I actually took leave from Domino's January 1st

2   to begin the signature collection process.  Before this year, an

3   independent had 90 days to collect their petitions, and they

4   could start January 1st and end on April 1st.  But the

5   legislators changed the law, which started January 1st this

6   year, preventing an independent from collecting signatures prior

7   to February 1st.  So before, I would have had from January 1st

8   until April 1st, that full 90-day window, to collect signatures.

9   And then I would have had an additional 30 days to collect the

10  signature petition sheets, to verify the signatures and get them

11  turned in on May 1st.

12          MR. MOSLEY:  Your Honor, I move to strike this.  This

13  is not responsive to my question.

14          THE COURT:  I think he's answering your question, so

15  I'm not going to strike it.

16      You may proceed, Mr. Whitfield.

17          THE WITNESS:  So by changing the deadline or the

18  beginning start date from January 1st to February 1st, I had

19  from February 1st until April 29th, I believe, to actually get

20  signatures, collect sheets, verify them, to be at the Capitol by

21  12 o'clock noon on May 1st.  And when I got home that evening,

22  because I had to drive, I actually had more signatures in my

23  P.O. box waiting.

24  BY MR. MOSLEY:

25  Q.    Right.  And you remember my question was are you still

1    delivering pizzas in March and April and May?  You remember

2    that.  Correct?

3    A.    I believe I answered your question, sir.

4    Q.    I'm not asking if you answered it.  You remember that was

5    my question.  Correct?  Are you still delivering pizzas in

6    February, March -- February, April and May.  That was my

7    question.  Do you recall that?

8    A.    I do recall your question.  I believe I answered I took

9    leave January 1st.

10   Q.    So in that regard, though, do you still stay in contact

11   with any of your fellow employees at Domino's?

12   A.    I stay in contact with my manager, sir.

13   Q.    Okay.  And you understand that Domino's, for instance, has

14   a protocol for delivering pizzas during COVID-19.  Correct?

15   A.    I would assume they do have a protocol, sir.

16   Q.    Have you ordered food for delivery to your home since

17   March 26th of this year?

18   A.    No, sir.  My wife is high risk, and I have a young

19   daughter.

20   Q.    Have you ordered prescriptions to your home from a pharmacy

21   for delivery since March 26th of this year?

22   A.    No, sir.  I have not.

23   Q.    Okay.  You understand people are doing this, though, during

24   COVID-19.  Right?  They are ordering prescriptions for delivery.

25   You understand people are ordering food for delivery from

1  Domino's; correct, during COVID-19 and the March 26th order of
2  the governor.  People are still ordering food for delivery.
3  Correct?
4  A.   I do not know for a fact.  But I would assume, yes, sir.
5  Q.   Okay.  Let me ask you about your signatures that you
6  obtained.  You obtained most of these signatures from your
7  district.  Is that correct?
8  A.   No, sir.  I have more than 400 volunteers throughout the
9  state helping us collect.
10 Q.   Well, we're going to get into that.  I understand this is a
11 statewide office that you are running for against Senator Tom
12 Cotton.  Correct?
13 A.   Yes, sir.
14 Q.   All right.  But how many -- are you keeping records on
15 where -- I mean, your petitions will say.  Where are you getting
16 your signatures from?  Did you get most of your signatures from
17 Benton County and Washington County and that area?
18 A.   I advise you contact the secretary of state's office for
19 that information.  They should have --
20 Q.   Do you not know?  Do you not know?  Do you know whether you
21 obtained most of your signatures from your district?  Do you
22 know?
23 A.   I would suggest contacting the secretary of state, sir.
24        MR. MOSLEY:  Your Honor, I would ask that he be
25 directed to answer my question.

```
 1            MR. LINGER:  Your Honor, at this point, I would like
 2    to -- this is James Linger.  I would like to impose an
 3    objection.  He has used -- I object to the form of the question.
 4    He says "your district."  He is running for the U.S. Senate.
 5    District could be a congressional district.  It could be a state
 6    Senate district or a state representative.  I would ask that he
 7    rephrase his question as to district.
 8            THE COURT:  Mr. Mosley, do you wish to rephrase your
 9    question?
10            MR. MOSLEY:  Yes, Your Honor.
11    BY MR. MOSLEY:
12    Q.    Mr. Whitfield, have you obtained most of your signatures
13    from northwest Arkansas?
14    A.    Have I personally or have my volunteers?
15    Q.    All of your signatures that you obtained through all
16    efforts, did most of them come from northwest Arkansas?
17    A.    I am not sure, but I do not think so, sir.  I have more
18    than 400 volunteers collecting throughout the entire state in
19    almost every single district.
20    Q.    Okay.  How many volunteers do you have in Pulaski County?
21    A.    I would have to look up that information, sir.
22    Q.    You don't know?
23    A.    No, sir.  I have more than --
24    Q.    You have more than 400 volunteers.  Well, you say you have
25    more than 400 volunteers.  But I've read your second
```

1   declaration.  According to your second declaration, don't you

2   have 627 volunteers?

3   A.   When I wrote the first declaration, I had counted more than

4   400.  And I have a list of all my volunteers if the judge would

5   like that list.  I mean, that's the answer I can give you right

6   now.  If you would like that list, Honorable Judge, I can get

7   you that list of all of my volunteers, including the private

8   ones who wanted their information hidden.

9   Q.   I'm not asking for anybody's names, Mr. Whitfield.  Could

10  you look at your second declaration?  Do you have that available

11  to you?

12  A.   Yes, sir.

13  Q.   Would you look at paragraph 4, please?

14  A.   "Therefore, she does not know that I had more than 600

15  private volunteers request petition sheets to be mailed to them

16  to be signed by their friends and family, that I had 27 publicly

17  identified volunteers in which Arkansas voters could contact in

18  order to sign a petition for my candidacy, and that I had

19  petitions placed in 12 businesses for people to sign which were

20  directly affected by COVID-19, and that I had 150-plus members

21  in my private volunteer Facebook group."

22  Q.   Okay.  Yes, that's what it says.  So my question was you

23  are saying that you have over 400 volunteers.  I thought you are

24  saying here you had 627 volunteers.  Am I incorrect?

25  A.   I apologize, sir.  I believe more than 400 -- 627 is more

1    than 400.  Am I correct, sir?

2    Q.    Yeah.  You are correct.  Is it more than 400, or is it 627?

3    A.    I believe 627 is more than 400, sir.

4    Q.    So I asked you a minute ago, how many volunteers do you

5    have in Pulaski County?  And you said you don't know.  Is that

6    correct?

7    A.    I can get that information to you, sir.  I have volunteers.

8    Q.    Okay.  What kind of signature drive have you done in

9    Pulaski County from February 1st to May 1st?

10        Did you hear me?

11   A.    Yes, sir.  I'm sorry.  I need a minute to collect my

12   thoughts.

13   Q.    Sure.

14   A.    Thank you.  Let's see.  I went to a firefighters' union

15   meeting before the worldwide COVID pandemic hit.  I went to an

16   Elizabeth Warren rally, where I received more than 519

17   signatures in just a few hours.  I went to the Little Rock

18   Marathon, sir.  Unfortunately, a lot of people participating in

19   the Little Rock Marathon weren't from Arkansas.  I have a

20   calendar book here that I can go through and look.  But those

21   are some of the bigger events that come to mind, sir, because it

22   has been a few months since then.

23   Q.    So you went to a firefighters' meeting in Pulaski County?

24   A.    Yes, sir.  I went to the union firefighters' meeting.

25   Q.    How many people were present at that meeting?  Do you know

1    just off the top, you know, approximate?

2    A.    I cannot give you an approximate, sir.

3    Q.    That was on -- do you remember the date that was on?

4    A.    I am looking that up, if you will give me one second, sir.

5    Q.    Sure.  Take your time.

6    A.    I believe that was on Thursday, March 12th, which was my

7    last event, when the governor issued his state of emergency, and

8    I had to cancel one, two, three, four, five, six, seven -- nine

9    events the next week.

10   Q.    Okay.  So March 12th you went to a firefighters' meeting in

11   Little Rock, a union firefighters' meeting.  The Elizabeth

12   Warren rally, you went to the one in North Little Rock on the

13   banks of the Arkansas River?

14   A.    I believe that was the only one, sir, yes, sir.

15   Q.    Okay.  So did you go to the one in northwest Arkansas on

16   February 29th?

17   A.    The Elizabeth Warren rally?

18   Q.    Yes, sir.  On February 29th, in northwest Arkansas, did you

19   go to that rally?

20   A.    Sir, I think you might be mistaken.  On February 29th, the

21   Elizabeth Warren rally was in Little Rock.  You may be referring

22   to the Mike Bloomberg meeting that was in Bentonville, Arkansas.

23   And I was there, and I collected signatures from nearly every

24   single person in line until the line was moving so fast people

25   couldn't pass my clipboards fast enough.  And after everyone was

1  inside, I went out and got signatures from every single

2  protester.

3  Q.   Okay.  So how many did you get do you think from the

4  Elizabeth Warren rally?

5  A.   I got, I believe, 100 -- oh, from the Elizabeth Warren

6  rally, sir?

7  Q.   Yes, sir.

8  A.   I got myself 519.  And I had at least five volunteers

9  collecting from that day as well that had gotten mailed in

10  later.  So I'm not sure the total amount for that one event.

11  Q.   Okay.  So do you recall that former Vice President Joe

12  Biden sent his wife to do a campaign rally in Arkansas?

13  A.   No, sir.

14  Q.   You didn't go to that?

15  A.   No, sir.

16  Q.   And did you go to Amy Klobuchar's rally in Arkansas?

17  A.   Amy Klobuchar canceled her rally in Arkansas.

18  Q.   Okay.  Did you go to all three of Mike Bloomberg's visits?

19  A.   I do not believe he did three visits here, sir.

20  Q.   Okay.  Well, you don't recall that he did three visits is

21  what you are saying.  If he did, you don't know that.  Right?

22  A.   I believe he did not.  I went to one you might consider a

23  Mike Bloomberg visit when he brought his tour bus, and the mayor

24  of Little Rock was actually there as well.  I got to meet all of

25  them.  That was really awesome.  They put one of my signature

1  clipboards in their office, which, unfortunately, was misplaced

2  after Bloomberg dropped out of the race.

3  Q.   You don't know how many signatures you lost on that

4  clipboard being misplaced?

5  A.   No, sir.

6  Q.   Okay.  Let me ask you this.  Did you do any signature

7  drives in Garland County, where Hot Springs is?

8  A.   I'm looking through my calendar book, sir, if you will give

9  me just one moment.

10  Q.   Sure.

11  A.   So I had events scheduled in Garland County on March 14th.

12  I'm sorry.  Let me correct that.  March 17th, 18th, 19th.  I had

13  three, four, five, six events scheduled that one day.  I did go

14  to the Garland County Farm Bureau meeting, where I was able to

15  meet a lot of people, where Mr. Ricky Harrington, the

16  Libertarian candidate, signed my petition to give me ballot

17  access.

18  Q.   What date was that?  Do you recall the date?

19  A.   That's what I'm looking for right now for you.

20       I may not have that date written down in my scheduling

21  book, as that was --

22  Q.   Sure.  One day, though.  Right?  You went to Garland County

23  one day out of May.  Correct?

24  A.   Let's see here.  I'm still looking, sir.  One second,

25  please.

1      So, yes, after the governor declared a national emergency
2    and I had to cancel my other Garland County meetings that
3    upcoming week, I did one day in Garland County, sir.  Then I
4    have since met with the Garland County Democrats as well
5    virtually.
6    Q.   And were you able to get any signatures from that meeting?
7    A.   They had signed my petition, I believe, and mailed it in,
8    yes, sir.
9    Q.   So how many?
10   A.   I cannot give you a direct answer to that question, sir.
11   Q.   All right.  Have you done any petition signature gathering
12   in Crittenden County, where West Memphis is?
13   A.   No, sir.  I was in the process of getting an event
14   scheduled, a meet and greet at a local gun range.  And due to
15   the governor's state of emergency, we had to cancel that event,
16   sir.
17   Q.   Okay.  Same question.  Have you done any signature drives
18   in Craighead County, where Jonesboro is?
19   A.   I have had -- so, yes, kind of.  What I did, sir, was on
20   December 29th, and then on January 4th, my birthday, I drove,
21   what, 3,000 miles, around the entire state, handing out
22   signature collection books to volunteers.  And I did go, yes,
23   sir, up to Jonesboro.  And I didn't just go to Jonesboro.  I
24   also went to Paragould, up to Piggott.  I also stopped by
25   Harrisburg, Bentonville, Melbourne and that whole area, sir.

1   Q.    So you dropped off petition sheets in those areas?

2   A.    And more, sir, yes, sir.

3   Q.    Yeah.  And that would have been December 29th and

4   January 4th.  Correct?

5   A.    At the time, we had not realized that the state legislators

6   had changed their laws, because when I first went to the

7   secretary of state's office, they gave me the old handbook --

8   Q.    Right.

9   A.    -- which didn't have the current laws in it.

10  Q.    So you were collecting signatures in December and January;

11  correct, because you didn't know that the law was you couldn't

12  start until February 1st.  Isn't that correct?

13  A.    No, sir.  That is incorrect.  We began collecting some

14  signatures on January 1st.  And by, I believe, January 4th or

15  5th, that is when we were -- the new law change was brought to

16  our attention, and we stopped all signature collection efforts.

17  Q.    Okay.  The signatures that you turned in to the secretary

18  of state's office, did they include those signatures that you

19  collected in early January?

20  A.    No, sir.  They did not.  So, unfortunately, some of the

21  people who signed in January may have thought they had already

22  signed and did not even get their signature on our petition

23  because they wouldn't have wanted to double sign.

24  Q.    Right.  So my question then is this.  You did that tour of

25  Arkansas in late December and early January.  Correct?

1    A.    I did that tour, yes, sir.

2    Q.    And you gave out petition sheets during that time.

3    A.    Yes, sir.

4    Q.    And did you do the same thing after February 1st?  Did you

5    do another tour of Arkansas, where you went to those same

6    locations, when you realized that you shouldn't have been

7    collecting signatures, and submit those petition sheets to folks

8    again?

9    A.    When we realized that the state legislators changed their

10   laws against the independents, I contacted my volunteers and

11   mailed sheets out.  I went to a few of them after one afternoon,

12   but I work.  I'm a regular working-class guy.  I couldn't take

13   that extra time off of work.  But I was able to mail signature

14   sheets out to people.

15   Q.    And which job was it you weren't able to take time off

16   from?

17   A.    From my job at J.B. Hunt, sir.

18   Q.    Okay.

19   A.    Unfortunately, it's one of the difficulties of being an

20   independent running and not being a millionaire.  I'm trying to

21   balance being a husband, a father, a student and an employee on

22   top of campaigning at the same time.  It's been difficult.

23   Q.    Mr. Whitfield, you state that your wife and daughter went

24   door to door to collect signatures when you were at work.  Is

25   that correct?

1   A.   Yes, sir.  They did go door to door in my neighborhood to

2   collect signatures before the national state of emergency.

3   Q.   When did they stop doing that?

4   A.   I could not give you a date, sir.

5   Q.   Do you know how many signatures you got from your

6   neighborhood?

7   A.   I live in Bella Vista, sir.  You are probably not familiar

8   with this area.

9   Q.   I've represented Bella Vista.  Yes, sir.  I've represented

10  Bella Vista a number of times.  I'm quite familiar with it.  My

11  question --

12  A.   There's no sidewalks over where we live, which made it

13  difficult for them, but they were able to go a few miles.  My

14  daughter being seven, you know, she couldn't make it very far.

15  But she just wanted to help her dad while I was at work.

16  Q.   Do your volunteers -- did your volunteers go door to door

17  for you?

18  A.   I believe they did, yes, sir.

19  Q.   When you say you believe they did, are you not sure?  You

20  suspect they did, but you are not positive?

21  A.   I have been told by volunteers that they had gone door to

22  door.  But I did not see them go door to door with my own eyes,

23  so I cannot guarantee you.

24  Q.   Got you.  I understand.  How many signatures did all of

25  your volunteers yield you?  Your 627 volunteers, how many

1    signatures did you get from that effort?

2    A.   I honestly could not break them down to you.  It would be a

3    majority of my signatures came from unpaid volunteers, sir.  And

4    after the worldwide pandemic, national and state emergencies, a

5    lot of them didn't feel safe anymore going door to door, going

6    to even talk to their friends.  And Arkansans' health is 100

7    percent more important than my campaign.  And I would not

8    jeopardize my volunteers' safety.

9    Q.   Well, let's break it down.  627 volunteers, mathematically,

10   you needed 10,000, or let's say 15,000 signatures for the

11   cushion that everybody is talking about.  Right?  You wanted at

12   least 15,000 signatures.  Is that correct?

13   A.   By a volunteer -- sir, I consider a volunteer someone who

14   reached out to me personally and asked for signature sheets for

15   their friends and family to sign.  That would be a volunteer,

16   sir.  That could be two signatures, sir.  That could be --

17   Q.   It could be one, couldn't it?  It could be one signature,

18   couldn't it?  A volunteer for you --

19   A.   A volunteer for me, sir, would be getting at least their

20   friends and immediate household family to sign.

21   Q.   Well, you just said a volunteer to you is at least two

22   signatures.  Correct?

23   A.   Yes, sir.

24   Q.   Okay.  So my question is then did any of your -- can you

25   state a number of volunteers that worked from February 1st until

1  March 26th, during the week, daily, consistently on collecting

2  signatures?  Did you have any number of volunteers that did

3  that, or are all of them just people who have at least collected

4  two signatures?

5  A.   I had volunteers who had collected many signatures up until

6  March 12th, when I asked my volunteers, for their safety and

7  their families' safety, to stop collecting signatures in public

8  if they did not feel like they could do so safely.

9  Q.   So let me just -- and I don't mean to jump back on this for

10  just a minute.  So you wouldn't necessarily -- a volunteer

11  wouldn't necessarily be somebody that goes door to door for you.

12  That's not a criterion to be a volunteer for you.  They don't

13  have to go door to door, even if it's before the pandemic.

14  Isn't that correct?

15  A.   A volunteer to me, sir, is someone who takes time out of

16  their day, unpaid, just out of their support to receive a paper

17  from me that have their friends sign it and to spend their money

18  to mail it back to my P.O. box.  That is what I consider a

19  volunteer, sir.

20  Q.   Did you go door to door collecting signatures at any time?

21  A.   I did not go door to door, sir.  I actually went to the

22  Department of Motor Vehicles, and I sat in front of there for

23  hours at a time, collecting signatures that way, where I had

24  Republicans, Democrats, Libertarians, independents, all sign my

25  petition, even people who were -- told me flat out they would

1  not vote for me, they support Tom Cotton, but they would sign my

2  petition because they believe that people should have ballot

3  access.

4  Q.    Understood.  Thank you.  Can we -- can we agree that

5  challenging the Republican incumbent here, Senator Cotton, that

6  a lot of your signatures are going to come from Democrats or

7  Democratic-leaning voters?

8  A.    I would say -- when collecting signatures, about 50 percent

9  of the people were stating their support for President Donald

10  Trump or for Senator Tom Cotton.  Within a minute or two of

11  speaking with them, then they would sign my petition.

12  Q.    They are indifferent.  A lot of people were just

13  indifferent.  It was just getting you on the ballot was fine

14  because let the voters decide.  Right, Mr. Whitfield?

15  A.    A lot of people were not indifferent, sir.  They were very

16  against helping anyone that would be an opponent to Tom Cotton.

17  But after speaking with them on a personal level, they would

18  sign my petition, sir.

19  Q.    Okay.  So two hours after the filing deadline in November,

20  the Democratic challenger dropped out of the race.  Correct?

21  A.    That would be correct, sir.

22  Q.    And so there's a void there.  There's nobody to run against

23  Senator Cotton except for you and a Libertarian candidate who

24  eventually signed your own petition.  Correct?

25  A.    I believe they tried to prevent the Libertarians from

1   getting ballot access last year as well.  And then they got the

2   Democrats to drop out after the filing deadline.  I believe they

3   issued a press release stating that that was their plans, to

4   hold on until after the filing deadline.  That was their

5   strategy.  Now, as an independent, they are ignoring our

6   requests for help trying to keep the independents off the ballot

7   as well.

8   Q.   They meaning the Democratic Party.

9   A.   No, sir.  They meaning the GOP, sir.

10  Q.   The GOP is keeping the Democrats from supporting your

11  campaign?

12  A.   No, sir.  That is not what I'm saying at all.  Can you

13  restate your question?

14  Q.   Yeah.  My point is you've claimed that people aren't quote/

15  unquote disillusioned with the established candidates until

16  closer to the general election.  But the only candidate that was

17  really in the race was Senator Cotton as against you.  So my

18  point is -- disregard that.

19       To go back to what I was saying, it was you, a Libertarian

20  candidate, and Senator Cotton in the race as of two hours after

21  the filing deadline in November.  Correct?

22  A.   That is correct, sir.

23  Q.   Okay.  And would you agree with me that one of the issues

24  that people -- whether you agree with Senator Cotton or not, he

25  is supportive of the President of the United States in large

1    measure.  Correct?

2    A.    Are you asking me if Tom Cotton supports President Trump,

3    sir?

4    Q.    In large measure, he does.  Isn't that correct?

5    A.    I believe he votes 99.1 percent of the time with President

6    Donald Trump, sir, yes, sir.

7    Q.    Okay.  So that is a fact.  In November of 2019, we knew

8    that then, didn't we?

9    A.    I'm sorry, sir.  I don't see where you are going with your

10   questions.  I don't think it's relevant to the constitutionality

11   of us obtaining ballot access due to the hardships that COVID-19

12   put on our signature collection efforts.

13   Q.    Okay.  Oh, thank you for clarifying that.  So you don't

14   think -- you don't think it's relevant at all as to when voters

15   become interested in the politics of a given race.  That doesn't

16   have anything to do in your opinion.  Correct?

17   A.    That is not what I said, sir.

18   Q.    Well, I'm asking you is that correct.  Do you think the

19   issues as it pertains to Senator Cotton versus you are

20   crystallized after you have filed in November of 2019?  I'm

21   trying to understand this whole disillusioned with the

22   candidates closer to the election deadline.  So my question

23   again is don't you think people have made up their mind as of

24   January, for instance, of 2020 whether they vote for you or

25   Senator Cotton?

1   A.   Well, sir, I disagree.  I talk with Tom Cotton supporters

2   almost every single day, sir.  And I've switched them from

3   Cotton supporters to my supporters.  You just have to show them

4   the corruption and the money trail.

5   Q.   Of the 12 businesses that you left petitions in, Mr.

6   Whitfield, where are those businesses located?

7   A.   I believe I have a list of them in my declaration, if you

8   would like to --

9   Q.   Yeah.  What paragraph would that be?

10  A.   I can get you that list of businesses.  I do have a list.

11  Q.   It's not in your declaration, is it?

12  A.   It may not be in my declaration.  But I do have the list of

13  businesses if you would like it, sir.  I can get it submitted to

14  you.

15  Q.   Well, let's talk about it for just a minute instead of me

16  asking you for that.  You know, I'll take anything you want to

17  submit to us.  But my question is where are those businesses,

18  generally speaking?  Where's most of those businesses located?

19  A.   I could not give you a direct answer without looking at

20  that list, sir.

21  Q.   Are you the one that contacted --

22  A.   Some are businesses who contacted me asking if they could

23  place petitions in their businesses to help support my

24  candidacy.

25  Q.   Well, it's a good idea, though, to leave a petition in a

1    business, don't you think?

2    A.    Yes, sir.

3    Q.    So after you started getting businesses contacting you

4    about obtaining your petitions, did you ever seek out businesses

5    throughout the state to leave petitions in?

6    A.    Give me just one minute, sir.

7          Other than businesses that had contacted me or supporters

8    who had suggested businesses owned by their friends, those are

9    the businesses that had my petition court sheets, sir.

10   Q.    So the answer is no.  You didn't reach out to businesses

11   throughout the state seeking that they put petitions in their

12   particular businesses.  Correct?  The answer is no.

13   A.    Actually, sir, I did put -- I'm sorry.  It has been a

14   while, a few months now.  I did -- in my hometown, here in Bella

15   Vista, I did walk around.  And I put out business cards and

16   petition note binders.  I have actually personally put out some

17   petition binders in businesses, I believe one in Rogers.  And

18   then I had one here in Bella Vista.  Then I have left others in

19   which they would be referred to the owners, and I have never

20   heard back from them.

21   Q.    Which business did you put your petition in in Bella Vista?

22   A.    I believe it was our CBD shop that we have here in town.

23   Q.    Okay.  Is that the cannabis like oils and things like that

24   shop?

25   A.    No, sir.  CBD does not come from cannabis, sir.  It comes

1   from hemp.  It has to have less than .3 percent THC to be

2   considered a hemp plant, from which they get CBD oils from.

3   Q.   I understand.  So that's where you put it.  Did you go to

4   the Grill & Chill there in Bella Vista and ask if you could put

5   a petition in there, you know, the DQ Grill & Chill there on the

6   road?

7   A.   The Dairy Queen, sir?

8   Q.   Correct.

9   A.   I walked through the line of businesses.  And some let me

10  put my business cards but not petition binders, unfortunately.

11  Q.   Did you ask Dairy Queen if you could put a petition there?

12  A.   No, sir.  I did not ask Dairy Queen if I could put a

13  petition on that location.

14  Q.   Where did you -- well, let me go back to the CBD shop.  Did

15  you ever ask if you could stand outside while people came in or

16  out of the CBD shop and seek signatures?

17  A.   No, sir.  When I was seeking signatures, I would go to the

18  Department of Motor Vehicles because it has a heavy foot

19  traffic.  And being a full-time student, husband, father and

20  employee, I found my time was max -- most efficient there.

21  Q.   I understand.  I'll get into that in just a minute.  But

22  what was the business in Rogers that you put a petition in?

23  A.   I believe it was Happy Daze, sir.

24  Q.   Is Happy Daze basically a head shop?

25  A.   Yes, sir, it is.  I support the federal decriminalization

1    of cannabis, including nationally expunging cannabis-related

2    crimes.  And they support that position and put a petition book

3    in there.

4    Q.    Okay.  So that's a great point, and that's what I wanted to

5    ask you about.  We now have -- do you know how many dispensaries

6    we have in the state?  I believe it's 27 dispensaries in this

7    state.  Are you familiar with the number of dispensaries we

8    have?

9    A.    Is that material, sir?

10   Q.    Are you familiar with the number of dispensaries we have in

11   the State of Arkansas?  Let me ask you a different question.

12   Did you go to any dispensary in the State of Arkansas and ask if

13   you could stay outside and request signatures at those

14   dispensaries, given that you are for the decriminalization of

15   marijuana?

16   A.    No, sir.  I did have cards inside the dispensary here in

17   Bella Vista.  I believe there are 13 operating dispensaries here

18   in Arkansas.

19   Q.    Did you ever send any volunteers to the dispensary to

20   collect signatures outside?

21   A.    Sir, dispensaries have different rules and regulations that

22   petitioners must follow.  I had spoken to one petitioner about

23   it, who -- I believe Gary Fults can better answer this question.

24   But there are different rules for making people -- from standing

25   in front of dispensaries collecting signatures, sir.

1    Q.    And what are those rules?

2    A.    I believe Gary Fults could probably answer that question

3    better than me.

4    Q.    Okay.  Well, let me ask you this.  If you don't know the

5    rules yourself, you wouldn't -- there's no reason you wouldn't

6    have approached a dispensary -- well, strike that question, Your

7    Honor.  Did you do any signature drives in Eureka Springs?

8    A.    Yes, sir.

9    Q.    And tell me about those.

10   A.    I was invited to the -- I was invited to the Methodist

11   church.  And I did not speak, of course, because it is a church.

12   I did, however, get to speak with the members.  They invited us

13   to a potluck.  I was able to get signatures from the church

14   members.  I did a meet and greet at a grill in Eureka Springs

15   and met with volunteers.  I went to a climate change protest in

16   front of the courthouse in Eureka Springs and met with some

17   activists there.

18   Q.    Was that all in one day?

19   A.    No, sir.  Eureka Springs is a little bit closer to where I

20   live, so I was able to go there a few different times.  Then I

21   also -- on February 1st, my kickoff meet and greet was at Brews

22   in Eureka Springs.

23   Q.    Right.  So that's sort of what I was getting at, Mr.

24   Whitfield, due to the proximity of your home.  Because of the

25   fact you have to work at J.B. Hunt, it has dictated your ability

1    to get out and about in the state and get signatures, hasn't it?

2    A.    No, sir.  That's why I was so lucky to have the support of

3    so many wonderful people helping me from all over the state,

4    sir.  Unfortunately, due to COVID-19, they were unable to

5    continue safely collecting signatures after around March 12th.

6    Q.    Okay.  How many times did a volunteer for you go door to

7    door in Union County, in El Dorado?

8    A.    I cannot give you a direct answer, sir.  But I do have

9    volunteers in El Dorado and also in Hamburg and also in

10   Texarkana, sir.

11   Q.    So my question is simply -- I mean, I think we already

12   established you didn't have volunteers go door to door that you

13   know of.  You've been told that, but you don't personally know

14   it.  Correct?

15   A.    Sir, I had volunteers tell me they went door to door.  I

16   did not direct any of my volunteers to any events or any

17   particular places after the governor -- the national emergency

18   was declared, sir.

19   Q.    Okay.  Did you ever ask any supermarkets even in your area

20   if you could stand outside and collect signatures?  Did you ever

21   seek permission to do that before or after March 26th?

22   A.    I had volunteers in front of some of those locations, sir.

23   But where I am located and work, the best foot traffic for me,

24   sir, was in front of the DMV.

25   Q.    Would you agree with me that you spent most of your time

1  campaigning in front of the DMV there close to where you work?

2  A.   No, sir.  I drove more than 10,000 miles around the state

3  campaigning, sir.  And I would say most of my time was traveling

4  the state.

5  Q.   Okay.  But other than December 29th to January 4th, when

6  did you drive around the state?  I know you came to Pulaski

7  County.  But did you go to any other locations after

8  January 4th?

9  A.   I have detailed records of everywhere I've gone, sir.  If

10 you would like, I can send those.

11 Q.   You would agree with me the governor didn't close

12 supermarkets.  Right?  He did not order supermarkets to be

13 closed specifically, did he, sir?

14 A.   No, he did not.

15 Q.   Okay.  And he didn't order dispensaries closed either

16 specifically, did he?

17 A.   Sir, I want to give you just yes-or-no answers.  But

18 truthfully and frankly, we are in a worldwide pandemic, where

19 people are dying every single day.  And people do not want to go

20 out and sign a petition.  If you walk past them and you are

21 sitting at a supermarket, most of them have masks on.  Some of

22 them have gloves on.  They don't want to touch your pen.  They

23 don't want to touch your piece of paper that multiple other

24 people have touched.

25 Q.   Mr. Whitfield, whether I agree with you or not, your

1   testimony is you didn't go to a supermarket from February 1st to

2   March 26th and try to get a signature, did you?

3   A.   Between my work and school, sir, my time was most

4   efficiently spent traveling and going to different county

5   meetings and also in front of the DMV, foot traffic.  But

6   whenever I would get off of work, sir, at say around 5 p.m., I

7   would pick my daughter up from school.  And we would drive to a

8   town meeting.  We would come home at eleven, twelve, one o'clock

9   in the morning almost every single day.

10  Q.   Okay.  What paperwork does a volunteer have to fill out for

11  you to be a volunteer for you?  Do they need to fill out

12  anything, you know, saying I agree not to break into somebody's

13  house, or I agree not to harm anybody, or I'll indemnify you if

14  I do, or do they just get a petition?

15  A.   No, sir.  My volunteers do not have to sign a nondisclosure

16  agreement or "I will not hurt people" agreement or "I will not

17  steal" --

18  Q.   Do they have to sign anything?

19  A.   -- signature sheets, or they print out their own signature

20  sheets.  And they collect signatures out of support and then

21  mail that sheet in, sir.

22  Q.   Do you offer your volunteers -- did you offer them any

23  training, either online or in person, as to how to collect

24  signatures?

25  A.   I have done a livestream video on how to collect signatures

1    with strategies, places to go, how they should be filled out

2    correctly and things like that, yes, sir.

3    Q.    Did you put that on social media?

4    A.    Yes, sir.

5    Q.    And what day did you do that?

6    A.    I would have to look for that particular video and let you

7    know, sir.  I have like 40 or 50 hours of videos now.

8    Q.    And did you put that on Facebook or Twitter do you think?

9    A.    I do all my videos on Facebook, and I save them and upload

10   them onto my website, ReplaceTomCotton.com.

11   Q.    But you also reference your videos on Twitter from time to

12   time, don't you?

13   A.    Sometimes I will share a video on Twitter, yes, sir.

14   Q.    And do you recall on February 20th on Twitter saying you

15   were having issues with people filling out petitions

16   incorrectly?

17   A.    I do not recall.  But I can look back and let you know.  I

18   would say we should go back and look at that video so no words

19   are taken out of context, sir.

20   Q.    Did you -- let me ask you a more general question.

21         Is somebody else talking?

22         Do you recall ever -- do you ever recall seeing somebody's

23   petition and saying, Wait, that's been filled out incorrectly,

24   and maybe saying something in general terms on Twitter about it?

25   A.    Are you saying have I received petitions that are not

Whitfield - Cross

1    filled out correctly and I have corrected -- have stated on

2    social media the correct way to fill them out?  Is that your

3    question, sir?

4    Q.    My question is do you recall ever doing that.

5    A.    Do I recall saying that this sheet was filled out

6    incorrectly and updating people on how to fill it out correctly?

7    Is that what I recall?  Yes, sir.

8    Q.    Okay.  So, for instance, on February 20th -- tell me if I

9    read this correctly.  "We need to be careful about filling them

10   out correctly.  I'm getting a lot of birth date columns for

11   current date and also a lot of current date columns as the zip

12   code."  Do you recall saying that on Twitter?

13   A.    Very possibly, sir.  And when I turned in my 6,514

14   signatures, lines like that were not included in my signature

15   count.  I left them out of my total that I turned in.

16   Q.    My question is did you offer any training on how to do them

17   correctly via social media, in person, after February 20th, when

18   that issue came up.

19   A.    And I can answer it for you, sir.

20   Q.    Sure.

21   A.    So due to COVID-19, a lot of my signatures have had to come

22   in through the mail.  That means I don't have a trained

23   volunteer collecting signatures.  That means I don't have anyone

24   watching someone sign the sheet, instructing them how to do it.

25   And that means, by having to do it through the mail the way we

1    did, we're at a huge disadvantage from being able to collect

2    signatures in front of a person because we can't instruct them

3    on how to do it.

4         So a lot of people were not filling them out properly and

5    were sending them in because they had no instruction.  They

6    didn't have someone to say, Oh, this says date signed, and this

7    says birth date.  I have signatures from people -- I believe

8    I've seen a birth date from 1919.  I have over a hundred years

9    old signing our petitions.  And sometimes older people like that

10   have a hard time reading small print and might have a hard time

11   filling it out correctly, and they did just the best that they

12   possibly could.  And I personally don't think that we should

13   penalize those signatures and take their voice away from the

14   electoral process by un-verifying something for simple mistakes

15   such as their name being under the signature line and their

16   printed name or the signature and signed name being reversed.

17   We shouldn't be taking people's voice away from that and taking

18   away part of our democracy.

19   Q.   Before March 26th, you knew that you had had people that

20   had incorrectly filled out the form, and there had been no

21   gathering limitations by the governor before March 26th.  Did

22   you offer to have a town hall meeting, where you could show

23   volunteers and maybe even people that wanted to sign your

24   petitions how to do it correctly?

25   A.   Sir, people -- we had our first case of COVID before

1    March 26th, I believe, sir.  And people were already worried

2    about the pandemic that was coming.  Here in Arkansas, we're

3    actually one of the worst-off cities.  And Fayetteville, I

4    believe, is the quickest growing, you know, pandemic hot spot.

5    Just because it wasn't until March 13th when our administrators

6    decided to finally do something about it and they decided it was

7    not a Democrat hoax, it doesn't mean that it wasn't happening,

8    that people were not scared, sir.  People were worried about

9    their families.  Especially here in Arkansas, we have a lot of

10   obesity.  We have a lot of older people.  We have a lot of

11   people who are high risk.

12   Q.    But you were still -- I mean, forget about March 26th.  You

13   were still going to the Garland County event, for instance, on

14   Thursday, March 12th.  Correct?

15   A.    That was -- the last event that I went to was not Garland

16   County, sir.  I believe it was the union firefighters' meeting

17   March 12th, which was the last event that I went to.

18   Q.    In Pulaski County.  So my question is between

19   February 20th, when you saw petitions coming in that were filled

20   out incorrectly, and March 12th, did you offer or do any live

21   in-person training to your volunteers?

22   A.    I believe so, sir.  Every single Saturday evening, I do a

23   weekly livestream Q and A update, where anyone can ask

24   questions.  I go over updates for the week and any possible -- I

25   know I've gone over signature issues in multiple videos.  If you

1   would like, I actually have all of those videos at

2   ReplaceTomCotton.com if you want to check out my website.  You

3   can review one of my videos, all of my different videos.  I have

4   some weekly trivia nights that are really fun to watch also.

5   But I do Q and As every single week.  I'm online answering

6   questions, sir.

7   Q.    And my question was about in person.  Did you go -- because

8   you were making the point about people that were a hundred years

9   old, that maybe they are not online.  But I was simply saying

10  did you offer to do anything in person?

11  A.    Yes.  Whenever I would be in person speaking at a meeting

12  or a meet and greet or any kind of gathering, I would always

13  instruct people, you know, Here's my signature sheets.  Make

14  sure it's filled out correctly.  Do not abbreviate cities

15  because they are going to throw out any signatures they possibly

16  can.

17  Q.    At any point during February 1st to May 1st, did you reach

18  out to any professional canvassers or circulating entities or a

19  business that could assist you in obtaining the signatures you

20  needed?

21  A.    My campaign is 100 percent grass roots, sir.  I don't take

22  money from political parties, political action committees,

23  corporations or billionaires or any kind of special interest.

24  All of our money is 100 percent funded by working-class

25  Americans.  You can go to ReplaceTomCotton.com, and you can

1    actually click on the expenses tab and see where every single

2    dollar in my campaign has been spent to make sure that we have

3    complete financial transparency.

4        I personally did not go to any canvassing company.  My wife

5    had surprised me.  She said, you know -- she had told me later,

6    after she did this, that her contribution to the campaign was

7    she was going to purchase 1,000 signatures for me.  And she was

8    going to pay $2,500 out of pocket -- oh, so much money -- to get

9    a thousand signatures for her contribution to my campaign.  She

10   paid half of that up front, 50 percent, which was $1,250, which

11   she donated in kind to our campaign, to Lee's consulting firm,

12   Lee Jarrod Evans.  He's one of the witnesses.  She paid him up

13   front for 500 signatures.  And he was able to collect 129

14   signatures a few days before the pandemic really broke out, and

15   his company had to stop.  And he's been sitting in the dark now

16   basically.  And, you know, that's due to COVID-19.  So he was

17   unable to get those signatures.  He was only able to receive

18   129.

19       Now, as a Republican, you have to pay a $20,000 filing fee

20   to get ballot access for your primary.  As a Democrat, you have

21   to pay a $12,000 filing fee for your primary access.  As an

22   independent, it's different.  You need 10,000 verified

23   signatures.  Now, I do understand Meghan Cox says, Well, you

24   could spend upwards in -- I believe it's one of the exhibits in

25   her testimony.  She said I could have spent upwards of $83,000

1    to pay someone like her to collect signatures for me.  So that

2    would mean as an independent they would expect us to pay $80,000

3    for ballot access when a Democrat only had to pay 12-.

4         My point being is we are a grass roots campaign.  We got 98

5    point, I believe, 1 or 01 percent of our signatures unpaid, just

6    from volunteers, people who want change, people who want to see

7    an actual representative representing them in Congress.  And --

8    Q.   I'm sorry, Mr. Whitfield.  Go ahead.

9    A.   Just having that kind of support is amazing.  I mean, it

10   has been since 2010 since any independent has been able to

11   receive 10,000 verified signatures, and they had to pay for

12   them.  These aren't people that are signing that, Oh, we want

13   you on the ballot.  Those are just people saying, Oh, okay,

14   sure.  I'll sign, and I'm going to get you a signature and

15   collect some money because that's my job.  Our signatures are

16   from volunteers, and I think that that says words.  The amount

17   of support I've gotten is just amazing.

18   Q.   Sir, on February 22nd, Mr. Whitfield, you said, quote:  I'm

19   thinking about taking out a personal loan for $5,000 to pay for

20   canvassing services."  Correct?

21   A.   Yes, sir.  We have thought about taking out a personal loan

22   and paying for canvassers.  And we decided, like I said, I'm

23   working class.  We really couldn't afford it at the time.  We

24   decided to go with volunteers.

25   Q.   But to the extent you could pay somebody to canvass for

1    you, you know, that was just a supporter instead of a canvassing

2    service, you would do that, wouldn't you?

3    A.    What would be more important to you, sir?  Having someone

4    get 5,000 signatures from supporters unpaid or having someone

5    pay for 5,000 signatures?  I believe the casinos to get their

6    initiative signed spent millions of dollars just to get their

7    ballot access for their casino law.  They didn't get that from

8    people who were wanting casinos.  They got them because they

9    paid a lot of money for it.  And I think it's a different

10   situation we're in right now.  Our support is grass roots.  It's

11   got the support of the people.  People want to see my name on

12   the ballot.  They want to see another option.  And I think that

13   denying them anything at this point otherwise is just --

14   honestly, it's unconstitutional, undemocratic.  And the way that

15   the whole process has been handled up until this point has been

16   very unethical in my opinion, sir.

17   Q.    Okay.  So on April 13th, you still had, what, 16 days, 17

18   days, 18 days to collect signatures?

19   A.    I would have to count on the calendar, sir.

20   Q.    Well, you had from April 13th to May 1st.  Correct?

21   A.    April 13th, so that would be seven, 14, 15, 16, 17.  I

22   actually had to leave my house by 5 a.m. on Friday, May 1st, so

23   I was unable to collect signatures.  I only had 89 days

24   technically to collect.

25   Q.    So 16 days.  You had 16 days from April 13th to May 1st.

1   Is that what you are saying?

2   A.    Seventeen, sir, yes.

3   Q.    Okay.  So you had 17 days left.  And instead of making a

4   plea online to your followers to get signatures, you decided to

5   seek money to file a lawsuit; correct, on Twitter?

6   A.    Sir, I have always asked my volunteers to help collect

7   signatures.  And between April 13th and April 30th, I'm sure --

8   I mean, I'm not sure what the cases of COVID-19 were in

9   Arkansas, but they were rising fast.  People were dying, sir.

10  Q.    So the answer is yes.  As of April 13th, you said the

11  problem is it will cost $5,000 to get a lawyer.  We don't have

12  $5,000.  And you raised that in about a day, didn't you?

13  A.    No, sir.  I was about $1,400 short of the 5,000 we had in

14  our campaign funds.  And I was able to raise the $1,400 in one

15  day, yes, sir.

16  Q.    Okay.  So you raised $1,400 in one day to file a lawsuit

17  instead of asking for signature efforts from April 13th to

18  May 1st.  Correct?

19  A.    That is incorrect, sir.  I never stopped asking for my

20  volunteers to collect signatures.  And that was after we had

21  already asked the secretary of state for relief, in which he

22  waited more than two weeks and never responded.  I had to reach

23  back out to them.  And that's when they told me they did not

24  have the authority to help with any kind of relief for an

25  independent.  They told me to contact my state legislators.

1      So then I had hundreds of Arkansans contact their state

2   legislators, write letters, do all of that.  Then, after hearing

3   nothing back, then actually I called every single independent in

4   Arkansas besides Christine, who her information is incorrect in

5   the secretary of state's office.  She was uncontactable.  And

6   then the one gentleman running for the House of Representatives,

7   he did not answer returned phone calls.

8      Every other independent I was able to speak with, listen to

9   their hardships for signature collection.  I drafted a letter.

10  And we all signed the letter and sent it to the office, in which

11  a few weeks after we had sent that letter, he never responded to

12  any of us personally or sent an email, any kind of

13  correspondence.  He said in an interview and in a news article

14  he had received our letter and gave it to his counsel.

15  Q.   I'm sorry, Mr. Whitfield.  Go ahead.

16  A.   Yes, sir.  That was as far as that letter went.  He said he

17  received it and sent it to his legal counsel.

18  Q.   The governor did not issue a stay-at-home order in this

19  state, did he?

20  A.   Sir?

21  Q.   He did not specifically issue an order that said stay home

22  unless absolutely necessary.  There was no emergency declaration

23  that required people to stay in their home, was there?

24  A.   We are one of four states in the United States that did not

25  issue that order.  And now we are spiking because of it, yes,

1    sir.

2    Q.    But --

3    A.    And we had only tested less than one half of the percent of

4    the population in Arkansas.  And people are dying.  Arkansans --

5    people's health and safety, sir, is more important than signing

6    a petition.  We do have to have a fair democracy in America.

7    That's part of why our founding fathers formed our union.

8    That's the heart of our being.  But I can't be asking people to

9    sacrifice their health and safety of their loved ones.

10   Q.    I'm sorry.  I just asked if the governor had issued a

11   stay-at-home order, and you said he had not.  Nothing the

12   governor said -- nothing the governor said prevented you or

13   anyone volunteering for you from going to someone's front porch,

14   putting a clipboard on it, stepping back, knocking and talking

15   to them from a distance.  Nothing the governor said specifically

16   prevented anybody from doing that, did it?

17   A.    Sir, I think that's an irrelevant question because I do not

18   believe our governor has handled this --

19   Q.    Okay.  I'm asking you a question.  If your lawyer wants to

20   object, he can do that.  My question is did you -- did the

21   governor prevent people from going to someone's door, knocking

22   on it, putting a clipboard down, stepping back and talking to

23   them?

24   A.    Sir, just because the governor did not tell someone that

25   they could or could not do something does not mean that people

1    are going to feel safe, sir.

2    Q.    So no is the answer.  Correct?

3    A.    I believe your question is irrelevant, sir.

4    Q.    Did you turn your ballot access petition -- and I believe

5    you've already answered this -- into the secretary of state's

6    office in person on May 1st?

7    A.    Yes, sir.  I had gloves on.  I had my mask on, sir.  And I

8    made sure I sanitized the box that the petitions were in.  I let

9    the staff know I had not sanitized the actual petitions so to

10   make sure they are careful upon their receival of them and, when

11   they go through and verify them, keep themselves safe.  That's

12   most important.  I livestreamed the entire event, sir.  I

13   believe it was only about 15 minutes for my livestream.  And you

14   can go to ReplaceTomCotton.com and review that livestream if you

15   would like.

16   Q.    Aren't you livestreaming this trial today?

17   A.    No, sir, I'm not.

18   Q.    Didn't you say you were gonna?

19   A.    I was going to.  But I did not know if the Honorable Judge

20   Baker would appreciate me livestreaming our case, our hearing,

21   while it was happening.  So I have decided not to livestream

22   this event in respect for her, sir.

23         THE COURT:  There's a local court rule that prohibits

24   recording.  So understand and appreciate the rules that are in

25   place.  And I'm going to say it now because it's the appropriate

Case 4:20-cv-00466-KGB  Document 25  Filed 06/04/20  Page 65 of 254
Whitfield - Cross                                                65

1    time on the record, and we'll also take a break.

2         Mr. Linger, I would advise you to talk to your client with

3    respect to what those rules are.  If you have questions about

4    the local rules, you can certainly ask the Court.  I'll inform

5    all parties and counsel about the inquiry so everybody can be on

6    the same page, but understand and appreciate that.  Although

7    we're doing this by telephone, it's still a court proceeding.

8    And we'll go back to what I said earlier, which is I expect

9    everybody to know and follow the rules on an equal footing.

10        It's about five till eleven right now, and we've been going

11   for about two hours.  So it's clear, we are sitting in the

12   courtroom conducting this proceeding.  There are folks who are

13   here in the courtroom with us in the gallery observing.  We're

14   going to take a ten-minute recess at this time to give our court

15   reporter a break and to give everyone a short break.  You are

16   welcome to just keep on the line but to mute your line.  We'll

17   come back in at five after eleven.  I'll take a roll call, and

18   then we'll proceed again.  But we're going to take a short

19   ten-minute break.  We'll be in recess until five after eleven.

20        (Recess from 10:56 a.m. until 11:13 a.m.)

21             THE COURT:  Gentlemen, we're back on the record in

22   court.

23        Counsel for plaintiffs, are you on the line, Mr. Linger?

24             MR. LINGER:  Yes, Your Honor.

25             THE COURT:  And is our witness on the line, Mr.

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

```
 1   Whitfield?
 2              THE WITNESS:  Yes, ma'am.  Thank you.
 3              THE COURT:  Mr. Hyman, are you on the line?
 4              MR. HYMAN:  Yes, Your Honor.
 5              THE COURT:  Mr. Fults, are you on the line?
 6              MR. FULTS:  Yes, ma'am.
 7              THE COURT:  Mr. Winger, are you on the line, Richard
 8   Winger?
 9              MR. WINGER:  Yes.  I'm here.  Thank you.
10              THE COURT:  Mr. Bronni, are you on the line?  Mr.
11   Bronni?
12              MR. BRONNI:  Yes, Your Honor.  Can you hear me?
13              THE COURT:  Yes.  Thank you.
14         Mr. Jacobs.
15              MR. JACOBS:  Yes, Your Honor.  I'm on the line.
16              THE COURT:  Mr. Wagner.
17              MR. WAGNER:  Yes, Your Honor.  I'm here.
18              THE COURT:  Mr. Mosley.
19              MR. MOSLEY:  Yes, Your Honor.
20              THE COURT:  Ms. Cox.
21              MS. COX:  Yes, Your Honor.
22              THE COURT:  All right.  Let's go ahead and proceed.
23         Mr. Mosley, you may proceed when you are ready.
24              MR. MOSLEY:  Thank you, Your Honor.
25              THE COURT:  Mr. Whitfield, you remain on cross and
```

 1  under oath.

 2          MR. MOSLEY:  Your Honor, may I ask a question?

 3          THE COURT:  Who is this asking?

 4          MR. MOSLEY:  I'm sorry.  This is Mike Mosley.  May I

 5  ask you a brief question about procedure?

 6          THE COURT:  You may.

 7          MR. MOSLEY:  When I am done, before I pass the

 8  witness, would it be permissible for me to confer with counsel

 9  briefly?

10          THE COURT:  Sure.  How do you propose doing that, Mr.

11  Mosley?

12          MR. MOSLEY:  We can do it online, where we're at.  And

13  if you could just give me a couple of minutes to confer with Mr.

14  Bronni, Mr. Wagner and Mr. Jacobs once I'm done, before I pass,

15  to make sure that I have everything, I would appreciate it.

16  This is different.  I'll put it that way, Judge.

17          THE COURT:  Understood.  So you do that.  If there's

18  some issue that you are unable to do it how you propose and we

19  need to reconfigure, let me know that.  But I'm happy to provide

20  you the time to confer with cocounsel before you pass the

21  witness.  All right.

22          MR. MOSLEY:  Thank you, Your Honor.

23          THE COURT:  You may proceed.

24  BY MR. MOSLEY:

25  Q.   Mr. Whitfield?

1    A.    Yes.

2    Q.    I think I know this question.  You agree with me any

3    registered voter in Arkansas could have signed one of your

4    petitions.  Right?

5    A.    Yes, sir.

6    Q.    And they weren't required to be notarized before being sent

7    to the secretary of state's office, were they?

8    A.    The notarization is only required for statewide

9    initiatives, not a petition.

10   Q.    Okay.  So, yes, in that regard -- okay.  Nevermind.  You

11   have over 6,600 followers on Twitter.  Is that right?

12   A.    I believe so, yes, sir.

13   Q.    I mean, you know, if every one of those followers got two

14   signatures, you would have it done, wouldn't you?

15   A.    Well, sir, I'm pretty sure the majority of my Twitter

16   followers are probably not from Arkansas, sir.  I believe Tom

17   Cotton, 89 percent of his followers are also not from Arkansas.

18   I don't think that's a relevant question, sir.

19   Q.    I'm curious.  Do you know how many of your followers are

20   from Arkansas on Twitter?

21   A.    There is no way to tell that, sir.

22   Q.    Online, you stated that you turned in 6,514 signatures on

23   May 1st to the secretary of state's office.  Is that correct?

24   A.    Yes, sir.

25   Q.    On April 30th, on Twitter, you stated that you had almost

1  6,047 signatures.  Just a day or two before, you had almost 500

2  signatures less.

3  A.    Did you take the time to watch my 15-minute livestream of

4  turning into the secretary of state's office?

5  Q.    No, sir.

6  A.    Would you like me to explain, sir?

7  Q.    Please, yes.

8  A.    Okay.  So all of the signatures that I've originally been

9  counting are on legal-sized paper.  If you look at -- this has

10  actually been a big issue throughout the entire signature

11  collection process.  I had called the secretary of state's

12  office more than three times.  And I've had volunteers call them

13  as well verifying that signatures do not have to be on

14  legal-sized paper but can also be on letter-sized paper.  Now,

15  where it creates an issue is I was told by Peyton Murphy that --

16  on multiple times now -- that I can turn in signatures on

17  letter-sized paper and they would be counted by the secretary of

18  state but, if it was brought before a judge, the judge might not

19  uphold them.

20        Now, this is because at the bottom of the signature

21  collection sheet it says "Pursuant to Act 340 of 2015, this

22  petition page format, on legal size paper, is prescribed by the

23  secretary of state."  So I wanted to make sure that we did not

24  overestimate our amount of signatures, turn it in, and I was

25  only counting signatures on legal-sized paper.

1    Now, I had more than 6,000 on legal-sized paper, which, by

2  the way, is a lot harder for someone to have access to print

3  legal-sized paper from their home, canvass a petition and go to

4  the post office and mail it in.  It definitely added a hardship

5  to the collection process.  So that was my original count.  I

6  had -- let's see here.  That's not the updated one.  There we

7  go.  I had 6,048 signatures on legal-sized paper.  Then I had

8  around 500, a little less than 500 on letter-sized paper.  When

9  I did my turn-in at the secretary of state's office, I did

10  clarify with Peyton, who was there.  I said -- I actually wrote

11  down everything I signed on here.  I put -- let's see here -- so

12  I have 129 signatures separate, let's say.  These signature

13  sheets were obtained by Evans Consulting.  I'm not sure if the

14  sheets need to be notarized or not.  There are 129 signatures

15  enclosed on these letter-sized sheets.  That is accounting for

16  129 of the letter-sized.

17    I have another group.  These sheets may have duplicates.

18  We mailed each of the signers legal-sized sheets with a prepaid

19  return envelope.  We're not sure how many were signed and

20  returned on legal-sized sheets.  These were from letter-sized

21  sheets that my wife actually sent the letter out to each one of

22  them with a letter-sized or a legal-sized signature sheet and a

23  return envelope.  I just do not know how many of those returned

24  a legal-sized signature.  And I wanted to make sure they were

25  aware of that.  So that is where the numbers came from.  6,048

1  signatures on legal-sized paper; and then, with the letter-sized

2  paper, because I did clarify with Peyton while I was turning in,

3  that brought our count to 6,514 signatures.

4  Q.   What are you looking at, if you don't mind me asking?

5  A.   I'm looking at the actual petition sheets.  At the very

6  bottom of the petition sheet, it states, Act 340 of 2015, where

7  it says it must be on legal-sized paper.  At a later point,

8  after I have my law degree, I do plan to pursue a course of

9  action to remove that statement "on legal-sized paper" to make

10 it less burdensome for independent candidates to gain ballot

11 access.

12 Q.   Are you looking at an empty or a petition that has not been

13 filled out, a petition sheet that's not been filled out, or one

14 that's been filled out?

15 A.   Sir, it is a petition for independent candidate for

16 federal/state/district office.

17 Q.   Does it have signatures on it?

18 A.   Does what have signatures on it?  All of the petitions have

19 signatures on them.  I did not turn in any blank sheets, sir.

20 Q.   So what you are looking at has signatures on it.  Correct?

21 A.   I'm looking at a blank sheet of paper right now.  I have a

22 lot of signature sheets left over, sir.

23 Q.   Okay.  That was my question.  Thank you.  Instead of

24 spending money on this lawsuit, you could have spent money on

25 paying a canvassing company like that's done a statewide

1    election before, couldn't you?

2    A.   I believe all canvassing companies are not working right

3    now due to the national and state emergencies of COVID-19, sir.

4    The company my wife had surprised me with stopped collection,

5    and they were not able to even collect the ones that we had paid

6    for.

7    Q.   Did you ever reach out yourself to any canvassing company

8    to get a quote, for instance?

9    A.   Sir, our campaign is a grass roots campaign paid for by the

10   people.  And using $5,000 from our hard-working Arkansan

11   donations to pay for this lawsuit because the secretary of state

12   refused to help us and then having taxpayer Arkansans have to

13   pay for the legal counsel is -- honestly, it makes me really

14   disappointed and sad in our system that we have to do this, sir.

15   Q.   You mentioned that.  My question, though, was did you reach

16   out to any canvassing companies yourself?

17   A.   I did not reach out to any canvassing companies myself,

18   sir.  I have been contacted by multiple of them just through

19   junk mail, and I have not responded to any of them.  I

20   apologize.  I did respond to one of them, and I think they

21   wanted $5 per signature.  And that was back in maybe January,

22   when they had reached out to me.  Sorry.  It was a while ago.  I

23   forgot about that.

24   Q.   Do you remember the name of that company?

25   A.   I do not, but I should be able to look it up in my records

1   somewhere.

2   Q.   How much money total have you received in donations for

3   this campaign?

4   A.   I would refer you to my filing.

5   Q.   That's not submitted to me.  That's not in evidence in this

6   case.  Do you know how much money you've received in donations

7   from your testimony?

8   A.   I am looking right now, sir.  "I'm not a robot."  I'm

9   checking pictures with motorcycles.  One minute, sir.  I know

10  from Donorbox, sir, I have received $13,017 in donations from my

11  Donorbox account.

12  Q.   Okay.  Thank you.  Other than the $5,000 you spent on the

13  retainer for this lawsuit, what did you spend the remainder on,

14  8,000 and some change that you just mentioned?

15  A.   One of the unique things about my campaign, sir, is we are

16  completely transparent.  I want to make sure everyone knows

17  where every single dollar is spent.  So if you go to

18  ReplaceTomCotton.com, and you can click the campaign tab, and

19  you click donations spent, and I have a spreadsheet here of

20  every single dollar that I've spent, all the way down to

21  spending $6 on a Facebook ad, spending $23.86 on Amazon for a

22  three-hole punch binder or a three-hole puncher for signature

23  collection.  I have it broken down to the dollar amount, sir.

24  If you would like to refer to that, it's ReplaceTomCotton.com

25  and then campaign donations spent.  You can see where we spent

1    every single dollar, sir.

2    Q.    Mr. Whitfield --

3    A.    You can go to my FEC filings, and it's in there as well.

4    Q.    Mr. Whitfield, do you know what you might need to do to get

5    somebody else's mailing list, like the Democratic Party's

6    mailing list?  Do you know what you might have to do to get a

7    hold of that?

8    A.    Unfortunately, as an independent candidate, those are some

9    of the hardships that we face.  We don't get access to a

10   Republican list of donors or, you know, contacts for volunteers.

11   I don't get access to a Democratic list of donors or volunteers.

12   I don't get any mailing lists.  I don't get any of that, sir.

13   Everything that I have to go off of is the list of registered

14   voters from the secretary of state, which, unfortunately, our

15   secretary of state has not updated in the last, I think, four

16   years, since they took office.  And it only has back in 2016.

17   So my list I'm going off of is going to be four years old since

18   it has not been updated by this administration.

19   Q.    So I know the answer to this question based on your

20   testimony.  You didn't reach out to the Democratic Party since

21   there was no Democrat running as of November and do whatever

22   legally you could do to get their mailing list.

23   A.    Well, sir, there's an application called VAN.  Are you

24   familiar with it?

25   Q.    No.

Whitfield - Cross

1    A.    So VAN is a canvassing tool that Democrats and Republicans

2    both use.  I have been solicited by VAN to either be able to get

3    those lists and, unfortunately, since I'm an independent, they

4    require me to reach out to either the Democratic or the

5    Republican leadership in the state and get permission to use

6    their software.  I reached out to the Democratic leadership in

7    the state, and they denied my request to access VAN through

8    their party, so I am unable to access tools like that as an

9    independent.

10   Q.    Okay.  Have you ever worked for the Arkansas Secretary of

11   State's Office?

12   A.    No, sir.

13   Q.    Do you know how many votes you would need to beat Senator

14   Cotton in the general election, roundabout?

15   A.    It's hard to say, sir, because the secretary of state has

16   not updated their voting history in the last couple of years,

17   unfortunately.

18   Q.    It's going to be more than 10,000 votes, isn't it?

19   A.    Yes, sir.

20   Q.    Okay.

21   A.    And may I add to your question, sir?

22   Q.    Yeah.

23   A.    It is a lot easier for someone to click a name on a ballot

24   on an electronic machine during voting day, sir, than it is for

25   someone to either go online, download a petition sheet, print it

1    on legal-sized paper, sign it and then mail it to a P.O. box

2    than it is -- it's just going to be a lot different.  It's

3    amazing how far people will go to or how far -- what's the word

4    I'm looking for?  I apologize.  I hate to say it.  But some

5    people just aren't -- they are kind of lazy.  So, of course,

6    some people would be more likely to click a button when they are

7    already somewhere than they would be to take all the extra steps

8    of printing, finding legal-sized paper, signing and mailing it

9    in, if that's where you are going with it, I can't even get

10   10,000 signatures, how do I expect to get 10,000 votes.

11   Q.   That's a good question.  Do you think you are a viable

12   candidate if you couldn't get 10,000 signatures?

13   A.   Absolutely, sir.  If I am on the ballot on November 3rd,

14   2020, I will unseat and replace Tom Cotton, sir.

15   Q.   Okay.  Let me ask you this, though.  You would agree with

16   me that if signatures have to be turned in, verified, ballots

17   have to be printed, the administrative things, there has to be

18   some deadline for that to occur.  Right?  We just differ as to

19   what the deadline ought to be.

20   A.   I believe they do the ballot printing in early or late

21   August, if I'm not mistaken.

22   Q.   Okay.  Would you agree with me that only people that are

23   serious about running for a particular office ought to be

24   allowed to run, or do you think there ought to be people that

25   just at the last minute can throw their name into the hat and

1    get their name printed on the ballot?  Do you have an opinion

2    about that?

3    A.    If you are stating that I am not a serious candidate, I

4    first announced my candidacy when I woke up to the corruption in

5    our government back in 2016.

6    Q.    Mr. Whitfield, I'm not stating that.

7    A.    Yes.

8    Q.    Mr. Whitfield, I'm not stating that.  I'm asking you, you

9    consider yourself a serious candidate.  Correct?

10   A.    Absolutely, sir.

11   Q.    And I'm not trying to debate that with you.  I'm saying,

12   you ought to be a serious candidate, right, to run for statewide

13   office against a sitting incumbent senator?

14   A.    Yes, sir.

15   Q.    Okay.

16   A.    What would you consider serious?

17   Q.    Somebody who is willing to put some work in to get on the

18   ballot, not just somebody who, at the last minute, says I think

19   this will be a hoot, let's get my name put on the ballot and

20   run.  Right?  Somebody who is willing to put in some work.

21   Right?

22   A.    Yeah.  I believe I was the first candidate to file for

23   United States Senate.  And I've driven more that 10,000 miles to

24   meet with my constituents around the state.  I'm not sure --

25   Q.    I'm talking general.  Mr. Whitfield, I'm sorry.  I'm just

1   talking generally.  I am not -- I am not failing you and saying

2   that I don't think you are a serious candidate.  I'm saying you

3   think you are a serious candidate.  I don't have any involvement

4   in this.  I'm curious.  Do you think everybody that runs ought

5   to be a serious candidate?  And you said yes.

6   A.   I do not see anywhere in the Constitution, sir, that says

7   that in order to run for office you must be a serious candidate.

8   Q.   Okay.  But having some signature requirement is a way to

9   make sure that anyone who says they want to run for office is

10  serious about doing so.  Correct?

11  A.   I'm looking in my Constitution right now, sir.  And I don't

12  see anywhere that says that there should be a signature

13  requirement for a candidate to gain ballot access.

14  Q.   Okay.

15  A.   I'm still looking through my Constitution.  One second,

16  sir.

17       I don't see a signature requirement to represent your

18  constituency, sir.

19  Q.   Okay.  Let me ask you this.  You've sued Secretary of State

20  Thurston.  Correct?

21  A.   I am in an ongoing lawsuit against the Honorable Secretary

22  of State John Thurston, yes, sir.

23  Q.   This lawsuit that we're talking about, that's who you sued

24  in this lawsuit.

25  A.   That is correct, sir.  He is the secretary of state and

1    responsible for elections in the State of Arkansas.

2    Q.    But he's not -- you are not suggesting he got a vote in the

3    legislation in 2019 that enacted the 90-day requirement, the

4    May 1st deadline, or the petition signature requirement.  You

5    are not suggesting he voted on that legislation, are you, Mr.

6    Whitfield?

7    A.    I think I would object to your question, sir, because --

8    Q.    Mr. Whitfield, you don't get to object.

9    A.    Would my lawyer like to object for me?

10   Q.    Were you present at any committee hearings at the 2019

11   General Assembly for Arkansas?

12   A.    I'm not sure, sir, how that has anything to do with my

13   lawsuit for ballot access due to relief from COVID-19.

14   Q.    You are challenging a law that was enacted at the 2019

15   Arkansas General Assembly, aren't you, or are you not

16   challenging it anymore?  You filed a lawsuit challenging the law

17   that our legislature enacted in 2019.  Isn't that correct?

18   A.    I am -- I'm not 100 percent sure how I need to answer your

19   question, sir.  Can you rephrase that?

20   Q.    I'm going to withdraw it and move on.

21         MR. MOSLEY:  Okay.  Your Honor, if I could have just a

22   moment to confer with my associates here.

23         THE COURT:  You may, Mr. Mosley.

24         MR. MOSLEY:  Thank you.

25         THE WITNESS:  Your Honor, may I ask a quick question?

1          THE COURT:  Mr. Whitfield, I'm going to encourage you

2     to speak to Mr. Linger if you have a question before you ask,

3     unless it's just a housekeeping question.  But if it's a

4     merits-based question, you might want to speak with your own

5     lawyer first.

6          THE WITNESS:  It would be a housekeeping question,

7     ma'am.

8          THE COURT:  You may proceed.

9          THE WITNESS:  Am I allowed to have a side dialogue

10    online with my counsel?

11         THE COURT:  If you want to do that, what I would

12    suggest is we take another recess for you to speak with your

13    lawyer.

14         THE WITNESS:  May I please?

15         MR. LINGER:  Your Honor, this is Mr. Linger.  If he

16    could call me on my office phone, since I'm on my cell phone.

17         THE COURT:  All right.  Why don't we wait until Mr.

18    Mosley passes the witness, Mr. Linger.

19         MR. MOSLEY:  Your Honor, I'm going to pass the

20    witness.

21         THE COURT:  All right.  So we're going to take a short

22    recess.  Mr. Whitfield has asked to confer with Mr. Linger for a

23    moment, so I'm going to permit him to do that in this process.

24    They would probably be sitting by each other at the table or

25    take a recess to do that, so I'm going to permit them to do

1    that.  We will take another -- how long do you think you need,

2    Mr. Whitfield and Mr. Linger?  Do you need five minutes or ten

3    minutes?

4                   MR. LINGER:  I would suggest five minutes, Your Honor.

5                   THE COURT:  All right.  We'll take a five-minute

6    recess.  It is 11:35.  We'll come back in at 11:40, be on the

7    call at 11:40.  We'll take a five-minute recess.  We're in

8    recess until 11:40.

9         (Recess from 11:36 a.m. until 11:42 a.m.)

10                  THE COURT:  We're back on the line.  Let me just

11   quickly go through the roll.

12        Mr. Linger, are you on the call?

13                  MR. LINGER:  Yes, Your Honor.

14                  THE COURT:  Mr. Hyman?

15                  MR. HYMAN:  Yes, Your Honor.

16                  THE COURT:  Mr. Whitfield?

17                  THE WITNESS:  Yes, Your Honor.

18                  THE COURT:  Mr. Fults?  Mr. Fults, are you on the

19   line?  Mr. Fults, if you are on the line, you can chime in.

20        Mr. Richard Winger, are you on the line?

21        Mr. Bronni, are you on the line?

22                  MR. BRONNI:  Yes, Your Honor.

23                  THE COURT:  Mr. Wagner, are you on the line?

24                  MR. WAGNER:  Yes, Your Honor.

25                  THE COURT:  Mr. Mosley, are you on the line?

1          MR. MOSLEY:  Yes, Your Honor.

2          THE COURT:  Mr. Jacobs, are you on the line?

3          MR. JACOBS:  Yes, Your Honor.

4          THE COURT:  Ms. Cox, are you on the line?

5          MS. COX:  Yes, Your Honor.

6          THE COURT:  Mr. Fults, have you joined our call?

7          MR. FULTS:  Yes, Your Honor.  I'm on here now.

8          THE COURT:  Richard Winger, are you on the line?

9          MR. WINGER:  Yes, I am.  Thank you.

10          THE COURT:  All right.  Mr. Mosley passed the witness.

11     Mr. Linger, do you have redirect of Mr. Whitfield?

12          MR. LINGER:  Yes, Your Honor.  Briefly.

13                    REDIRECT EXAMINATION

14 BY MR. LINGER:

15 Q.   Mr. Whitfield, you understand you are still under oath?

16 A.   Yes, sir.

17 Q.   First off, there'd been a question in regard at one time

18 that you had an attempt to livestream this case or your

19 testimony at least.  In that regard, did you inquire of your

20 counsel whether or not you could do that?

21 A.   Yes, sir.  Originally, I wasn't sure if I could livestream,

22 so I posted that I might do it.  And before the hearing today, I

23 did call Mr. Whitfield and ask.  And he said most likely not, to

24 look at the local rules and contact my other attorney, Mr.

25 Linger.  And when I contacted my other attorney, I got clarity.

1   And I did not livestream this event.

2   Q.   Is that because you were told that it would be a violation

3   of the rules of the Court?

4   A.   Yes, sir.

5   Q.   All right.  Now, secondly, I would like to ask you --

6   counsel had asked you about the 90-day petitioning time.  He was

7   talking about the number of days from February 1 up to May 1.

8   Would you agree that this is a leap year, that the month of

9   February has 29, March has 31 days, and April has 30 days?

10  A.   Yes, sir.

11  Q.   Do you agree that that comes out to 90 days from February 1

12  through the end of April 30th?

13  A.   Yes, sir.

14  Q.   So you did not collect any signatures on May 1st, did you,

15  because that would have been 91 days.

16  A.   I did not collect any signatures on May 1st, sir.

17  Q.   You said something about when you returned home on May 1st

18  that you did find some signatures that had been mailed in after

19  the turn-in time of no later than noon May 1st.  Is that

20  correct?

21  A.   Yes, sir.  I now have 108 signatures that were sent to my

22  mailbox dated before May 1st, but I got them after the deadline,

23  unfortunately.

24  Q.   All right.  Now, in that regard, you originally -- this is

25  a new law that was passed after the previous law was declared

1    unconstitutional and the district court's decision that in 2018

2    was allowed to stand by the Eighth Circuit in 2019.  If you had

3    had, say, 150 days, like in the months of December and January,

4    would you have been able to collect a considerably larger number

5    of signatures if you and your volunteers were able to?

6           MR. MOSLEY:  Objection, Your Honor.  He's testifying

7    to facts not in evidence.

8           MR. LINGER:  Well, Your Honor, they brought it up in

9    regard to about when he started doing December and January, and

10   so he understood about the new law and since then.  One time,

11   you were allowed 150 days.  I was just wondering how much more

12   he could have gotten if, before the pandemic hit so badly in

13   February, if he had had December and January.  I asked for his

14   view on that.

15          THE COURT:  I overrule the objection, and I'll permit

16   the question.

17   BY MR. LINGER:

18   Q.   Mr. Whitfield, if you had been able to initially petition

19   for an extra 60 days or so in December and January, what would

20   that effect have been?

21   A.   In my opinion, having run a campaign through the primary

22   process of collecting signatures, I think, of course, we

23   undoubtedly would have received more signatures if we had an

24   additional 60 days.  It would have been 60 days before the

25   COVID-19 outbreak really took place here in the United States of

1    America.

2        But, on the contrary, I think that as an independent, it is

3    a lot harder to collect signatures for ballot access than a

4    party such as the Libertarian Party, who actually had a window

5    to collect signatures.  But they were able to begin last year in

6    the summer months through some of the largest outdoor events,

7    like the 4th of July and things like that.  As an independent,

8    being required to collect signatures February, March, April,

9    which are, you know, winter and early spring, the coldest months

10   of the year, we do have a large disadvantage towards how easy it

11   is for another group, such as the Libertarian Party, to collect

12   their signatures since they get to choose their signature

13   collection period.

14   Q.   If it had not been in your opinion for the coronavirus

15   hitting, whenever it started having its effect after, say,

16   February 29th, do you think your petition drive would have been

17   successful?

18   A.   Yes, sir.  100 percent.

19   Q.   Counsel asked you about putting signatures at some of the

20   businesses.  And do you remember that question?

21   A.   Yes, sir.

22   Q.   Did you find, after this problem arose with the

23   coronavirus, that some businesses started to lay off employees

24   or furlough them or weren't fully open for business as they were

25   before the crisis struck?

1   A.   Yes, sir.

2   Q.   And did you find that that had some effect on that avenue

3   of collecting signatures?

4   A.   Yes, sir.  Petition binders inside a place of business to

5   collect signatures, when their patrons stop coming, of course,

6   it does hamper their ability to collect signatures.

7   Q.   Counsel asked you about maybe he seemed to think it was a

8   very potential gold mine that collecting signatures would be at

9   supermarkets.  When you approach people to collect signatures,

10  do you find that if they are holding groceries and bags, that

11  that's not the best time to talk to them about politics?

12  A.   Yes, sir.

13  Q.   Okay.  And what did you think would be -- I think you said

14  something about what you found was most productive before the

15  coronavirus really got bad.  Why is it that you thought that?  I

16  think the Department of Motor Vehicles was better than somewhere

17  like the supermarket or in front of certain government buildings

18  or whatever.  What's the difference in your opinion?

19  A.   A good reason is because most of the people that are going

20  to the Department of Motor Vehicles are registered voters,

21  number one.  Number two, the foot traffic is higher.  Number

22  three, the lines here in Arkansas are outrageous at the DMV, so

23  a lot of people could go inside and grab a ticket and then come

24  back out and sign.  It was just an effective way to do it.

25  Q.   Go ahead and finish.

1  A.    I was going to say I believe that's where paid canvassers

2  make the most money is sitting outside of those buildings.

3  Q.    In approaching petitioners, like at the supermarket or when

4  they are doing something else that's important to them, do you

5  find it's important to be polite, to not interrupt them when

6  they are doing something that they find important, to talk about

7  politics, doing you a favor?

8  A.    Absolutely.  As a candidate, wearing a badge that says Dan

9  Whitfield for independent or U.S. Senate, it's very important to

10 me that I am not bothersome, that I introduce myself, ask their

11 name and continue in a manner that is the least burdensome to

12 them in their daily activities.

13 Q.    Now, you were asked about canvassing companies.  And you

14 said that one thing where your wife had given money to -- I

15 believe it's Mr. Lee Evans, who is going to testify later today.

16 He had a company, and they were going to be paid to get 1,000

17 ballot signatures.  I believe you said they only got 129?

18 A.    Yes, sir.

19 Q.    Why did that happen exactly?  What was explained to you

20 about that?

21 A.    He had told me, I believe, if I am recalling correctly,

22 that after a certain date he had to stop all of his petitioning,

23 including for things like the taxing the slot machines and gas

24 stations and things like that.  They had to cancel all of their

25 petitions.

1   Q.   So of the 1,000 signatures you were hoping to get from him,

2   129 would only be 12.9 percent of what was expected.  Is that

3   correct?

4   A.   Yes, sir.  And, personally, I was not expecting to get any

5   from him.  My wife had surprised me with that.

6   Q.   All right.  Did he give any other indication, other than

7   the coronavirus, as the cause of why he could only get

8   12.9 percent of the signatures they were hoping to get for you?

9   A.   No, sir.  He was under complete confidence that he would,

10  after speaking with him, that he would have been able to get all

11  the signatures.  But due to the COVID-19, or the coronavirus, he

12  was unable to do so.

13  Q.   And, finally, you were asked a question about a canvassing

14  company that wanted $5 per signature.  Do you remember that

15  question?

16  A.   Yes, sir.

17  Q.   Now, for 10,000 ballot signatures, that would be at least

18  $50,000 if all the signatures collected were valid.  Did your

19  campaign have that sort of money to get professional paid-for

20  signatures?

21  A.   As a grass roots campaign, no, sir.

22           MR. LINGER:  Your Honor, I have no further questions.

23           MR. MOSLEY:  One question, Your Honor, if I may.  Mike

24  Mosley.

25           THE COURT:  All right.

```
 1                    RECROSS-EXAMINATION
 2   BY MR. MOSLEY:
 3   Q.   Mr. Whitfield, didn't you say that Mr. Evans was for $2,500
 4   going to obtain 500 signatures?
 5   A.   No, sir.  For $2,500, he would receive 1,000 signatures.
 6   And he was paid half up front, $1,250.  And that was -- my wife
 7   wrote that as an in kind donation to our campaign.  He was able
 8   to receive 129 signatures, leaving us out about $800 personally.
 9             MR. MOSLEY:  Nothing further, Your Honor.
10             THE COURT:  Anything further, Mr. Linger?
11             MR. LINGER:  No, Your Honor.  May this witness be
12   excused?
13             THE COURT:  Yes.
14             THE WITNESS:  Thank you, Mr. Mosley, ma'am and Mr.
15   Linger.
16             MR. LINGER:  Thank you, Mr. Whitfield.
17             THE COURT:  Mr. Linger, you may call your next witness
18   on behalf of plaintiffs.
19             MR. LINGER:  Yes, Your Honor.  We would next call Mr.
20   Gary Fults.  And, as previously stipulated to by the parties as
21   to the admission of evidence, his declaration, which is
22   Exhibit 2, and his supplemental declaration, which is
23   Exhibit 10, along with Exhibit 11, which was the entry of
24   Ballotpedia for Meghan Cox, are admitted into evidence.  And
25   they serve as his direct testimony.  So I believe it would be
```

1    the secretary of state's turn to do cross-examination of Mr.

2    Fults.

3              THE COURT:  All right.  Mr. Fults, are you on the

4    line?

5              MR. FULTS:  Yes, Your Honor.

6              THE COURT:  Please raise your right hand, Mr. Fults.

7    Ms. Washington will administer the oath.

8              **GARY FULTS, PLAINTIFFS' WITNESS, DULY SWORN**

9              THE COURT:  Counsel for defendant, you may proceed

10   with cross of Mr. Fults.

11             MR. JACOBS:  Your Honor, this is Dylan Jacobs.  I'll

12   be handling the cross-examination of Mr. Fults.

13                         CROSS-EXAMINATION

14   BY MR. JACOBS:

15   Q.   Mr. Fults, can you hear me?

16   A.   Very well.  I can hear you very well.

17   Q.   If at any point you can't hear me or you need me to speak

18   more slowly, please tell me.  Feel free to interrupt me if

19   necessary so I don't have to repeat myself any more than

20   necessary while we do this.  Okay?

21   A.   Okay.  Thank you.

22   Q.   Thank you, Mr. Fults.  So you are a candidate for the

23   Arkansas State House of Representatives, District 27.  Is that

24   correct?

25   A.   That's correct.

1  Q.    And your district includes geographically what area?  For
2  instance, in the city of Bryant and in the East End community,
3  is that right?
4  A.    That's correct.
5  Q.    You had to file your petition -- you had to file for your
6  candidacy in November of 2019.  Right?
7  A.    That's correct.
8  Q.    And I understand from the lawsuit that you are a part of,
9  from your declaration, you have a complaint that that date is
10 too early relative to the November 2020 election.  So just to be
11 clear, you filed your petition on time.  Correct?
12 A.    Yes.
13 Q.    And it wasn't a problem for you to file it on that
14 particular day, specifically speaking.  Right?
15 A.    It was no problem.
16 Q.    Okay.  Do you know roundabout what the population of your
17 state House district is?  And by district, I mean the district
18 in which you are running for office.
19 A.    The registered voters or the population?
20 Q.    If you know either of those.
21 A.    I think registered voters was like 22,000, something like
22 that.
23       THE COURT:  Mr. Fults, this is Judge Baker.  And I had
24 a hard time hearing that number, Mr. Fults, if you would repeat
25 it.

1          THE WITNESS:  I think it's around 22,000 registered
2    voters in my district.
3          THE COURT:  Thank you.
4       Mr. Jacobs, you may proceed.
5          MR. JACOBS:  Thank you, Your Honor.
6    BY MR. JACOBS:
7    Q.   And thank you, Mr. Fults.  Do you know or have a ballpark
8    estimate of about how many votes you think that you would need
9    to win elections for your state House district?  And a
10   roundabout estimate is fine.  You don't have to give me an exact
11   figure, obviously.
12   A.   I don't really know because the candidate that holds the
13   position now has never had to have an opponent, so I don't know
14   what would be required.
15   Q.   Okay.  That's fine, Mr. Fults.  So you agree that in order
16   to be placed on the ballot for this race, under Arkansas law you
17   had to obtain 286 valid signatures and submit them to the
18   secretary of state.  Correct?
19   A.   Correct.
20   Q.   And you turned in 128 signatures on May 1st.  Is that
21   correct?
22   A.   That's correct.
23   Q.   When you filed for office in November, what was your goal?
24   A.   I don't understand what you mean by that.
25   Q.   Let me rephrase.  When you filed for office in November,

1  was it your intention to win elections and become a member of

2  the House of Representatives?

3  A.   Yes.

4  Q.   Okay.  For the signature collection window -- and by that,

5  I mean the space between which you could collect signatures that

6  started on February 1st, and then you had to turn in your

7  petition and your signatures by May 1st.  Is that right?

8  A.   That's right.

9  Q.   And when would you say you began your efforts either

10 yourself or people working on behalf of you?  When would you say

11 that you started collecting signatures to get placed on the

12 ballot?

13 A.   Well, I would say the majority of the signatures I gathered

14 were in the last -- I would say the last couple of weeks.

15 Q.   So let me make my question clear.  My question is when was

16 the first time in which you started to collect signatures,

17 meaning one day you weren't doing anything to collect signatures

18 and the next day you did something?  What date would you say

19 that that was?

20 A.   Probably I would say about the 1st of April.

21 Q.   Okay.  So to be clear, then you say you didn't really start

22 collecting any signatures in February of this year.

23 A.   I was sick the whole month --

24         THE COURT:  Mr. Fults, if you would repeat the last

25 part.  I heard -- this is Judge Baker.  I heard that you were

1    sick, and then your voice trailed off.

2            THE WITNESS:  Oh, I'm sorry.  I was sick.  I had an

3    upper respiratory infection almost the whole month of February.

4            THE COURT:  Thank you.

5    BY MR. JACOBS:

6    Q.   So you yourself, during the month of February, because you

7    were ill, you did not go out and collect signatures in February.

8    Correct?

9    A.   Correct.

10   Q.   Prior to becoming ill in February, had it been your plan to

11   go out and begin collecting signatures in February?

12   A.   Yes.

13   Q.   And if I understood you correctly, you didn't begin

14   collecting signatures in March either.  Right?

15   A.   No.  I didn't collect any in March.

16   Q.   So you started the majority -- you said the majority of

17   your efforts were in the last couple of weeks of April.  Would

18   you say that that's when you started, sometime in the middle of

19   April then?

20   A.   I would say I actually began gathering signatures in the

21   first week of April.  And the bulk of the signatures I was able,

22   and the volunteers that helped me were able to get, most of them

23   were in the last two weeks of April.

24   Q.   Okay.  Thank you, Mr. Fults.  And in this case, you've

25   submitted two declarations.  One is dated the 28th of April, and

Fults - Cross

1   one of them is dated the 17th of May.  Do you remember

2   submitting those declarations?

3   A.    Yes.

4   Q.    And it's okay if you don't.  But do you happen to have a

5   copy of those declarations in front of you?

6   A.    I do.

7   Q.    Okay.  So I'm looking at that, the supplemental

8   declaration.  That's the second declaration, the May 17th

9   declaration, and I'm looking at the second page of that.  And

10  it's numbered paragraph 4.  So you state that you had a

11  petitioning company which has been successful in Arkansas

12  previously in petitioning for state amendments since 2011.  Do

13  you see that?

14  A.    Yes.

15  Q.    And so you say, further down, you've successfully gotten

16  two different amendments and initiatives placed on the ballot in

17  Arkansas in 2016 and 2012.  When you say that you have

18  successfully gotten those on the ballot, do you mean that your

19  petitioning company has done that?

20  A.    Yeah.  Well, we didn't have a petitioning company at that

21  time, but we had volunteers that gathered signatures for us.

22  And we did have some paid canvassers that worked for us in 2012.

23  Q.    Okay.  So up above, when it says that you have had a

24  petitioning company since 2011, are you saying that it was

25  actually 2012 that you had that petitioning company, or was it

1   later than that?

2   A.    Well, actually 2011.  2012 is when it was on the ballot.

3   I'm sorry.  We began actually gathering signatures in 2011.

4   Q.    Okay.  And what were the initiatives or amendments that you

5   were successful in getting on the ballot in 2012 and 2016?

6   A.    In 2012, it was the Arkansas Medical Marijuana Act, and we

7   got on the ballot in 2012.  Then 2016 -- we weren't successful

8   in the election.  In 2016, we did the medical marijuana again.

9   We got on the ballot.  And because of some legal stuff with the

10  signatures, we were thrown out by the Supreme Court.

11  Q.    Okay.  Then, on the last sentence that begins, where it

12  says on March 12th -- excuse me -- "March 2nd, 2020, we had

13  begun to have paid canvassers" -- and when you say you began to

14  have paid canvassers, are you talking about your petitioning

15  company?

16  A.    No.  In this, we were working with at the time -- well, we

17  did then.  Let me think.  We didn't have my petitioning company

18  at that time.  We were working as a group to get it done.

19  Q.    So these paid canvassers, were they petitioning or --

20  excuse me -- were they collecting signatures for a ballot

21  initiative, or were they collecting signatures for your

22  candidacy for the state House?

23  A.    No.  They were doing it for a ballot initiative.

24  Q.    And what's the ballot initiative that they were collecting

25  signatures for?

Fults - Cross

1   A.   What time period are we talking about now?

2   Q.   In March 2nd of 2020, the paid canvassers.

3   A.   Okay.  All right.  I'm with you now on the time period.

4   March 2020, we were doing the recreational use of marijuana

5   amendment.  And that is my petitioning company doing that.

6   Q.   Okay.  And am I reading correctly that as of March 2nd your

7   petitioning company and those who you were working with, I

8   guess, had five paid canvassers out for the recreational

9   marijuana amendment?

10  A.   That is correct.

11  Q.   Then, later, the next sentence, it says:  "As to my

12  candidacy, I had three petitioners helping me."  When you say

13  you had three petitioners, were those paid petitioners, or were

14  those volunteers?

15  A.   Volunteers.  And the people who are actually gathering the

16  signatures are canvassers, not petitioners, if I'm correct.

17          THE COURT:  Mr. Fults, would you repeat that?  I'm not

18  sure that I caught the first part of that.

19          THE WITNESS:  My understanding is that the person

20  that's gathering the signatures is not a petitioner.  The person

21  signing it is the petitioner.  The person gathering the

22  signature is a canvasser.

23          THE COURT:  All right.  I understand.

24  BY MR. JACOBS:

25  Q.   So, Mr. Fults, when you say that you had three petitioners

1    helping you, are you saying that you had three people who had

2    simply signed your petition, or were those people out gathering

3    other petition signatures for you?

4    A.    Those were people out gathering signatures for me.

5    Q.    But you say that those people aren't canvassers?

6    A.    They are canvassers.  They are canvassers, but they also

7    were -- they also signed the petition too.

8    Q.    Okay.  So you are saying that they both signed the petition

9    and were gathering petitions for you on a volunteer basis.

10   A.    Correct.

11   Q.    And those three petitioners, were those people that were

12   friends or family, or were they people that you knew through

13   your petitioning company, or how did you find those three

14   petitioners to help you with your signature gathering?

15   A.    They were friends.

16   Q.    So in your declaration, you say that it was particularly

17   difficult to collect signatures in the months of March and April

18   because of the coronavirus.  Correct?

19   A.    Correct.

20   Q.    But also you say that almost all of your signatures came in

21   the month of April.  Correct?

22   A.    Towards the end of April, the last two weeks of April.

23   Q.    So almost all of your signatures came during the last two

24   weeks of April.

25   A.    Correct.

Fults - Cross

1  Q.    And your deadline to turn in those signatures was May 1st.
2  Correct?
3  A.    Correct.
4  Q.    So the majority, the overwhelming majority perhaps of your
5  signatures, were collected, say, a couple of weeks prior to the
6  deadline to turn in those signatures.  Right?
7  A.    Correct.
8  Q.    And so do you remember Mr. Whitfield's testimony earlier
9  where he stated that he had called off his volunteers largely
10 from going out and collecting signatures after sometime in the
11 month of March?  Is that correct?
12 A.    That's correct.
13 Q.    But most of your signatures that you collected happened
14 after that point.  Right?
15 A.    At the end of April.
16 Q.    Is your answer yes?
17 A.    Ask the question again.
18 Q.    Most of the signatures that you collected, if not almost
19 all of them, were collected after Mr. Whitfield, after the time
20 during -- in which Mr. Whitfield had called off his volunteers
21 for his campaign.  Correct?
22 A.    Correct.
23 Q.    Okay.  So from your declaration, the majority of the
24 signatures that you collected were -- excuse me.  Strike that.
25 In your declaration, you state that you spent $900 mailing out

1    petitions to 820 addresses.  Is that right?

2    A.   That's correct.

3    Q.   Where did you get the list, or how did you come up with the

4    list to determine where you would send those mailings out?

5    A.   The secretary of state's office, election commission.

6    Q.   And what criteria did you use to determine who you would

7    send a petition to versus who you would not send a petition to?

8    A.   I looked at -- the easiest way to pinpoint a group of

9    people with the money that I had, I could mail out to the

10   registered Democrats or people who had voted Democrat in the

11   primary.  And I used that as a basis to mail it out to, to

12   people who voted in the Democratic primary.

13   Q.   Okay.  And $900 was the amount that you budgeted for that

14   mailing effort?

15   A.   It's all the money I had.

16   Q.   That's all the money that you had for your entire campaign

17   effort?

18   A.   Yes.  That's correct.

19   Q.   So if you had had a greater amount of funds, would you have

20   sent more mailers out?

21   A.   Yes.

22   Q.   And for the mailers that you sent out, you got 62

23   signatures.  Is that right?

24   A.   That's correct.

25   Q.   So if you had had a greater amount of funds, sent out more

1    mailers, you would have gotten more than 62 signatures from

2    that.  Right?

3    A.    Yeah.  If I would have sent out a couple thousand of them,

4    it probably would have been better.

5    Q.    I'm sorry.  Could you repeat that last bit that you said?

6    A.    Yeah.  If I could have sent a couple thousand letters out,

7    the results probably would have been better.

8    Q.    So you agree that if you had more campaign funds, it's

9    possible that you could have gotten all 286 signatures that you

10   needed from mailers alone.

11   A.    Yes.

12   Q.    So that $900, was that from donations to your campaign, or

13   was that from money that you personally invested in your

14   campaign?  Where did that $900 come from?

15   A.    The bulk of it came from campaigns, donations.  The rest of

16   the money I donated in kind to it.

17   Q.    Did you -- excuse me.  What efforts did you make to raise

18   campaign donations?

19   A.    I reached out to union committees and other personal people

20   that I knew that give donations to me, I mean, the usual places

21   to go get donations.

22   Q.    Okay.  Is it true that your wife ran for House District 27

23   in 2016?

24   A.    Yes, it is.

25   Q.    And she ran --

Fults - Cross

1   A.    Actually, she ran in 2014.

2   Q.    In 2014?

3   A.    Yes.

4   Q.    And she ran as a partisan candidate.  Correct?

5   A.    That's correct.

6   Q.    So she ran as a Democrat against a Republican candidate?

7   A.    That's correct.

8   Q.    Do you remember how much money she raised for her campaign?

9   A.    I really don't know how much she raised for it.

10  Q.    If I told you that she raised over $16,000, does that sound

11  about right?

12        MR. LINGER:  Your Honor, I object to that.  I object.

13  He's putting words in his mouth because he said he didn't know,

14  and now he's just asking something.  I think the question is not

15  a proper form.

16        MR. JACOBS:  Your Honor, either he knows or he doesn't

17  know.

18        MR. LINGER:  He already said he doesn't know.  You

19  asked the question.  Asked and answered.

20        THE COURT:  I'll let you proceed with the question,

21  Mr. Jacobs.  But I am inclined to agree with Mr. Linger, that he

22  said he doesn't know.  You can ask him if that number sounds

23  familiar, but I think he's already testified that he doesn't

24  know.  So I'm not sure that we haven't moved past into the realm

25  of speculation, but I'll permit the question.

1   BY MR. JACOBS:

2   Q.   Mr. Fults, let me rephrase it this way.  Would you agree

3   that your wife raised several thousand dollars for her campaign

4   for House District 27?

5   A.   Yes, I would.

6   Q.   And are you familiar that -- when a candidate runs for an

7   office as a partisan candidate, are you familiar with if they

8   have to pay a filing fee for political parties in order to do

9   that?

10  A.   Yes, there is.

11  Q.   Do you remember how much it cost for your wife to file as a

12  Democrat in her election?

13  A.   In 2014, I think it was $3,500.

14  Q.   And in order to run as an independent, you didn't have to

15  pay anyone a filing fee.  Correct?

16  A.   That's correct.

17  Q.   When you filed for office in November, were you planning to

18  raise only $900 for your campaign?

19  A.   No.

20  Q.   So let's turn to -- so in order to collect signatures to

21  get on the ballot, did you go out and collect signatures

22  personally from anyone?

23  A.   Yes, I did.

24  Q.   And did you do that going door to door through

25  neighborhoods, or did you just do that with people that you ran

1   into anyway?

2   A.   I would contact people that I knew personally and make

3   arrangements to go to them and take petitions to them.

4   Q.   So you didn't go, say, door to door through the

5   neighborhood to people you didn't know and ask?

6   A.   No, I did not.

7   Q.   Did anyone collecting signatures on your behalf go out and

8   do that?

9   A.   They did not.

10  Q.   Did you ask anyone to go and collect signatures door to

11  door on your behalf?

12  A.   I did not.

13  Q.   Did you ever visit any businesses and ask to leave a stack

14  of petitions for signatures at a business for people to sign?

15  A.   No, I did not.

16  Q.   Did you ever personally go to any businesses and ask to

17  stand outside the parking lot and collect signatures from people

18  outside?

19  A.   No, I did not.

20  Q.   You are the president of Arkansans for Cannabis Reform.

21  Correct?

22  A.   Correct.

23  Q.   And you are familiar with the availability of medical

24  marijuana in Arkansas.

25  A.   Yes, I am.

Fults - Cross

1   Q.   Is there a medical marijuana dispensary within your House
2   district?
3   A.   Yes.  There is actually -- no.  There's one.
4   Q.   Did you ever -- did you ever go to that dispensary and ask
5   if you could stand outside and ask for signatures?
6   A.   I did not.  There is specific rules about how
7   dispensaries -- how people can be on the property of
8   dispensaries.  I didn't do that.
9   Q.   Would those rules, as you understand them, have prevented
10   you from, say, standing on sidewalks by the dispensary?
11   A.   Well, this particular dispensary does not have a sidewalk.
12   You can't be on their property for more than two hours at a
13   time.  That's just the rule for being on a dispensary's
14   property.
15   Q.   But did you ever ask if it would be okay for you to spend
16   some time less than two hours collecting signatures?
17   A.   No, I did not.
18   Q.   So would you agree -- excuse me.  Strike that.  Would you
19   say that one of your campaign issues that you are passionate
20   about is legalizing recreational marijuana?
21   A.   Yes.
22   Q.   And would you expect that people who share your views would
23   be enthusiastic about you being on the ballot for them to
24   potentially be able to vote for you?
25   A.   Yes.

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1  Q.   Do you think that people who frequent medical marijuana
2  establishments might be particularly enthusiastic about getting
3  you on the ballot?
4  A.   If they lived in my district, they probably would be.
5  Q.   But you never visited there and tried to get those people
6  to sign petitions for you.  Right?
7  A.   Correct.
8  Q.   So your declaration, you don't mention anything about any
9  efforts over the internet to collect signatures.  Right?
10 A.   Right.
11 Q.   So you have a Facebook page for your campaign.  Right?
12 A.   Yes, I do.
13 Q.   And that page is entitled Gary Fults for State
14 Representative, District 27?
15 A.   Yes.  That's correct.
16 Q.   And you created that page in November of 2019?
17 A.   Yes.
18 Q.   So does it sound about right that you have over 500 people
19 who have either liked or followed your campaign Facebook page?
20 A.   I don't know how many people are on there.  I would say
21 yes.
22 Q.   So did you ever post on that Facebook page asking for the
23 people who are following that page to contact you about signing
24 a petition?  Again, I'm only talking about the Facebook page,
25 not anything on your personal account.

Fults - Cross

1    A.    I don't think I have enough.

2    Q.    So you don't remember making any posts like that is what

3    you are saying.

4    A.    I don't remember making a post.

5    Q.    Okay.  Do you remember making posts on your personal

6    Facebook page -- excuse me -- your personal Facebook account

7    attempting to ask people to help collect signatures for you?

8    A.    I don't remember if I have or not.  I probably have.  I

9    know that I did go on -- what's that called -- the Saline --

10   several of the Democratic pages there in Saline County asking

11   people to sign petitions for me.

12   Q.    Okay.  So if I told you that on April 23rd you created a

13   post on your personal Facebook account addressed, quote, To all

14   my friends that live in State Representative District 27, end

15   quote, and you were asking people to sign a petition and to

16   contact you, does that refresh your memory at all?

17   A.    Yes.

18   Q.    And you had said in the post, quote:  I will do everything

19   in my power to meet you and safely get your signature, end

20   quote.  Do you remember saying something like that?

21   A.    Yes.

22   Q.    So you were willing, as of April 23rd, to go out and meet

23   people in order to collect signatures from them.  Correct?

24   A.    Yes.

25   Q.    And you believed that you could do that in a safe way.

1    A.   Well, we were going to practice safe practices to do it.

2             THE COURT:  Mr. Fults, can you repeat that?

3             THE WITNESS:  We were going to practice safe

4    distancing and social distancing to do that.

5    BY MR. JACOBS:

6    Q.   So you were willing to go out and collect signatures in

7    person, following social distancing rules, in order to collect

8    signatures.

9    A.   Correct.

10   Q.   So in the comments of this post -- and I understand that

11   you don't necessarily remember this.  But I'll hope to maybe

12   refresh your memory.  Do you remember if anyone asked you how

13   many signatures you needed?

14   A.   I do not.

15   Q.   So would it surprise you that on April 25th at 10:45 p.m.

16   you responded to someone saying you needed about 160 signatures?

17   A.   Okay.

18   Q.   You don't remember saying that?

19   A.   I don't remember that.

20   Q.   So looking at your first declaration that you signed, the

21   April 28th declaration, in paragraph 8 -- and that's on page 4

22   of the document -- as of -- it says:  "As of today" -- this is

23   the very last sentence of paragraph 8.  It says, quote:  As of

24   today, I have approximately 100 petition signatures in hand."

25   And that's as of April 28th, when you signed that declaration.

1    Right?

2    A.    Right.

3    Q.    And that was just three days before you had to turn in your

4    petition with signatures.  Correct?

5    A.    Correct.

6    Q.    So assume with me that you said on your Facebook page to

7    someone that you needed about 150 signatures on April 25th, that

8    would put you pretty close to 286, but not quite there.  Right?

9    A.    It's estimated numbers, but yes, correct.

10   Q.    But that wouldn't put you anywhere near 500 signatures.

11   Right?

12   A.    No, sir.

13   Q.    So is it fair to say that you were seeking to get around

14   286 signatures, not 500 signatures?

15   A.    If 286 is what I was required to have, that's what I was

16   trying to get.

17   Q.    Okay.  And you ended up collecting 128 signatures.  Right?

18   A.    Right.

19   Q.    And I'm going through your second declaration.  This is the

20   May 17th declaration.  Paragraph 7, you state that you turned in

21   128 signatures and that you believed at least 108 of those were

22   valid.  Is that right?

23   A.    That's correct.

24   Q.    Do you remember why you thought that 108 of your

25   signatures, at least 108 of them, were valid?

Fults - Cross

1   A.   I went through and validated them myself.

2   Q.   So you agree that if we divide 108 by 128, that would mean

3   that at least 84 percent of the signatures that you got were

4   valid?

5   A.   Yes.  That sounds right.

6   Q.   So in your first declaration -- again, this is the April

7   28th one -- I'm looking at paragraph -- this is the

8   second-to-last sentence.  You say, quote:  Because a petition

9   signature invalidity rate is expected, it will be necessary to

10  submit almost 500 petition signatures in order to have 286 valid

11  petition signatures for State House District 27."  Do you see

12  that?

13  A.   I see that.

14  Q.   But you had a much better validity rate than that.

15  Correct?

16  A.   I did.  The fact the mail-outs that I did, the 62

17  signatures I got, they were all registered voters that I sent

18  the letters to.

19  Q.   So you say that the mailing efforts that you did was very

20  good at getting signatures from people who were actually

21  registered voters?

22  A.   Yes.

23  Q.   And would you say that in your experience doing this, the

24  main reason that a signature wouldn't be valid would be that the

25  person is not actually a registered voter?

1   A.   Well, in this case, it could be that they didn't -- someone

2   signed that didn't know what district they were in.  Somebody

3   could not be a registered voter, you know.  The conventional

4   process [inaudible] --

5            THE COURT:  Mr. Fults, could you repeat that?

6       I'm sorry, Mr. Jacobs.

7       Mr. Fults, could you repeat that?

8            THE WITNESS:  The part about the gathering signatures

9   at the end?

10           THE COURT:  Yes, sir.

11           THE WITNESS:  Generally, the signature gathering,

12  gathering signatures like this at stores or wherever, you are

13  going to have a lot of people that aren't registered in your

14  district, or they are not going to be registered voters, period.

15           THE COURT:  Thank you.

16  BY MR. JACOBS:

17  Q.   So Mr. Fults, the mailing effort that you did by using the

18  secretary of state's list, you should be, say, more certain than

19  you otherwise would be that you are getting someone who is both

20  a registered voter and actually lives in your district.  Right?

21  A.   Correct.

22  Q.   And did you use or have any mailing lists from when your

23  wife ran for the House previously?

24  A.   No.

25  Q.   Did you have any contacts with her supporters, her campaign

1   donors or anything like that?

2   A.    No.

3   Q.    Going back to February of this year, I understand that you

4   and your wife were ill for much of that month.  Did you ask

5   anyone else during the month of February to go out and collect

6   signatures for you?

7   A.    I did give one volunteer petitions to go out and gather

8   signatures for me.

9   Q.    Did that volunteer get any signatures for you?

10  A.    I don't know.  I didn't look at his times -- the dates that

11  were on the signatures that he gathered.  So he may have got

12  some and then got more in April to try to tie things up.

13  Q.    And when you say you got a volunteer, is that volunteer the

14  only person that you asked in February to go out and get

15  signatures for you?

16  A.    I'm sorry.  You got blurted out there.

17  Q.    That volunteer that you were just talking about, is that

18  the only person who went and got -- excuse me.  Is that the only

19  person you asked to go out and collect signatures for you in

20  February?

21  A.    Yes.

22  Q.    Did you ever speak with any company or petition-gathering

23  company to see how much it would cost to go get signatures for

24  your campaign?

25  A.    No.

1   Q.    So you agree that there was nothing legally -- nothing the

2   State of Arkansas did that prevented you from gathering

3   signatures either yourself or through others in the month of

4   February.

5   A.    No.

6   Q.    No, you don't agree with that or, no, nothing the State of

7   Arkansas did prevented that?

8   A.    Nothing the state did prevented it.

9   Q.    Okay.  And would you also agree that nothing the state did

10  prevented you, either yourself or through others, going out and

11  collecting signatures in the month of March?

12  A.    I feel like the governor's proclamations about the social

13  distancing did hamper my ability to go collect signatures.

14  Q.    Well, you would agree that Arkansas did not issue a

15  stay-at-home order like many other states did.  Right?

16  A.    Right.

17  Q.    And you agree that it's possible to follow social

18  distancing rules and still collect signatures.  Right?

19  A.    You can go out and do that, yeah.

20  Q.    Well, and you say that even in April that you were willing

21  to go out and collect those signatures, follow social distancing

22  rules with anyone who is willing to sign a petition for you.

23  Right?

24  A.    Yes.  Things -- the coronavirus had kind of let up a little

25  bit, and the governor relaxed some rules, so yes.

1  Q.   But you agree that there's nothing legally that stopped you

2  from doing that, doing what you were doing, through the second

3  half of April, I mean legally stopped you from doing that in the

4  month of March either.

5  A.   Legally, no.  I agree.

6  Q.   And you agree that nothing legally would have prevented you

7  from, say, standing outside of a business or grocery store with

8  a table and asking people to collect signatures for you.

9  A.   Correct.

10 Q.   And you agree that you didn't actually try to do that,

11 stand outside any businesses or grocery stores or --

12 A.   I agree.

13 Q.   Okay.  So did you ever -- strike that.  So on the lists

14 that you obtained from the secretary of state's office, the

15 registered voters, did those include phone numbers?

16 A.   No.

17 Q.   No.  And did you ever attempt to contact, for example, the

18 Democratic Party of Arkansas and receive a mailing list or phone

19 list of voters in your district?

20 A.   No.

21 Q.   One moment.

22      So wouldn't you agree that your declaration lists two

23 things that you think stopped you from being successful in

24 gathering the signatures required:  One, you and your wife's

25 illness in February; and, two, the coronavirus happening?

1   A.   The response to collecting signatures is what you are

2   asking me?

3   Q.   Yes.  Would you agree that you say that those two things

4   are what stopped you from being able to collect the signatures

5   that you were required to collect?

6   A.   Yes.

7   Q.   And you are not suggesting that the State of Arkansas or

8   the secretary of state caused the coronavirus.  Right?

9   A.   Right.

10  Q.   And you are not saying that the secretary of state or the

11  State of Arkansas caused you and your wife's illness.  Right?

12  A.   Right.

13  Q.   Do you think if you hadn't fallen ill in February that you

14  probably would have been able to collect the signatures that

15  were required?

16  A.   If I had not been ill in February, I probably would have

17  collected those.

18  Q.   Okay.

19  A.   I tell you what.  I collected signatures in the month of

20  February.  But by March, when the virus kicked in, it would have

21  stopped.

22  Q.   I'm sorry, Mr. Fults.  Could you repeat that?

23  A.   I would have been able to collect signatures in the month

24  of February if I had not gotten sick.  But by the time the virus

25  set in in March -- I'm a heart patient.  And I've done

1    everything I can to stay away from anybody when I'm out, so I

2    would not have collected signatures in the month of March.

3    Q.    So you are saying that because of concerns over your own

4    health you did not go out and collect signatures in the month of

5    March.

6    A.    Correct.

7    Q.    But going back to make sure that I'm clear on this, if you

8    hadn't gotten sick in February, you think you would have been

9    able to go out and collect signatures and meet the 286 signature

10   requirement.  Right?  Is that what you are saying?

11   A.    No.  What I'm saying is, if I would have collected

12   signatures in the month of February, I don't know how many I

13   would have got, because in the wintertime, people don't want to

14   stop and sign; in the rain, like every other day, so you are not

15   going to canvass in the rain.  I don't know how many I would

16   have got in the month of February.

17   Q.    Well, so you agree that the majority of your signatures, if

18   not almost all of them, were collected in the second half of

19   April and that you didn't go out and canvass anywhere in person

20   for those signatures.  Right?

21   A.    Right.

22   Q.    And so would you agree that even if you had bad weather in

23   February that you could have done just what you did at the end

24   of April and collected signatures that way?

25   A.    Yes.

1          MR. JACOBS:  All right.  Your Honor, if we could have

2     maybe five minutes for me to confer with cocounsel.

3          THE COURT:  Certainly.

4          MR. JACOBS:  And I believe we'll be ready to pass the

5     witness.

6          THE COURT:  Certainly.  We'll take a five-minute

7     recess.  We'll come back on the line at ten till.  Actually,

8     we'll just say five till one, five till one we'll come back on

9     the line.  We'll be in recess until five till one.

10        (Recess from 12:48 p.m. until 12:58 p.m.)

11         THE COURT:  We're back on.  Let me just make sure

12    everyone has joined us.

13        Mr. Linger, are you on the line?

14         MR. LINGER:  Yes, Your Honor.

15         THE COURT:  Mr. Hyman, are you on the line?

16         MR. HYMAN:  Yes, Your Honor.

17         THE COURT:  Mr. Whitfield, are you on the line?

18         MR. WHITFIELD:  Yes, ma'am.

19         THE COURT:  Mr. Fults, are you on the line?

20         MR. FULTS:  Yes, Your Honor.

21         THE COURT:  Mr. Winger, are you on the line?

22         MR. WINGER:  Yes, Your Honor.

23         THE COURT:  Mr. Bronni, are you on the line?

24         MR. BRONNI:  Yes, Your Honor.

25         THE COURT:  Mr. Wagner, are you on the line?

1           MR. WAGNER:  Yes, Your Honor.

2           THE COURT:  Mr. Jacobs, are you on the line?

3           MR. JACOBS:  Yes, Your Honor.

4           THE COURT:  Mr. Mosley, are you on the line?

5           MR. MOSLEY:  Yes, Your Honor.

6           THE COURT:  Ms. Cox, are you on the line?

7           MS. COX:  Yes, Your Honor.

8           THE COURT:  All right.  Mr. Jacobs, do you have any

9    other questions for Mr. Fults on cross?

10          MR. JACOBS:  No, Your Honor.  We pass the witness.

11      Thank you, Mr. Fults.

12          THE COURT:  Mr. Linger, do you have redirect?  And

13   I'll say a housekeeping point.  We'll take Mr. Fults and

14   complete Mr. Fults' testimony.  Then we'll take a lunch break.

15   The Court has another short matter to take care of at 2 o'clock,

16   so we'll take our lunch break to sort of coincide with that.

17   Then we'll continue after a short break for lunch.  But let's

18   finish up with Mr. Fults if we can.

19      So, Mr. Linger, you may proceed with redirect if you have

20   it.

21          MR. LINGER:  Yes, Your Honor.  Briefly.

22                     REDIRECT EXAMINATION

23   BY MR. LINGER:

24   Q.   Mr. Fults, as I understand it, you were asked about your

25   petitioning company and previous petitions in regard to

1  initiatives in Arkansas.

2  A.    Yes.

3  Q.    Did that give you experience of people you worked with with

4  what you have to do when you approach people with a petition and

5  ask them to sign it?

6  A.    Yes.

7  Q.    Is that an easy thing to do?

8  A.    No.

9  Q.    Why is that?

10  A.    Some people, they don't care about your issue, for one

11  thing.  And another thing is they just don't want to sign the

12  petition.  They just don't do it.

13  Q.    Is that a similar practice, though, when you are

14  petitioning to be an independent candidate and have to approach

15  people?

16  A.    I don't think so.  I think if you are running as a

17  candidate, you are reaching out to them in your community, it's

18  easier to do I think.

19  Q.    Excuse me.  Can you repeat that?

20  A.    I think if you are a candidate, it's a lot easier to do

21  that way because the rules petitioning for a candidate and for

22  initiatives are very different.

23  Q.    Okay.  Is one of those differences that in an initiative

24  petition you are not limited to only collecting signatures

25  during 90 days?

1    A.    That's correct.

2    Q.    Is another difference the fact that while you have to, as

3    an independent candidate, decide a year before the election you

4    are going to be a candidate and file certain papers and then

5    have your signatures by no later than noon on May 1st, as

6    opposed to an initiative petition, where you can do it much

7    closer to election time?  Is that another difference?

8    A.    Yes.

9    Q.    Now, in regard to the District 27 state House race, unlike

10   an initiative petition or a statewide candidacy, you can only

11   get petition signatures for people who are actually registered

12   to vote in the state House district.

13   A.    That's correct.

14   Q.    District 27 is one of 100 state House districts in

15   Arkansas, isn't it?

16   A.    Yes.

17   Q.    So each state House district is 1 percent of the state

18   approximately by population.

19   A.    That sounds right.

20   Q.    In that regard, have you found that there's a problem -- I

21   think there was some questioning in regard to this about asking

22   people where they were, what state House district they were in?

23   A.    Yes.

24   Q.    Did you find -- does everybody know what state House

25   district they are in?

Fults - Redirect                                          121

1   A.    Very few people know what district they are in.

2   Q.    All right.  And does that require extra work, unlike

3   initiative petitions, to try to focus and target people who are

4   actually in the district, the state House district?

5   A.    Yes.

6   Q.    In initiative petitions also, isn't there something that if

7   you turn in the petition signatures, if you don't have enough,

8   you have like an extra 30 days to cure it?

9   A.    Yes.  You have a 30-day curing period.

10  Q.    Okay.  And if you had had another -- for example, when you

11  filed your declaration and your affidavit of eligibility and

12  your political practices pledge back in early November of last

13  year, if you had been able, like with an initiative petition, to

14  petition the rest of November, December and January, do you

15  think you would have been able to meet the 286 ballot petition

16  signature requirement for District 27?

17  A.    Yes.

18  Q.    You were asked about petitioning and having done canvassers

19  for other petitions and things.  Did you find that the

20  coronavirus had an effect on petitioning here and in other

21  situations this year?

22  A.    As opposed to like the amendment that I'm working on?

23  Q.    Yes, yes.

24  A.    It definitely made a difference.  It made a difference.

25  Q.    Do you have any sort of opinion or view, based on your

1    experience in previous petitioning and what happened here in

2    talking to people, as to how much percentage-wise it reduced

3    your ability to collect signatures this year because of the

4    coronavirus?

5    A.   We went from -- I think the first week my paid canvassers

6    were working, we got like 1,700 signatures on the first turn-in.

7    The last turn-in the paid canvassers gave me was 47.  That's how

8    big a difference it made in the gathering.

9    Q.   There's been talk, a lot of talk, about what the governor

10   of Arkansas did legally having an effect on things.  Did you

11   find, besides legal effect, that there was an effect from the

12   national media and the news about the effect of the COVID-19,

13   the coronavirus?

14   A.   As people being afraid to go out and stuff like that?

15   Q.   Yes, sir.

16   A.   Yes.

17   Q.   Was that something -- I mean, was it only -- the only thing

18   people -- did you find the only thing people were deciding what

19   they should do or not do was based on what Governor Hutchinson

20   told them they could do or not do?

21   A.   Yes.

22   Q.   From the standpoint of what you were hearing and what your

23   petitioners were hearing and your people who were signing the

24   petitions or not signing them, did they get -- did you get more

25   of your information from anything Governor Hutchinson said or

1    what was broadcast generally on the national news from the

2    President of the United States and from senators and other

3    governors?

4    A.   I think the combination of all of it.  I think the people

5    of Arkansas were paying more attention to the governor, who is

6    more connected to the people of Arkansas.

7    Q.   Now, you said you were a heart patient, that you were a

8    little concerned after February, when you and your wife had had

9    the upper respiratory infection or disease or whatever it was,

10   about exposing yourself to the coronavirus or whatever.  Was

11   that also a problem you found in regard to other people that

12   might have been afraid to be approached or whatever?

13   A.   Yes.

14   Q.   Was there also -- did you have a concern about mailings,

15   about whether petitions or what came back to you, in fact, might

16   have been infected with the coronavirus?

17   A.   Yes.  And we actually tried to sterilize them when they

18   came back to us the best we could.

19   Q.   All right.  In regard to the number of signatures required,

20   the 286 signatures that were required for District 27, that

21   represents, does it not, 3 percent of the last gubernatorial

22   vote in District 27?

23   A.   That's correct.

24   Q.   Now, could you tell the Court, please, what 3 percent of

25   the last vote in District 27 for state representative is?

Fults - Redirect

1   A.   Three percent of the 286?

2   Q.   No.  The last vote, it's 3 percent of the gubernatorial

3   vote that was in District 27.  What's 3 percent of the last

4   vote, in 2018, for the state representative of District 27?  To

5   put it another way, what's 3 percent of zero?

6   A.   Zero.

7   Q.   And that's because you were asked about your opponents.

8   She's never been on the general election ballot because no one's

9   ever run against her.  Isn't that correct?

10  A.   That's correct.

11  Q.   From the standpoint of the public interest, do you see --

12  is there a benefit in actually having an election, where

13  candidates -- the incumbent gets to actually meet the voters, go

14  out and discuss things, get feedback from them, hear from an

15  opponent?  Do you think that's in the public interest?

16  A.   Yes.

17  Q.   And do you think your incumbent there, who has never

18  actually been in an election, do you think it would be too much

19  of a burden on her if she actually had to participate in at

20  least one election as to being the state representative?

21  A.   I don't know if it would be a burden on her or not.

22  Q.   Would it be to the public's benefit to actually have an

23  election to discuss issues?

24  A.   Yes.

25  Q.   Finally, you weren't really able to do much in February.

Fults - Redirect                                                125

1    But when you tried, when you started to try in March and
2    everything, you and your people that were helping you, before
3    you did this, did you think you could be successful in gathering
4    enough signatures?
5    A.    Yes.
6    Q.    And in that regard, what did you find out as to your counts
7    and the people who were helping you?
8    A.    We weren't going to be able to do it because the people
9    that were helping me were not going to get out and get exposed
10   to it, and the people that would sign the petitions were not
11   going to do it either.
12   Q.    And the coronavirus, was that anything back in November,
13   December, January and early February that you were expecting to
14   happen?
15   A.    No.
16   Q.    And in regard to counsel's question about whether the state
17   had done anything to do this, the state -- the secretary of
18   state is enforcing the law that limits petitioning to only 90
19   days and makes it have to be turned in by noon on May 1st.  You
20   could use either additional time or a lesser figure as a result
21   of the coronavirus, could you not?
22   A.    Yes.
23   Q.    Do you feel that you have given a significant modicum of
24   support to show that there is an interest in people in the 27th
25   District for something novel to occur, there actually be a

1   general election for state representative?

2   A.   I don't quite understand the question.

3   Q.   Do you think you've shown a modicum of support by what

4   you've done and what you've been able to do and what you could

5   have done had you had more time or hadn't had the coronavirus

6   introduced?

7   A.   Yes.

8            MR. LINGER:  No further questions, Your Honor.

9            THE COURT:  All right.  May this witness step down?

10           MR. JACOBS:  This is Mr. Jacobs.  There's no

11   objection.  Yes, Your Honor.  No further questions from us.

12           MR. LINGER:  May he be excused, Your Honor?

13           THE COURT:  He may be.

14           MR. LINGER:  Thank you.

15           THE COURT:  Right now it is ten after one.  I suggest

16   that we take our lunch recess.  We'll be in recess until 2:15.

17   We'll take about an hour and five minutes.  We'll come back on

18   the phone at 2:15.  That should permit me to take care of the

19   other business that I need to take care of this afternoon that

20   we had scheduled.  And then, from 2:15 on, we'll continue with

21   our hearing.

22       Any housekeeping matters or questions at this point before

23   we take our recess, counsel for plaintiffs?

24           MR. LINGER:  No, Your Honor.

25           MR. HYMAN:  Yes, Your Honor.  This is Whitfield Hyman.

1    Mr. Talley informed me that he is going to be at the federal

2    courthouse at 2 o'clock because a friend of his is having a

3    hearing.  Is it okay if he comes from that federal courtroom to

4    your courtroom to give his testimony?

5              THE COURT:  That's fine.  My courtroom is open, and he

6    is more than welcome to come in.  He is under the rule.  So if

7    you will ask him, if you speak with him, ask him when he comes

8    into the courtroom to either approach a court security officer

9    and introduce himself as a witness subject to the rule or to

10   come forward and introduce himself to one of the court staff,

11   either Ms. Washington or Mr. Lax, who is here at the front of

12   the courtroom with me, so we know and can identify him to make

13   certain that he doesn't listen in on other testimony when he

14   walks in.  We have a witness room that we can allow him to wait

15   in right outside the courtroom if we're not ready for his

16   testimony yet.  But he is more than welcome to come in person.

17             MR. HYMAN:  Thank you, Your Honor.

18             THE COURT:  Anything further, counsel for plaintiffs?

19             MR. HYMAN:  Would Mr. Talley need to wear a mask, Your

20   Honor?

21             THE COURT:  If he has a mask, he's being encouraged to

22   wear it in the courthouse, but there's no requirement that he

23   wear it.

24             MR. HYMAN:  Thank you, Your Honor.

25             THE COURT:  And there's enough space in the courtroom

1   today that we can definitely permit social distancing.  He can

2   sit at counsel table in front of a microphone, or he can sit at

3   the witness stand here next to me.  That's about 6 feet away

4   from anyone else that he would be in proximity to, and there's a

5   microphone there at the witness stand.  So you can assure him of

6   that.

7          MR. HYMAN:  Okay.  Thank you, Your Honor.

8          THE COURT:  Anything, counsel for defendant, before we

9   take our recess?

10         MR. BRONNI:  No, Your Honor.

11         THE COURT:  If there's nothing further, then we'll be

12  in recess.  We'll come back on the line at 2:15.

13      We're in recess.

14      (Recess from 1:15 p.m. until 2:20 p.m.)

15         THE COURT:  We are back on the record.  This is Judge

16  Baker.  I'm going to take roll to make sure everyone is on the

17  line.

18      Mr. Linger.

19         MR. LINGER:  Yes, Your Honor.

20         THE COURT:  Mr. Hyman?

21         MR. HYMAN:  Here, Your Honor.

22         THE COURT:  Mr. Whitfield?

23         MR. WHITFIELD:  I'm present.  Thank you, Your Honor.

24         THE COURT:  Mr. Fults?

25         MR. FULTS:  Here, Your Honor.

```
 1              THE COURT:  Mr. Winger?

 2              MR. WINGER:  Here, Your Honor.

 3              THE COURT:  Mr. Bronni?

 4              MR. BRONNI:  Here, Your Honor.

 5              THE COURT:  Mr. Jacobs?

 6              MR. JACOBS:  Here, Your Honor.

 7              THE COURT:  Mr. Wagner.

 8              MR. WAGNER:  Here, Your Honor.

 9              THE COURT:  Mr. Mosley?

10              MR. MOSLEY:  I'm here, Your Honor.

11              THE COURT:  Ms. Cox?

12              MS. COX:  I'm here, Your Honor.

13              THE COURT:  All right.  Mr. Linger, you may --

14              MR. LINGER:  Your Honor, I believe Sandra Furrer is

15     also on the line now.

16              THE COURT:  All right.  And is she your next witness?

17              MR. LINGER:  Yes, Your Honor.

18              THE COURT:  All right.  And your other witness who is

19     here in court is present but is outside of the courtroom in a

20     witness room.  And I think that was Mr. Talley.  Right?

21              MR. HYMAN:  Yes, Your Honor.  That's correct.

22              THE COURT:  We'll proceed.  You may go right ahead and

23     call your next witness, Mr. Linger.

24              MR. LINGER:  We would call Sandra Furrer to the stand,

25     and I believe she will need to take the oath.
```

1      THE COURT:  Ms. Washington will administer the oath.

2      Ms. Furrer, if you will raise your right hand and repeat

3  after Ms. Washington.

4      **SANDRA FURRER, PLAINTIFFS' WITNESS, DULY SWORN**

5      THE COURT:  You are under oath.

6      You may proceed, Mr. Linger.  Go right ahead.

7                      DIRECT EXAMINATION

8  BY MR. LINGER:

9  Q.   Would you please state your name for the record.

10 A.   Sandra K. Furrer.

11 Q.   Furrer.  Ms. Furrer, where do you reside?

12 A.   20701, Little Rock -- Colonel Glenn Road, Little Rock,

13 Arkansas, 72210.

14 Q.   Are you a registered voter in the State of Arkansas?

15 A.   Yes, I am.

16 Q.   And are you a potential candidate for state representative

17 here in Arkansas this year as an independent?

18 A.   Yes.

19 Q.   And what district is that?

20 A.   District 31.

21 Q.   All right.  In regard to District 31, how many valid

22 petition signatures would it take for an independent candidate

23 to be listed on the ballot this year?

24 A.   That is debatable.  The first number I was given by the

25 secretary of state's office was 438.  The most recent number

1    that I was given was 436.  That number is not available on their

2    website.  I mean, it's based on the gubernatorial -- the last

3    gubernatorial election, 3 percent of the vote.  And you can't

4    find that statistic anywhere.  So whatever number they told me,

5    who knows.  And it's changed.

6    Q.    Ms. Furrer, let me ask you this.  Exactly what areas of

7    Arkansas are within your District 31?

8    A.    It's western Pulaski County and parts of Saline County.

9    Q.    All right.  And in that regard, what did you do in

10   preparation to be an independent candidate for a state

11   representative this year in Arkansas?

12   A.    I filed on November 4th, 2019.  And with the change in the

13   law, recent change in the law by Act 68 of 2019, we had to wait

14   until February 1st the following year prior to the election to

15   begin our petition drive.

16   Q.    All right.  Would you have liked to have been able to start

17   petitioning in November, December and January?

18   A.    Actually, yes.

19   Q.    All right.  And when did you -- did the time come when you

20   became aware of a problem relating to petitioning as from the

21   effects of the coronavirus?

22   A.    Yes.  Well, as one who follows the news, you are very much

23   aware of the devastation in China followed by Italy and then, in

24   the United States, the problems with Washington state and then

25   New York state.  And then, in March, early March, initially we

1    didn't have any cases in Arkansas.  And then in March, when we

2    had our first case, I thought, Oh, no, you know, I can't

3    continue going door to door with a pandemic.

4        So on March 12th, I stopped collecting signatures going

5    door to door.  In fact, I had one individual who gave me a small

6    bottle of Purell and said, If you are going to be going door to

7    door, you might want to offer this to people.  And that was the

8    last day I felt I could collect signatures.  I felt bad because

9    we had our first case reported in Arkansas, and the numbers have

10   climbed steadily ever since.

11   Q.   Will you tell the Court and us about what you did in your

12   petitioning drive in preparation for it beginning petitioning on

13   February 1?

14   A.   Well, I printed off the petition form.  I've attended

15   ethics trainings.  I've filed -- oh, I've had business cards

16   printed up, as I've talked to people and asked them to sign

17   petitions.  I, you know, developed a website.  I would hand out

18   business cards and thank them for their signatures and give them

19   a business card and say keep me in mind in November.

20   Q.   All right.  Did you have volunteers or paid petitioners or

21   what besides yourself?

22   A.   I did not use paid petitioners.  I had recruited a number

23   of family members.  And then, when the time come to ask them for

24   help, you get a lot of excuses.  So basically I had my husband

25   to help me when he was free on the weekends, and I had one

1    member of the volunteer fire department collected a couple of

2    signatures for me.  But basically it was me out there.  I

3    treated it like a full-time job.  I was out there every day that

4    it wasn't pouring down rain.

5    Q.   As of the first day of February 2020, when you were

6    starting this, at that time did you have any doubts about your

7    ability to get the 400-plus signatures, whether it was 436 or

8    434, that were going to be required?

9    A.   I didn't think it would be a problem because I had thought

10   I could have it completed by Valentine's Day if I took it very

11   seriously, was out there every day like it was a full-time job.

12   Yes, I thought, this is going to be a piece of cake.  And then

13   it rained, and it rained, and it rained some more.  And so --

14   Q.   Tell me about the weather, the rain.

15   A.   Oh, it was rainy.  The month of February was incredibly

16   rainy.  So any day that it was pouring down rain, you couldn't

17   go out.  The early voting was my best opportunities.  I went to

18   shopping centers.  I went door to door in the late evening.  You

19   know, when people were still working, there was no sense in

20   going door to door because people weren't home.  So during the

21   winter months, it gets dark early.  So if you are out there at

22   5 o'clock knocking on doors, it's dark by six.  So, you know,

23   you had a limited time frame there in the evening.  So shopping

24   centers were pretty good.

25        But the districts are so gerrymandered, you know, it's hard

1    to -- it's hard to collect signatures that way.  So I basically

2    -- I would ask people, "Are you a registered voter?"  If they

3    said yes, "Do you live in western Little Rock?"  "Yes."  Then

4    "please sign my petition," you know, "would you mind signing my

5    petition."  It's very difficult.

6    Q.    In your experience with voters before the coronavirus

7    started, did you find that most voters know what state House

8    district they are registered in?

9    A.    Most of them didn't have a clue.

10   Q.    All right.  Now, in that regard, in regard to this severe

11   rain and weather problems in February, was that something you

12   expected before February 1st?

13   A.    No, no.

14   Q.    And what sort of impact did that have on your collections

15   for the months of February before the coronavirus became so

16   severe?

17   A.    Well, it extended my collection period beyond Valentine's

18   Day, so I was going into March.  And I was getting close at that

19   point.  You know, I had been told to try to collect twice the

20   signatures that you need, and that's what I was shooting for.

21   Q.    When you turned in your signatures, would you tell the

22   Court when you turned them in?

23   A.    Well, I collected my last signature on March 12th.  And

24   then, you know, everybody -- the governor kept saying, stay at

25   home, stay at home, public health emergency, don't go out.  So I

1   didn't collect another signature.  I couldn't collect another

2   signature after March 12th, so I'm sitting at home.  I'm

3   debating whether or not to turn them in.  So I write a letter,

4   and I decide to turn them in on April 3rd.

5   Q.   And how many signatures did you have at that time?

6   A.   812.

7   Q.   All right.  At that point, had you also -- besides what the

8   governor was saying, had you also heard reports from the

9   national news media about what was going on?

10  A.   Absolutely.  And the death toll in New York was just

11  climbing by the hundreds every day.

12  Q.   Did you find that individuals you had contact with or

13  discussed over the phone or anything, was there any problem with

14  the fear factor that this was causing?

15  A.   Oh, absolutely, absolutely.

16  Q.   Now, you said that but for the bad weather that hit in

17  February, you thought you could have done it.  How about the

18  coronavirus?  If the coronavirus then after February, when the

19  weather was so bad, if the coronavirus hadn't hit, do you think

20  you would have been successful in gathering even more

21  signatures?

22  A.   Oh, absolutely.  Oh, absolutely.

23  Q.   Would you tell us, ma'am, what your political experience is

24  prior to this election.

25  A.   I have never run for public office.

1    Q.    Okay.  This is the first time for you.

2    A.    Right.  I'm a former civics teacher.  So this is the first

3    time in years this is an open seat in District 31.  And for

4    years, we're just seeing the same old -- it's like they hand it

5    off to the next Republican.  It's like I've been endorsed by the

6    previous one, and it's like this has got to stop.  This has got

7    to stop.  And we've never had a woman serve District 31, so I

8    thought I would give it a shot.

9    Q.    And is it your intention to try to win the election if you

10   are on the ballot?

11   A.    Absolutely.

12   Q.    And do you think there's also a value in people discussing

13   issues and actually having an election campaign?

14   A.    Absolutely.

15   Q.    Now, do you have in front of you what is marked as

16   Plaintiffs' Exhibit 13?

17   A.    Yes.

18   Q.    That's marked for purpose of identification.  I would ask

19   you to look at it.  And I would like you to, after the cover

20   page, to look at the first page there.  This refers to April 3

21   of 2020.  Do you see that?

22   A.    Yes.

23   Q.    Would you identify that for the Court, what that is on the

24   first page of that exhibit?

25   A.    It was the cover letter from my petitions that I turned in

1   that day.  And it was stating the fact that I could not collect

2   any more signatures, you know, due to the coronavirus, the

3   public health risk.

4   Q.   And after you turned in the signatures on April the 3rd to

5   the secretary of state's office, did you find out how long it

6   was before they had determined how many were valid?  How long

7   did it take them to do that for you?

8   A.   Initially, I didn't hear anything.  And then, when I

9   contacted them, they said to allow another -- to allow 30 days.

10  Q.   Okay.  Have you subsequently, later that is, later found

11  out when they actually finished validating your signatures?

12  A.   Yes.  They completed that on April 16th.

13  Q.   April 16th.  Okay.  And when did they inform you, though,

14  that they had completed, that you didn't have sufficient

15  signatures?

16  A.   At 2:19 p.m. on Friday, May 1st.

17  Q.   2:19 p.m.  That's after -- that's after the noon hour on

18  May 1st.  That's when they let you know.

19  A.   Yes.

20  Q.   Can you tell me -- do you have any explanation why, if they

21  finished counting and verifying your signatures on April 16,

22  which was two weeks before, why they didn't let you know?  Do

23  you have any explanation that you know of yourself?

24  A.   No.  I have not been provided an explanation.

25  Q.   Now, if you would look at the second page of what has been

1   marked for Court's identification as Plaintiffs' Exhibit 13,

2   would you identify that, ma'am?

3   A.   It is a letter.  It was part of the attachment.  And then I

4   received a letter in the mail, the same letter, from Peyton

5   Murphy dated May 1st.

6   Q.   Okay.  And that's the one you just referred to as the

7   2:19 p.m. on May 1st?

8   A.   It was an attachment to his email.

9   Q.   Okay.  And then the third page there, is that the letter

10  from John Thurston's office dated May 1, 2020?

11  A.   Yes.

12  Q.   All right.  And that says you had 421 valid signatures of

13  the 812 that you turned in.  And your understanding was you

14  needed 400 and what?

15  A.   Initially I was told 438.  And then Peyton Murphy

16  subsequently said 436 was required, but I don't know for certain

17  how many were needed.

18  Q.   Okay.  In any event, if you would now look at the fourth

19  page there of what has been marked for Court's identification as

20  Plaintiffs' Exhibit No. 13, do you see that, the date May 3 at

21  the top?

22  A.   Yes.

23  Q.   What is that, ma'am?

24  A.   It is a letter to Governor Asa Hutchinson explaining the

25  dilemma that I've had in trying to go door to door collecting

1   signatures for my petition drive and the fact that I had to stop

2   collecting signatures on March 12th due to his -- the public

3   health pandemic, the public health crisis and the stay-at-home

4   orders.  So I was trying to abide by those orders.  And in my

5   final paragraph, I was requesting that he put politics aside and

6   issue an executive order to reduce the number of signatures

7   needed for independent candidates or extend the period for

8   collecting signatures until July 1st.

9   Q.    Did you ever hear back from Governor Hutchinson?

10  A.    Not a word.

11  Q.    All right.  Now, if you would look at the next page, the

12  May 18 at the top, would you identify that for the Court,

13  please?

14  A.    Okay.  Well, prior to that, I reviewed -- I asked to see

15  all of my petitions, meet with the elections division staff and

16  review all of my petitions for accuracy.  And I wanted to talk

17  to them as well.  I had some questions.  And a week passed.  And

18  when I finally got them back, I was not happy with the results

19  from that.  And so this is a letter to John Thurston explaining

20  that problem, that I still disagreed with the findings, and I

21  wanted to meet with him.  And I had also asked that he put

22  partisan politics aside and consider this dilemma.

23  Q.    And did you hear anything back from Mr. Thurston in regard

24  to this letter dated May 18th?

25  A.    Not, not a peep.

1    Q.   Now, there are three additional pages that are attached

2    after that.  Could you identify that and explain what that is?

3    A.   Okay.  So the secretary of state's office wouldn't let me

4    come in and review my original documents because of the public

5    health crisis.

6    Q.   They would not let you do that?  Okay.

7    A.   No.  They wouldn't let me come in.  They said that if you

8    have a problem, we will send you all of your petitions back.  We

9    will scan them, send them to you by email.  So I reviewed all of

10   the petitions that I had questions about, made notes on 32 pages

11   and sent them back.  Okay.  And what is listed here, what is --

12   okay.  The printed information is what I got back from the

13   secretary of state's office.  And they had told me that if they

14   live in the district and they are registered voters, they should

15   be counted.  Well, now they are saying, well, they may have

16   moved into the district, or they haven't updated their voter

17   registration, so they are not considered valid voters, so they

18   didn't count all of those names.  And then there was two

19   additional names that they didn't even address -- well,

20   actually, three.  There is one on page 1021, Mike Fox

21   (phonetic).  They didn't even address him.  There was one on

22   page 1078, Trevor Stevenson.  I didn't get a response on that

23   one.  There was also one elderly woman who didn't list her date

24   of birth, and they just put "not a registered voter."  So that's

25   what that is.

1    Q.    These last three pages, as to the printed material, how

2    about the writing on there?  Whose writing is that?

3    A.    The writing is mine.

4    Q.    And what was the purpose of that writing that you put on

5    that document?

6    A.    That was the issue because the staff had been saying that

7    in order to count any voter, they have to live in the district.

8    If they are a registered voter, they live in the district, they

9    should be counted.  Well, none of these people that are

10   outside -- that are outside of the district or had voted

11   previously in the district -- other districts were not counted.

12   So there's 18 signatures there that are not counted.  There's

13   two additional names that they didn't even consider that I

14   identified they didn't consider.

15              MR. LINGER:  All right.  At this time, Your Honor, we

16   offer into evidence Plaintiffs' Exhibit No. 13.

17              THE COURT:  Counsel for defendant?

18              MR. MOSLEY:  No objection, Your Honor.

19              THE COURT:  Plaintiffs' Exhibit 13 is admitted.

20        (Plaintiffs' Exhibit 13 received in evidence.)

21   BY MR. LINGER:

22   Q.    Ms. Furrer, have you received anything else from the

23   secretary of state's office after this exhibit was prepared?

24   A.    No.

25   Q.    Okay.  And have you received any further explanation from

1    them as to -- it appears to me that if there's 438 signatures

2    that was needed from you, you were within 26 signatures, using

3    their count, of having the necessary number of signatures being

4    an independent candidate in state District 31.

5    A.    Actually, Mr. Murphy indicated it was 436, the last letter

6    that I got from him.

7    Q.    That would only be 24 signatures short.  Let me ask you

8    this.

9    A.    Not that much.  It's not that much.

10   Q.    Well, wherever -- you are right, yes.  Whether it's 438 or

11   436 or whatever there, why is it that there were so many more

12   signatures required for your district than, say, Gary Fults,

13   where he said it's 286, or Roderick Talley, who I think was

14   about 234 or 236?  Why is it so many more signatures required

15   for being an independent candidate in District 31?

16   A.    I was told that it is based on 3 percent of the vote that

17   was taken in the last gubernatorial election.  I have never seen

18   how many votes were actually cast in that election because that

19   statistic is not published on the secretary of state's website,

20   nor have I been given that information.  So I don't know exactly

21   how many signatures, valid signatures, were needed.

22   Q.    All right.

23   A.    It's based on whatever they have told me.

24            MR. LINGER:  All right.  Your Honor, I have no further

25   questions for the witness at this time.

1          THE COURT:  All right.  Cross?

2          MR. MOSLEY:  Yes, Your Honor.  This is Mike Mosley.

3                        CROSS-EXAMINATION

4  BY MR. MOSLEY:

5  Q.   Ms. Furrer, did you do a Google search online and see if

6  you could figure out how many votes were in the last

7  gubernatorial election?

8  A.   You can't because this district covers parts of Saline

9  County.  So you can't -- you can't tease that out for District

10  31.  It has to be within District 31.

11  Q.   Okay.

12  A.   So how would you tease that out?

13  Q.   Well, I'm asking you questions.  You can't -- I don't

14  answer your questions.  But let me ask you this.  You had no

15  problem doing your candidate filing documents on time in

16  November.  Correct?

17  A.   Correct.

18  Q.   You got that done.  That was no problem whatsoever.  Right?

19  A.   No problem.

20  Q.   Okay.  You mentioned that the governor had a stay-at-home

21  order.  Ma'am, there was no stay-at-home order in Arkansas

22  issued by Governor Hutchinson, was there?

23  A.   There was a public health emergency issue.

24  Q.   My point, though, is the governor never said you couldn't

25  go to someone's front door, put a petition on the clipboard on

Furrer - Cross

```
 1   their front porch, knock on the door, step back and talk to
 2   somebody, did he?  Ma'am?
 3   A.   I was out there on March 12th doing that.  I did that.
 4   Q.   Right.  You quit doing that as of March 12th.  You didn't
 5   do anything to obtain any further signatures after March 12th,
 6   and you had 812 on that date.  Right?
 7   A.   We had our first case reported in Arkansas the day before.
 8   Q.   You didn't do anything to obtain any further signatures
 9   after March 12th.  Correct?
10   A.   I did not.
11   Q.   Okay.  You never considered -- let me ask you a question.
12   Did you stop doing that because you felt like you had enough
13   based on the conversation that you had with the secretary of
14   state's office?
15   A.   No.
16   Q.   Well, okay.
17   A.   I was shooting for twice the number needed.
18   Q.   All right.  So you fell a little shy of that 812.  Right?
19   A.   Yep.
20   Q.   Okay.  And you chose not to go door to door after the 12th
21   because of coronavirus.
22   A.   Yes.
23   Q.   Okay.  Did you ever attempt, before you submitted your
24   signatures on April 3rd, to do a validating of the signatures of
25   the persons that signed your signatures, whether they were
```

Furrer - Cross

1   registered voters in your district?  Did you do any work on that
2   before you submitted them?
3   A.   I did not know how to validate signatures.  I validated
4   their addresses on the House of Representatives websites.
5   That's the only way I was told to do it.
6   Q.   Before you submitted them on the 3rd?
7   A.   I validated that the addresses were in the district, the
8   signatures, yes.
9   Q.   Before you submitted them to the secretary of state?
10  A.   Not all of them were, no.  Clearly not all of them because
11  as you are collecting signatures, you have no way of knowing if
12  a person -- most people don't know what House district they
13  reside in.  And so I would say, Do you live west of this street?
14  Do you live south of this street?  Are you in western Little
15  Rock?  Are you in one of the Chenal neighborhoods?  If they were
16  in most of the Chenal neighborhoods, yes, they were in the
17  district.  But it is so gerrymandered, there's no clearcut
18  lines.
19  Q.   You were unclear sometimes whether or not you were actually
20  in your own district collecting signatures.  Is that what you
21  are saying?
22  A.   No.  I'm saying people don't know.  If you are on the east
23  side of one street, they are not in the district.  If you are on
24  the west side, yes.  I mean, it's bizarre.  The gerrymandering
25  is bizarre.

Furrer - Cross

1    Q.    Ms. Furrer, you knew.

2    A.    No.  I did not know.

3    Q.    Okay.

4    A.    It's hard -- it's very hard.

5    Q.    You potentially collected signatures from persons that were

6    not in the district.  That's what happened.  Right?

7    A.    You have to collect signatures where people in the general

8    area are.

9    Q.    All right.  After the 12th, though, you submitted your

10   signatures almost a month early.  After the 12th, did you

11   consider going online or making phone calls and seeing if you

12   could arrange with people to mail you petitions if you emailed

13   them?  Did you do any of that?

14   A.    No.

15   Q.    Let me ask you about Exhibit No. 13.  I'm reading your

16   letter to Secretary of State Thurston on May 18th, 2020.

17   A.    Uh-huh.

18   Q.    Again, I asked you a minute ago about a stay-at-home order.

19   You stated here that Governor Hutchinson declared a stay-at-home

20   order -- issued a stay-at-home order.  But, again, that did not

21   occur, did it?

22   A.    I kept hearing on the news stay at home, businesses were

23   closed, stay at home, public health emergency.  How could you

24   miss that?

25   Q.    Ms. Furrer, have you ordered delivery, food to your house,

1    in the last month?

2    A.    No.

3    Q.    Have you during any time subsequent to March 12th?

4    A.    No.  I have not ordered food to my house, no.

5    Q.    What about an online -- what about a prescription from a

6    pharmacy?

7    A.    No.

8    Q.    Have you had anything delivered to your house?

9    A.    No.  Mail.

10   Q.    Well, that's interesting.  You have had mail.  We've all

11   had mail delivered to our houses.  So this is a question I have

12   about this letter, though.  We just established that there was

13   no stay-at-home order originally in your testimony.  It's just

14   the reason you stopped going door to door was because it was a

15   public health emergency.  Correct?

16   A.    As far as I've heard, the governor closed businesses, told

17   people to stay at home.

18   Q.    Okay.

19   A.    How could you miss that?  How could you miss that?

20   Q.    Well, do you watch the news, Ms. Furrer?

21   A.    Yes.

22   Q.    You understand that Arkansas is one of the few states that

23   very clearly did not have a stay-at-home order, and many states

24   actually did.  You know there's a distinction there.  Right?

25   Some states' governors actually said you have to stay at home.

1   Arkansas was noted as not having one.  You are clear on that.

2   Right?

3   A.   Yes.  The governor did not mandate per se.  But I've heard

4   from -- I've heard repeatedly that it's best to stay home, don't

5   go out, stay home, don't spread the virus.

6   Q.   Okay.  On paragraph 2 of your letter to Secretary Thurston

7   on May 18th, last sentence:  "Thus, I am unable to determine the

8   actual number of signatures needed to qualify as a candidate."

9   That's what you said.  Right?

10  A.   Yes.

11  Q.   Okay.  Let's go up here to your first letter, which it's

12  hard to read, of April 3rd, 2020.  Do you see that?

13  A.   Yes.

14  Q.   Who is Josh Bridges?

15  A.   I think I've seen his title as elections coordinator.

16  Q.   With the state?

17  A.   Yes.  Secretary of state's office, election commission.

18  Q.   So on April 3rd, you understood from the state that you had

19  to get 438 signatures.  That's what they told you.  Correct?

20  A.   Initially, that's what I was told.

21  Q.   And you believed on April the 3rd that you only needed 431.

22  Correct?

23  A.   I thought it was based on the House of Representatives'

24  vote, which is published.  That's the only vote that is

25  published.

Furrer - Cross

1   Q.   You believed on April 3rd you needed 431 signatures.  You
2   said that in the letter.  Right?
3   A.   Uh-huh.
4   Q.   Is that a yes, ma'am?
5   A.   Yes.
6   Q.   Then we go down here to May 18th, and you are saying, "I'm
7   unable to determine the actual number of signatures needed to
8   qualify."
9   A.   Because I received a letter from Peyton Murphy saying it's
10  436.  And then I went on their website trying to figure out,
11  well, how many votes were cast in the last governor's election.
12  And you can't find that statistic anywhere.  How many votes were
13  cast for the governor in District 31?  Please tell me that.
14  Q.   Ma'am, I'm not going to answer your questions.  I'm simply
15  trying to understand why you've said on --
16  A.   How do I know the number that is needed if you can't find
17  the actual number of votes cast so I can figure 3 percent if
18  that number is not published?  That number is not published.
19  Where is it published?
20  Q.   Ms. Furrer, you did what -- you called the secretary of
21  state's office --
22  A.   I've asked --
23  Q.   Ms. Furrer, may I finish my questions?
24  A.   Sure.
25  Q.   You called the secretary of state's office.  You attempted

1   to determine it.  You differed with the number that they had.

2   But you were given a number on April 3rd.  Correct?

3   A.    On April 3rd, no.

4   Q.    Okay.  Before April 3rd, before you wrote that letter, you

5   were given a number by Josh Bridges.  Correct?

6   A.    Verbally, yes, verbally.

7              MR. MOSLEY:  Hang on one second, Your Honor, if I may.

8       Pass the witness, Your Honor.  Judge?

9              THE COURT:  I heard you.  Did you need to confer with

10  anybody, or you are certain you want to pass?

11             MR. MOSLEY:  Yes, ma'am.  I would like to pass, Your

12  Honor.

13             THE COURT:  Redirect.  Mr. Linger, do you have any

14  redirect?  Mr. Linger, if you are speaking, we can't hear you.

15             MR. LINGER:  I'm sorry, Your Honor.  I forgot to take

16  my mute off.

17             THE COURT:  That's all right.  We didn't catch

18  anything you said.  You were muted the whole time.  So if you

19  have redirect, you may proceed.

20             MR. LINGER:  Very briefly, Your Honor.

21                     REDIRECT EXAMINATION

22  BY MR. LINGER:

23  Q.    Ms. Furrer, do I understand the questioning about the

24  number of signatures, that you were given different requirements

25  at different times from the secretary of state's office?

Furrer - Redirect

1    A.    Yes.

2    Q.    Do they have anything -- any site up that shows the exact

3    number for each district that would be needed by an independent

4    candidate?

5    A.    No.  If they do, I'm not aware of where it's located.

6    Q.    If the secretary of state had notified you when they

7    finished validating and found you 21, 26, whatever signatures

8    short you were, back when they finished that on April 16th,

9    would you have tried to get the necessary signatures before

10   May 1?

11   A.    I could have done it in a day, yes.

12   Q.    All right.

13   A.    Yes.

14   Q.    What efforts would you have used at that time considering

15   the coronavirus?

16   A.    Direct.  You know, my husband and I were kind of going,

17   well, I should have gotten this one, and I should have gone to

18   see this person and, oh, I missed that person.  So, yeah, I

19   could do it, yeah.  I could do it in a day.

20   Q.    At the time, on April 3rd, when you sent in the 812

21   signatures you had, did you think you had complied with the law

22   that would have enough valid signatures?

23   A.    I thought it was close.  I had more than I thought I

24   needed --

25   Q.    All right.

1    A.    -- based on their addresses.

2    Q.    Finally, there were a number of questions about what

3    Governor Hutchinson actually did as opposed to maybe suggestions

4    as opposed to official orders.   In getting your information on

5    the coronavirus and people you know, did you rely to a large

6    extent on news reports?

7    A.    Yes.

8              MR. LINGER:   No further questions, Your Honor.

9              MR. MOSLEY:   Nothing further from the defense, Your

10   Honor.

11             THE COURT:   All right.   Thank you.

12             MR. LINGER:   May this witness be excused?

13             THE COURT:   She may be.   Thank you very much.   You are

14   excused.

15             THE WITNESS:   Thank you.

16             THE COURT:   Mr. Linger, you may call your next

17   witness.

18             MR. LINGER:   Mr. Hyman will conduct the next two

19   witnesses, Your Honor.

20             THE WITNESS:   Do I need to hang up?   Do I need to hang

21   up?

22             THE COURT:   You are excused.   You may hang up.   You

23   may listen to the rest.   And I don't think anyone has asked to

24   keep you on the hook for rebuttal, so you are welcome to listen

25   to the rest of the testimony if you choose to.

1              THE WITNESS:  Thank you.

2              THE COURT:  Mr. Hyman, who is your next witness?

3              MR. HYMAN:  Yes, Your Honor.  I would like to call

4     Roderick Talley to the stand.

5              THE COURT:  All right.  And we will ask Mr. Talley to

6     come in.

7          **RODERICK TALLEY, PLAINTIFFS' WITNESS, DULY SWORN**

8              THE COURT:  Mr. Talley, we're all in the courtroom.

9     But if you at any point have trouble hearing or understanding,

10    you let me know.  We're just going to listen on the phone.  Mr.

11    Hyman is going to question you.

12         Mr. Hyman, you may proceed.

13             MR. HYMAN:  Thank you, Your Honor.

14                          DIRECT EXAMINATION

15    BY MR. HYMAN:

16    Q.   Okay.  Mr. Talley, would you please state your name.

17    A.   Roderick Talley.

18    Q.   Okay.  And where do you live?

19    A.   Do you want my complete address?

20    Q.   Sure.

21    A.   2418 South Cross Street, Little Rock, Arkansas, 72206.

22    Q.   Okay.  And are you currently running for office?

23    A.   Yes, sir.

24    Q.   Which office are you running for?

25    A.   State Representative District 34.

Talley - Direct

1  Q.   And are you running as an independent?

2  A.   Yes, sir.

3  Q.   Okay.  Did you have to collect signatures for that?

4  A.   Yes, sir.

5  Q.   Okay.  And what was the number requirement of signatures

6  that you had to collect?

7  A.   I believe that number was 234.

8  Q.   And how many did you end up submitting?

9  A.   They validated 239.

10  Q.   And how many did you actually collect?

11  A.   Close to 350.

12  Q.   Okay.  And did you strike any of the ones that you

13  collected before turning it in?

14  A.   Yes, sir, I did.

15  Q.   Why did you do that?

16  A.   As I checked the Voter View website, the secretary of state

17  website, they weren't -- they were either not valid, I mean, not

18  registered voters, or they weren't registered in my district.

19  Q.   Okay.  And so the ones you turned in, what was that number?

20  What was the final number of ones that you actually turned in

21  that were not struck through?

22  A.   I want to say three hundred and -- I know it was about 300,

23  300 plus.

24  Q.   Okay.  Does 326, 323, was that about right?

25  A.   Yes, sir.  Somewhere in there, yes, sir.

Talley - Direct

1    Q.    Okay.  So now, of those that you turned in, did you check

2    and see that they were registered voters in your district on

3    Voter View?

4    A.    Yes, sir.

5    Q.    What is Voter View?

6    A.    It's the secretary of state's website to check registered

7    voters by entering their name and birthday.

8    Q.    Okay.  So all 320-something signatures that you turned in,

9    you independently verified that they were registered voters in

10   your district before turning them in?

11   A.    Some I didn't strike off.  What I did was when I got them

12   to sign, I would check Voter View.  And if they weren't

13   registered and they lived in my district, I revisited their

14   homes and had them to fill out a voter registration form or

15   update their address.

16   Q.    And did you do that with every single signature you turned

17   in?

18   A.    Yes, sir.

19   Q.    So what percent of the signatures that you turned in should

20   have been validated as registered voters in your district?

21   A.    Out of the 300 and I think it said 26, all but 31 should

22   have been registered voters in my district.

23   Q.    Okay.  And how many did the secretary of state's office

24   claim were not registered voters in your district?

25   A.    If I turned in 326, and they verified 239 -- I can't do the

1    math off the top of my head.  But that was the amount that they

2    said were valid is 239.

3    Q.   Okay.  And how many -- what was the number that you thought

4    was valid?

5    A.   Close to 300.

6    Q.   Okay.  So 300 minus 239 is 61.  Right?

7    A.   Yes, sir.

8    Q.   So do you think they got 61 of those signatures wrong,

9    those registered voters, wrong?

10   A.   Well, I know that 13 applications got lost that I

11   submitted.  Somehow they said that they were lost.  And --

12   Q.   Applications for what?

13   A.   Voter registration applications.

14   Q.   Okay.

15   A.   Then they didn't -- I don't know why they didn't.  But a

16   lot of the names that they did not validate are registered

17   voters.  I went back and checked after they gave me my forms

18   back and showed me the ones that they counted.

19   Q.   Okay.  So of the amount that you submitted, the secretary

20   of state got a lot of them wrong.  And you were able to prove

21   that on their own website is what you are saying.

22   A.   Yes, sir.

23   Q.   Okay.  Tell me about your collection efforts to get to this

24   239 number.  When did you start collecting signatures?

25   A.   I was in a special election that ended March 3rd.  So I

Talley - Direct

1  started collecting after March the 3rd just by going door to

2  door.  And it was more so really -- I will be honest -- during

3  the time everything was -- that the state had kind of placed

4  restrictions on a lot of things due to the coronavirus.  But I

5  still went out and went door to door to collect signatures.

6  Q.   Okay.  Now, so you went door to door.  Did you know a lot

7  of the people that you were getting signatures from?

8  A.   Yes, sir.  I had canvassed my district.  As I said, I was

9  in a special election, so I had visited those homes in my

10 district probably three or four times throughout the year.  So a

11 lot of people were familiar with who I was as I knocked on

12 doors.

13 Q.   Okay.  So by the time that you came knocking on their door,

14 after March 3rd, you already knocked on these doors three or

15 four times prior?

16 A.   Yes, sir.

17 Q.   Okay.  And did these people recognize you?

18 A.   Yes, sir.  A lot of them did.  Even though there was some

19 that did recognize me, a lot of them were practicing social

20 distancing.  So they didn't come to the door, or they told me to

21 come back another time.

22 Q.   Okay.  And so tell me about this special election that you

23 were in on March 3rd.  Were you running in a political party

24 during that election?

25 A.   No, sir.  I was running as an independent in that election

1    also.

2    Q.    And what percent of the vote did you get in that election?

3    A.    A very low percent.  I'm not for sure.  I think maybe

4    25 percent, I believe.  There was a primary going on at the same

5    time, so my election didn't even start on time.  And I wasn't on

6    the ballot at each voting location.

7    Q.    Oh, wow.  Okay.  So with that, for that special election

8    that you were running in --

9    A.    Yes, sir.

10   Q.    -- did you have to get signatures to be on that?

11   A.    Oh, yes, sir.

12   Q.    On that ballot as well?

13   A.    Yes, sir.

14   Q.    And when did you collect signatures for that?

15   A.    It was last year.  I think the day to turn them in -- I

16   can't remember the actual day to turn them in, but I submitted

17   those.  I collected -- I only needed, I think, maybe 37 last

18   year because it was a special election, so they reduced the

19   amount that I needed.

20   Q.    Okay.  So you only needed 37 signatures last year?

21   A.    Yes, sir.

22   Q.    Okay.  So how long did it take for you to get those 37

23   signatures last year?

24   A.    It took me maybe two or three days because I went, of

25   course, door to door.  But I also went on campuses, and I

1    registered quite a few students at one of the universities in my

2    district and turned it in after I did that.

3    Q.    Okay.  And how was signature collection last year for this

4    same House district in comparison to signature collection this

5    year after March 3rd?  Was it easier or harder?

6    A.    Last year it was easier.  It didn't have anything going on.

7    People weren't, you know, afraid to kind of come in contact with

8    you.

9    Q.    Okay.  Now, you mentioned that a lot of these people you

10   had already knocked on their doors three or four times by the

11   time March 3rd came around.  When you knocked on their doors,

12   what was that for?

13   A.    To vote, get out and vote for the last election, the one

14   that ended March 3rd.  I was out knocking then to get people

15   out, make them aware, because the original date of my election

16   was supposed to start on the 18th with the primaries with

17   everyone else.  But they started my election a week late, so I

18   had to basically re-walk my district again to inform people.

19   Q.    Okay.  And how long were these conversations with people

20   when you were knocking on their doors three or four times?

21   A.    You say how long were the conversations?

22   Q.    Right.

23   A.    Some of them lasted a long time.  I think I probably sat

24   outside some people's houses at times over 30 minutes just

25   having conversations with them about things in the community.

1   Q.   Okay.  Now, you've testified in court before, haven't you?

2   A.   Yes, sir.

3   Q.   Now, why were you testifying in court before?

4   A.   I think I may have been a defendant, and then I did a

5   deposition for a lawsuit that I filed here in Arkansas.

6   Q.   Okay.  Now, when you were a defendant in that criminal

7   case, what was the outcome of that case?

8   A.   It was dismissed.  The charges were dismissed.

9   Q.   And why is that?

10  A.   Because some things were falsified against me.

11  Q.   Okay.  And you were able to prove that basically some

12  police officers lied in your police report that led to your

13  arrest.  Right?

14  A.   Yes, sir.

15  Q.   Due to video evidence that you had?

16  A.   Yes, sir.

17  Q.   Okay.  And did you go on to help other people who had been

18  charged with crimes by those same officers?

19  A.   Yes, sir.  About 40 different people had their cases

20  dismissed, yes, sir.

21  Q.   Okay.  And did this help you develop any kind of reputation

22  in the community?

23  A.   Yes, sir.  I think that was probably what didn't alarm

24  people about me knocking.  A lot of people were familiar with

25  who I was even before my first time knocking on their door.

1   Q.   Okay.  And did any news outlets pick up your story?

2   A.   Sir?

3   Q.   Did any news organizations pick up your story and report on

4   it?

5   A.   Yes, sir.  It hit national news.

6   Q.   Okay.  Had any of the people in your district heard about

7   any of this when you were knocking on their doors?

8   A.   Yes, sir.  Because in my district, which is a predominantly

9   African-American community, a lot of those people that I helped

10  out were a part of that district, my district.

11  Q.   Okay.  And other than through politics, was there any other

12  way -- and community organizing, was there any other way you

13  knew a lot of these people in your district?

14  A.   Other than just being in the community, no, sir.

15  Q.   Okay.  And tell me about your line of work.  What do you

16  do?

17  A.   I'm a barber, licensed barber.

18  Q.   Okay.  And did the governor issue an order shutting down

19  barbershops?

20  A.   Yes, sir, he did.

21  Q.   And when did he do that?

22  A.   March -- I want to say March 23rd.

23  Q.   Okay.  And how did that impact your ability to collect

24  signatures?

25  A.   It freed up my day.  I was able to basically dedicate the

1    entire day to nothing but getting out and knocking on doors.

2    Q.    Okay.  And do you think that you would have been able to

3    collect more signatures had it not been for corona?

4    A.    Yes, sir.  I mean, however many more I would have needed, I

5    think, without this going on, I would have been able to collect

6    them.  I think the biggest issue I have had with collecting them

7    has been with the voter registration office with them losing

8    applications.  And the prior year, when I had to get signatures,

9    they actually had kicked me off the ballot saying that my

10   petition was invalid being that I submitted voter registration

11   applications.  And the voter registration office purposely

12   didn't enter them until the very next day, which invalidated

13   about 18 signatures of mine.  Eventually, it was overturned.

14   And two of the workers were suspended because of those actions.

15   But I think that's the hardest part about collecting them,

16   making sure the people that were supposed to count them do

17   right.

18   Q.    Okay.  And you also were going to attempt to do several

19   initiatives.

20   A.    Yes, sir.

21   Q.    And by initiatives, I mean you wanted to submit

22   constitutional amendments to be voted on by the general public

23   in the 2020 election.  Correct?

24   A.    Yes, sir.  Yes, sir.

25   Q.    Okay.  And you were going to collect signatures to support

Talley - Cross

1    those initiatives?

2    A.    Yes, sir.  I had started initially, but I kind of slowed

3    down during the time of my election.  While I was out collecting

4    signatures this time, I didn't want to bombard people with

5    papers while I was trying to get on the ballot.

6    Q.    Okay.  And is there any other reason why you didn't

7    continue with the initiative petitions?

8    A.    Yeah.  Once I, you know, got on the ballot, and I thought

9    things would kind of open up a little bit more to where I could,

10   you know, go outside of grocery stores and, you know, where

11   there was a bigger wave of people and events and certain things

12   to where I could get more signatures.  And being that, you know,

13   the amount of signatures needed for the ballot initiative, it

14   would almost make it impossible -- or not almost.  It would be

15   impossible to collect the amount of signatures needed to get

16   something on the ballot.

17            MR. HYMAN:  Okay.  Well, Your Honor, I pass the

18   witness.

19            THE COURT:  Cross.

20            MR. MOSLEY:  Yes, Your Honor.  Thank you.

21                      CROSS-EXAMINATION

22   BY MR. MOSLEY:

23   Q.    Mr. Talley, my name is Mike Mosley.  How are you doing

24   today, sir?

25   A.    I'm doing all right.

Talley - Cross                                    164

1    Q.   You are going to be on the general election ballot in

2    November as an independent candidate for your House district,

3    aren't you?

4    A.   Yes.

5    Q.   Congratulations.

6    A.   Thank you.

7    Q.   You collected -- I'm looking at your signatures here, your

8    petition.  You started collecting -- other than your own

9    signature, you started collecting signatures on April the 16th

10   of 2020.  Correct?

11   A.   I'm not looking at it, so I'm not for sure.

12   Q.   Well, let me ask you this.  This says from April 20th to

13   April 30th you collected all your signatures.  Do you have any

14   reason to dispute it only took you 14 days?

15   A.   I don't have a reason to dispute it.  I can't see it.

16   Q.   Okay.  You don't have a reason.  You are not disputing

17   that.  You are fine with that.  Okay.  Let me ask you a better

18   question.  In general, do you remember doing your collection

19   efforts in the mid to late part of April?

20   A.   Yes, sir.

21   Q.   Okay.  And you ran a real signature drive, didn't you?

22   A.   I don't understand what you mean.

23   Q.   You went street to street, door to door.  Correct?

24   A.   Yes, sir.

25              MR. MOSLEY:  All right.  Nothing further, Your Honor.

1          THE COURT:  Redirect.

2          MR. HYMAN:  Yes, Your Honor, if I may.

3                    REDIRECT EXAMINATION

4    BY MR. HYMAN:

5    Q.   Mr. Talley, do you have any health problems that would

6    prohibit you from going door to door?

7    A.   Not health-wise, no, sir.

8          MR. HYMAN:  Okay.  No further questions, Your Honor.

9          THE COURT:  May this witness step down and be excused?

10         MR. MOSLEY:  Yes, Your Honor.  This is Mike Mosley.

11         MR. HYMAN:  Yes, Your Honor.  Whit Hyman.

12         THE COURT:  You may step down.  You are excused.

13   Thank you so much.

14         MR. LINGER:  Your Honor, the plaintiffs would like to

15   call Lee Jarrod Evans to the stand.

16         THE COURT:  All right.  Ms. Washington will contact

17   Mr. Evans.  Bear with us just one moment.

18      Mr. Evans?  I wanted to make sure Mr. Evans is not on the

19   phone yet.  I didn't hear anybody dial in yet, but I just wanted

20   to make certain.  Ms. Washington has reached him, so he should

21   be dialing in here soon.

22      Mr. Evans?

23         THE WITNESS:  Yes.  I'm here.

24         THE COURT:  Ms. Washington will administer the oath.

25     **LEE JARROD EVANS, PLAINTIFFS' WITNESS, DULY SWORN**

```
 1              THE COURT:  All right.  You may proceed with direct.
 2              MR. HYMAN:  Thank you, Your Honor.
 3                          DIRECT EXAMINATION
 4     BY MR. HYMAN:
 5     Q.   So, Mr. Evans, would you please state your name and where
 6     you are from.
 7     A.   Lee Evans, Uniontown, Arkansas.
 8     Q.   Okay.  And what's your profession, Mr. Evans?
 9     A.   I run Evans Political Consulting.  We do petitioning and
10     fundraising.
11     Q.   Okay.  And you yourself have been a canvasser, have you
12     not?
13     A.   Yes.
14     Q.   Okay.  Now, you and I know each other, don't we?
15     A.   Yes.
16     Q.   Okay.  Would you say we're friends?
17     A.   Yes.
18     Q.   Okay.  And you know Mr. Whitfield, Dan Whitfield?
19     A.   Yes.
20     Q.   And you know him because he hired you, or his wife, rather,
21     hired you to collect signatures for his campaign.  Correct?
22     A.   That's correct.
23     Q.   And you know Mr. Fults because you used to work for him,
24     and, you know, who knows, maybe you'll work for him again in the
25     future.  Correct?
```

1    A.    That's correct.

2    Q.    Okay.  Now, you've collected a lot of signatures in

3    Arkansas for various things.  Right?

4    A.    Yes.

5    Q.    How many years have you been a canvasser?

6    A.    I started back in 2012 working on a medical marijuana

7    petition that was being circulated back then.  But I didn't

8    begin to do this full time until 2016, also starting again on

9    that same kind of issue.  And it's been growing exponentially

10   year after year since then.

11   Q.    And you collect signatures in other states as well.  Right?

12   A.    Yes.  That's correct.

13   Q.    And you've collected signatures for the Libertarian Party?

14   A.    Yes.

15   Q.    And what other causes and organizations have you collected

16   signatures for off the top of your head?

17   A.    Only Arkansas or anywhere?

18   Q.    Anywhere.

19   A.    Term limits, various candidate petitions.  Just this year I

20   was able to qualify the Prohibition Party's presidential

21   candidates.  I did that pretty much single-handedly.  What else

22   have I worked on?  Oh, there was a casino petition I helped out

23   on in 2018.  Then, of course, this year I've been working on the

24   coin-operated amusement machine amendments petitions, the one in

25   Florida to make sure only citizens were voting.  That's just off

1    the top of my head.  There's more.  I did another medical

2    marijuana petition in Missouri in 2017.

3    Q.    And last year did you collect signatures for optometrists?

4    A.    Yes.

5    Q.    I mean, there's a lot more than that.  Right?

6    A.    There's more, yeah.  The Libertarian Party in several

7    states.  Yes, there's more.

8    Q.    Okay.  And tell me about the coin-operated signatures.

9    What is that?  Coin-operated machines, what is that?

10   A.    It would allow places like gas stations to carry games of

11   chance with some skill involved.  As payment, you can win

12   scratch-off cards.

13   Q.    Okay.  And they were circulating a petition in Arkansas

14   this year?

15   A.    Yes.  It was suspended -- I don't have that exact date in

16   front of me -- but sometime mid-March.

17   Q.    Okay.  And did they get any reasons for the suspension of

18   signature collections?

19   A.    Yes.  COVID-19.

20              MR. MOSLEY:  Your Honor, respectfully, I don't want to

21   get into a whole thing about objecting here.  But it sounds like

22   the questions that are being asked relate to him potentially as

23   having some type of expertise.  And I thought this was a fact

24   witness as it pertains to Mr. Whitfield's campaign.  He's not

25   been disclosed as an expert to us.

1          MR. HYMAN:  Well, he is going to testify, Your Honor,

2     I believe, to the differences between collecting signatures this

3     campaign season as opposed to other campaign seasons and

4     specifically for Dan Whitfield's campaign.

5          THE COURT:  So here's what I'm going to say with

6     respect to this.  I haven't heard an opinion really.  I think he

7     can base his testimony on his experience with respect to these

8     issues.  For all of this, if you think he strays into an area

9     that requires some expertise that he is not qualified to give or

10    that you feel you weren't properly made aware of, you can

11    certainly let me know that.  But I've already heard from Mr.

12    Talley about his experience, prior experience in collecting

13    signatures.  I heard from Mr. Fults about his prior experience

14    collecting signatures at times other than this.  So I'm not

15    really sure what the basis of the objection is so far based upon

16    the testimony that I've heard yet or what I'm forecast to hear

17    with respect to this witness or how that differs from many of

18    the other witnesses I've already heard from today.

19          MR. HYMAN:  Thank you, Your Honor.

20          THE COURT:  You may proceed.

21          MR. HYMAN:  Thank you, Your Honor.

22    BY MR. HYMAN:

23    Q.   Mr. Evans, in suspending their campaign, did they list any

24    reasons why, you know, in particular?

25          MR. MOSLEY:  Objection.  Hearsay.

1   BY MR. HYMAN:

2   Q.   Okay.  So when you were going and collecting signatures

3   before COVID-19, did you notice a difference between that and

4   the signatures you collected after news reports started to

5   accumulate about COVID-19?

6   A.   Yeah, yeah.  People were becoming more wary about stopping.

7   People -- you know, this was -- so I did find a date for you

8   when I was able to stop collecting, which was March 13th.  I

9   believe that was the last day I collected signatures.  And that

10  week you could see a change.  People were starting to wear

11  masks.  I wasn't yet, but other people were.  So, yes, I did see

12  a change.

13  Q.   Okay.  And was it easier or harder for you to collect

14  signatures leading up --

15  A.   Harder.

16  Q.   Okay.  In particular, is anyone in your home

17  immunocompromised?

18  A.   My wife.  She has asthma, and she has arthritis.  So I had

19  reasons I needed to quit anyways.  But, you know, this is my

20  main -- this is the main way I bring income into my family.  So

21  I would have kept going if I could have.  But the coin-operated

22  amusement machines was my main source of income.  That was the

23  main contract I had, and they suspended all operations.

24  Q.   Okay.  And you were also paid to collect signatures for Dan

25  Whitfield.  Correct?

1    A.    That's correct.

2    Q.    How many signatures did you collect?

3    A.    129.

4    Q.    Okay.  And how many signatures have you been paid to

5    collect so far?

6    A.    The deal was for a thousand.  He paid for half up front,

7    which was 500.  It was actually supposed to be 1,250.  He ended

8    up paying 1,213.15.  I forget what happened at the time.  It

9    could have been PayPal took it out or something.  But, yeah, I

10   didn't have much time to collect them all, honestly.  I started

11   on March 4th, and I stopped on March 13th.  So I didn't get near

12   the job that I wanted to get done for them, unfortunately.

13   Q.    Okay.  And you've collected signatures for ballot access

14   even this year for other candidates.  Correct?

15   A.    Yeah, yeah.  Namely the Prohibition Party candidates.  It

16   doesn't actually say the party name on there, but it's the

17   presidential candidates.  I turned in 1,400 signatures to get on

18   the ballot.  And they are certified.

19   Q.    When did you collect those signatures?

20   A.    I don't have the exact date in front of me, but I believe I

21   was able to complete that February, or maybe it was December.

22   Somewhere around then was when I completed that.  And I'm also

23   working on the Solidarity Party presidential candidates.  And I

24   currently have 842 signatures on that one.

25              THE COURT:  What party was that, Mr. Evans?  You cut

1    out.

2                THE WITNESS:  Oh, sorry.  The Solidarity Party.

3                THE COURT:  Thank you.

4                THE WITNESS:  You are welcome.

5                MR. HYMAN:  Okay.  Your Honor, I pass the witness.

6                THE COURT:  Cross.

7                MR. MOSLEY:  Your Honor, this is Mike Mosley.

8                          CROSS-EXAMINATION

9    BY MR. MOSLEY:

10   Q.   Mr. Evans, my name is Mike Mosley.  And I'm representing,

11   with some other attorneys, the secretary of state in this case.

12   Had you been contacted by Mr. Whitfield before or, rather, Mr.

13   Whitfield's wife, before March the 4th -- let's say you had been

14   contacted in January so you could have ramped up and gotten

15   ready to start collecting petitions, petition signatures, on

16   February 1st, you would have gotten a lot more, wouldn't you

17   have?

18   A.   If you are asking if they would have contacted me earlier

19   would I have gotten more signatures?  If that's the question,

20   yes.

21   Q.   Okay.

22   A.   Yes.

23   Q.   Do you have any employees?

24   A.   Subcontractors.

25   Q.   Did you use any subcontractors on the Whitfield project,

1    I'll call it?

2    A.   They turned down the petition.  For whatever reason, they

3    didn't want to do it.

4    Q.   Were you on your own on that?

5    A.   Yes.

6              MR. MOSLEY:  Pass the witness, Your Honor.

7              MR. HYMAN:  No further questions.  He may be dismissed

8    as far as the plaintiffs are concerned.

9              THE COURT:  And defense counsel, may Mr. Evans step

10   down and be excused?

11             MR. MOSLEY:  Yes, Your Honor.

12             THE COURT:  Thank you, Mr. Evans.  You are excused.

13             THE WITNESS:  Thank you.

14             MR. LINGER:  Your Honor, can we take just five

15   minutes?

16             THE COURT:  Why don't we go ahead and take a little

17   bit longer.  Why don't we go ahead and take about a ten-minute

18   break.  It is now 3:30.  Why don't we come back at 3:40.  And at

19   that point I think the plaintiffs still have one more witness to

20   call.

21        Is that right, Mr. Linger?

22             MR. LINGER:  Yes, Your Honor.  We will call Mr.

23   Winger.

24             THE COURT:  We'll take a ten-minute recess.  We'll

25   come back on the line at 3:40.  We're in recess.

1           (Recess from 3:32 p.m. until 3:47 p.m.)

2               THE COURT:  This is Judge Baker.  We're back on the

3       record.  Let me call the roll and make sure everybody has joined

4       us.

5           Mr. Linger, are you on the line?

6               MR. LINGER:  Yes, Your Honor.

7               THE COURT:  Mr. Hyman, are you on the line?

8               MR. HYMAN:  Yes, Your Honor.

9               THE COURT:  Mr. Whitfield?

10              MR. WHITFIELD:  Yes, Your Honor.

11              THE COURT:  Mr. Fults?

12          Mr. Fults, if you are speaking, we can't hear you.  You may

13      be muted.

14          Mr. Winger, are you on the line?

15              MR. WINGER:  Yes, Your Honor.

16              THE COURT:  Mr. Bronni, are you on the line?

17              MR. BRONNI:  Yes, Your Honor.

18              THE COURT:  Mr. Jacobs, are you on the line?

19              MR. JACOBS:  Yes, Your Honor.

20              THE COURT:  Mr. Wagner, are you on the line?

21              MR. WAGNER:  Yes, Your Honor.

22              THE COURT:  Mr. Mosley, are you on the line?

23              MR. MOSLEY:  Yes, Your Honor.

24              THE COURT:  Ms. Cox, are you on the line?

25              MS. COX:  Yes, Your Honor.

1      THE COURT:  Mr. Fults, have you joined us?

2      MR. FULTS:  Yes, Your Honor.

3      THE COURT:  All right.  Mr. Linger and Mr. Hyman, you

4  may call your next witness.

5      MR. LINGER:  Your Honor, I'll be handling Mr. Winger.

6  This is Mr. Linger.  Mr. Winger we would call to the stand.

7      THE COURT:  Mr. Winger, Ms. Washington will administer

8  the oath.

9      **RICHARD WINGER, PLAINTIFFS' WITNESS, DULY SWORN**

10      THE COURT:  You may proceed.

11      MR. LINGER:  Your Honor, we have previously admitted

12  into evidence Plaintiffs' Exhibit 3, which is the declaration of

13  Richard Winger; Plaintiffs' Exhibit 4, his CV; Plaintiffs'

14  Exhibit 5, which is a ballot access chart of independent

15  candidates for the U.S. Senate; Exhibit 6, which is an amended

16  order of April 30th, 2018, in the *Moore v. Martin* case; then

17  Exhibits 7 and 8, which are letters from John Thurston, one on

18  July 29 and the second one on December 10, 2019, to the

19  Libertarian Party chairman, Dr. Michael Pakko, acknowledging

20  mistakes that were made and what they thought were the number of

21  ballot signatures.  And that is our direct testimony for Mr.

22  Winger.

23      THE COURT:  All right.  Cross.

24      MR. MOSLEY:  This is Mike Mosley, Your Honor.

25                  CROSS-EXAMINATION

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1    BY MR. MOSLEY:

2    Q.    Mr. Winger, how are you doing today, sir?

3    A.    Oh, it's been a long day.  But I'm doing fine.  Thank you.

4    Q.    Are you in San Francisco?

5    A.    Yes.

6    Q.    Your declaration that's been submitted here in evidence as

7    your direct testimony, that represents all of the opinions and

8    conclusions you've made in this case.  Is that correct?

9    A.    Well, I'm not too sure what to say.  I probably do have

10   miscellaneous thoughts in my head that aren't in there.  But I

11   think I put what I felt was important in there.

12   Q.    Okay.  So your opinions, though, starting on page 7, I

13   understand that you say, "I see no reason that the deadline," of

14   May 1st, and then you say, "in light of Judge Moody's amended

15   order, could not also be May 1st for the filing of the

16   independent candidate political practice pledge, affidavit of

17   eligibility, and notice of candidacy."  That's your opinion

18   about the candidate filing deadline?

19   A.    Yes.

20   Q.    Okay.  And then, flipping over to the next page, on page 8,

21   at the bottom there of that first big paragraph -- it actually

22   starts on the earlier page:  "Therefore, I see no reason that

23   the independent petition deadline for petition signatures and

24   the deadline for the independent political practices pledge,

25   affidavit of eligibility and notice of candidacy could not also

1    be both May 29th of the general election or even as late as

2    July 6th of the general election year."  That's your opinion

3    with respect to the petition filing deadline for signatures.

4    Correct?

5    A.    Yes.

6    Q.    Okay.  And then, on paragraph 9 there, at the bottom, last

7    sentence:  "Therefore, I see no reason why the independent

8    petition for non-presidential candidates could not be 150 days,

9    as it once was, or even a year or more, as it is in most states,

10   or for the independent presidential petition for Arkansas."

11   That's your opinion with respect to the number of days a

12   candidate has in Arkansas to canvass, to get signatures.

13   A.    Yes.

14   Q.    Is that correct?

15   A.    Yes.

16   Q.    Do you recall the *Hall* case you worked on in the 11th

17   Circuit in Alabama?

18   A.    Yes.

19   Q.    Okay.  Let me see if we can agree on some general things

20   that you might agree on with respect to independent candidacy.

21   You need funds as an independent candidate to run a campaign.

22   Would you agree with that statement?

23   A.    Could you repeat that, please?

24   Q.    You need funds, funds, money, as an independent candidate

25   to run a campaign.

1  A.   No.  I remember U.S. Senator William Proxmire was very

2  proud of the fact that when he ran for re-election to the U.S.

3  Senate time after time, he didn't spend anything.  And he still

4  got re-elected.  I wouldn't say it's all that you need money.

5  Q.   Do you think -- do you agree that you need an organization

6  for a campaign as an independent candidate?

7  A.   It depends on the jurisdiction.  If it's a very small

8  jurisdiction, the kind of jurisdiction where it's plausible to

9  go around and meet every voter in the jurisdiction, no, I would

10 think that one person could do it without an organization.

11 Q.   Right.  But in Mr. Whitfield's case, that's not plausible

12 because it's a statewide election for United States Senate.

13 That's not plausible.  He needs an organization.  Correct?

14 A.   Well, maybe you should specify for what purpose.

15 Certainly, if he's bound and determined that he is really going

16 to try and win and feels he can win, yes, he has to have an

17 organization.

18 Q.   In order to collect 10,000 signatures, he's going to need

19 an organization for a statewide office.  Correct?

20 A.   Not necessarily.  There's a man in Ohio who has run for

21 president as an independent for the last four presidential

22 elections, and he needs 5,000.  And all four times, he's

23 collected every single signature himself, but it takes him a

24 long time.

25 Q.   But he's able to do it.

1    A.    Yes.

2    Q.    If you have an organization, should you assign major duties

3    to staff?  Do you agree with that?

4    A.    I have a very feeble opinion, but that's getting outside of

5    my area of knowledge.  I've never ever run a campaign.

6    Q.    You've never run a campaign before?

7    A.    No.

8    Q.    Okay.  Your area is that of data and information with

9    respect to independent candidacies, third-party candidacies and

10   filing requirements throughout the state.  Would you agree with

11   me that's generally speaking your area that you know about?

12   A.    Yes.  I tend to know which independent candidates have got

13   on the ballot for various offices through history, and I tend to

14   know what the requirements were through history for independent

15   candidates.

16   Q.    Going back to the 1800s.  Correct?

17   A.    Well, we didn't have any ballot access laws until 1889.

18   But yes, going back that far, yes.

19   Q.    With respect to Mr. Whitfield, he would need volunteers in

20   order to get 10,000 signatures in your opinion, don't you think?

21   A.    Well, he either needs volunteers, or he needs paid

22   circulators or, if he has long enough, he could be like Mr.

23   Hall.  You mentioned Alabama, Mr. Hall.  He and his wife got all

24   his signatures.  But you need a lot of time to do that.

25   Q.    If you have volunteers, they need to be trained, don't

1   they?

2   A.   Not necessarily.  But it's advantageous.

3   Q.   I mean, to avoid duplicative efforts, for instance.  You

4   want to make sure you stay in constant contact with your

5   volunteers or at least, you know, fairly constant contact so you

6   don't have a group of volunteers going to the same neighborhood

7   as another one has already been.  Correct?

8   A.   Well, that makes sense.

9   Q.   Do you recall your work on the Tobin campaign for secretary

10  of state in California?

11  A.   Yes.  Christina Tobin was a friend of mine.  And she asked

12  me to be her campaign manager, and I did say I would do it.  I

13  probably shouldn't have accepted because I really didn't have

14  the expertise to do that.

15  Q.   Okay.  Would you agree with me, though, that press releases

16  can help drive support for a campaign, even an independent

17  campaign?

18  A.   Yes.

19  Q.   And that was your experience with Ms. Tobin.  Correct?

20  A.   She did her own press releases.  She was quite skilled at

21  public relations.

22  Q.   She called potential petition signers herself, didn't she?

23  A.   Well, I don't remember that.  But I do remember attending

24  the California Libertarian state convention to get signatures.

25  She needed 150 signatures of registered Libertarians to avoid

1    paying the filing fee, and we succeeded in getting those 150
2    Libertarian signatures.
3    Q.    She also had mailing lists.  Correct?
4    A.    I really don't know.
5    Q.    Okay.  Do you recall giving deposition testimony in a
6    lawsuit named Martin Cowen versus Brian Kemp back in 2019?
7    A.    A Georgia case.  Right?
8    Q.    I believe you are correct.
9    A.    Who was the first named plaintiff?
10   Q.    Martin Cowen.
11   A.    Oh, yes.  I remember that.
12   Q.    I asked you a minute ago about volunteers or paid
13   canvassers.  And you said it depends, right, on whether somebody
14   needs volunteers or paid canvassers.  Right?
15   A.    Well, the third alternative would be do it all by himself
16   or herself.
17   Q.    But to get the requisite number of signatures and
18   specifically with respect to Mr. Whitfield, he needed volunteers
19   or paid canvassers, didn't he?
20   A.    Yes, given the 90 days.  I think it's conceivable he could
21   have got them all himself if he had had unlimited time.
22   Q.    Do you have any information about Mr. Whitfield's
23   willingness to call potential petition signers himself?
24   A.    No.  I don't know anything about that.
25   Q.    And do you have any knowledge about Mr. Fults calling

1   potential petition signers himself?

2   A.   No, I don't.

3   Q.   Okay.  You are not offering an opinion about that.

4   A.   No.

5   Q.   I noticed in your CV and your opinion, you talk about legal

6   cases.  Correct?

7   A.   Well, from my CV, I do certainly list a lot of lawsuits by

8   name and sometimes with a citation.

9   Q.   You mention specific lawsuits in your declaration, don't

10  you?

11  A.   Well, I guess I need to --

12  Q.   Let's take a look.  Look at paragraph 8.

13  A.   Yes.  I see them there, yes.

14  Q.   Then look at paragraph 11.

15  A.   I see that.

16  Q.   So you do talk about lawsuits.  You do talk about specific

17  lawsuits in your declaration.  Correct?

18  A.   Yes.

19  Q.   And most of the cases on the issue of deadline, filing

20  deadline or petition deadline, that have struck down those laws,

21  have done so where the deadline to submit signatures was well in

22  advance of a primary election.  Isn't that correct?

23  A.   Not every single one, no.

24  Q.   Most of them, would you agree, strike them down because

25  they predate -- they precede the primary election?

Winger - Cross

1    A.   That is generally true if the plaintiffs are running for

2    office other than president.  But if they are running for

3    president, there's generally no connection to the date of a

4    primary.

5    Q.   You think that's generally true for candidates other than

6    presidential candidates?  And that's what we have in this

7    lawsuit, don't we?

8    A.   Yes.

9    Q.   Okay.  So here, in Arkansas, you understand that an

10   independent candidate has 58 days or thereabouts approximately

11   after the primary election in Arkansas, which is March 3rd, to

12   submit their signatures to the secretary of state's office.

13   Correct?

14   A.   Yes.

15   Q.   Okay.  I know you are familiar with these legal opinions.

16   Are you familiar with the *McLain v. Meier* case out of our

17   circuit, the Eighth Circuit?

18   A.   Yes, although there were two cases from the Eighth Circuit

19   with that name, one in 1980 and one in 1988.

20   Q.   I'm referring to the one that upheld a 7,000 signature

21   requirement and a deadline of 55 days before the primary

22   election.  Do you recall that case?

23   A.   Yeah.  That's the 1988 one.

24   Q.   Okay.  The later case.

25   A.   Yes.

1    Q.    Would you agree that the law out there in various states,

2    in Arkansas, is that a state has an interest in ensuring a

3    candidate has bona fide support?

4    A.    I want to be not picky, but I would like to ask you to

5    define support.

6    Q.    As evidenced by petition signatures.

7    A.    In U.S. history, there has been minor parties and

8    independent candidates who are very socially significant and

9    very valuable to society that they be allowed to compete.  And,

10   yet, they had very little support.  I certainly agree that the

11   ballot should be confined to people who have a serious political

12   and social goal.  And I certainly approve of excluding people

13   who just want to have the ego thrill of having their name on the

14   ballot when they think having their name on the ballot is good

15   for their business or something.

16   Q.    Right.

17   A.    But --

18   Q.    I'm sorry, Mr. Winger.  Go ahead.

19   A.    I was just thinking of the first socialist presidential

20   candidate in this country in 1892, Simon Wing of the Socialist

21   Party.  He only got one -- not even one-fifth of 1 percent of

22   the vote.  He clearly did not have much public support.  But it

23   would have been a mistake for this country to have prohibited

24   that movement from getting going because it did contribute a lot

25   to the value.  And I'll give you just one more example.  I won't

1    keep going.

2         But the very first antislavery organization in this country

3    happened to have been a minor party, the Liberty Party, in 1840.

4    They were the first group that actually said we should get rid

5    of slavery entirely.  That was very controversial.  They ran for

6    president and only got a half a percent.  They didn't have much

7    support, but it was socially valuable to let them compete.

8    Q.   But my question was -- and I think you answered it exactly

9    what I thought you would say based on what I've reviewed of your

10   prior opinions -- is that the state has an interest in ensuring

11   that people just aren't getting on the ballot for the thrill of

12   it or to promote a business or for some other frivolous reason.

13   And I understand you don't like the term frivolous candidacies.

14   But the state has an interest in that.  Correct?

15   A.   Yes.

16   Q.   And one way to ensure that we're not dealing with a

17   frivolous candidacy is a signature requirement.  Right?

18   A.   No.  I don't agree with that at all.  I think petitioning

19   is a very poor way to measure that.  Obviously -- go ahead.

20   Q.   Okay.  That's why I'm trying to figure out what your

21   opinion is on that.  Because in reviewing the *De La Fuente* case

22   from the Fifth Central District of California that you worked on

23   in 2017 -- do you remember that case?

24   A.   Did you say 2017?

25   Q.   Maybe I have the year wrong.  But it's *De La Fuente*.  Yes,

Winger - Cross

1   2017.

2   A.   Oh, of course.  You mean the Ninth Circuit after the

3   election.

4   Q.   Did you not advocate there that the state could avoid

5   ballot overcrowding and voter confusion by requiring independent

6   candidates to get more than 5,000 signatures but less than a

7   percent?

8   A.   Yes.  I presented evidence if the state requires at least

9   5,000 signatures, you will never have a crowded ballot if

10  crowded ballot is defined as eight candidates, more than eight

11  candidates.  And I got that definition from a concurring opinion

12  in *Williams v. Rhodes*, where Justice Harlan said he didn't think

13  eight candidates for any particular office would cause voter

14  confusion.

15  Q.   But that is what you said.  One way to avoid overcrowding

16  and voter confusion is for independent candidates to get more

17  than 5,000 signatures but less than 1 percent.  That is what you

18  said.  Correct?

19  A.   Sir, it is specific.  I said 5,000 signatures will

20  guarantee against ballot crowding, period.

21  Q.   Okay.  Here both Mr. Whitfield and Mr. Fults fit within

22  that range as far as the percentage goes.  It's less than

23  1 percent for Mr. Whitfield and less than 5,000 for Mr. Fults.

24  Correct?

25  A.   The petition should be measured by raw numbers, not

Winger - Cross                                    187

1    percentages.

2    Q.    Okay.  You would agree, though -- well, I should tell you,

3    you understand that the parties have agreed here that Mr.

4    Whitfield only needed .58 percent of registered voters, and that

5    amounted to 10,000 signatures.  The parties have agreed to that.

6    You understand that.  Right?

7    A.    Yes.  But I would like to reiterate that any attempt to

8    correlate the number of candidates to qualify with a percentage

9    fails miserably.  What succeeds is a very nice, neat correlation

10   between the number of signatures, not a percent, a number, and

11   the number of candidates who qualify.

12   Q.    Okay.  So do you know -- well, let me move on.  Page 4 of

13   your declaration, we talk about independent candidates or the

14   lack thereof.  And you are also talking about -- strike that.

15   On page 4, you are talking about -- your declaration, you talk

16   about various candidacies where there was no challenger.  Right?

17   A.    Right.

18   Q.    That doesn't really tell us anything about how burdensome

19   running as an independent might be against those individuals

20   because we don't know why nobody ran against them.  Right?

21   A.    Right.

22   Q.    The statistics on page 6 of your declaration, where you

23   discuss independent candidate success in getting on the ballot

24   in Arkansas in past years, can you refer to that, please?

25   A.    All right.  I'm looking at that.

1    Q.    Those statistics come from years when the filing deadline

2    for signatures was considerably earlier than May 1st, don't

3    they?

4    A.    Yes.

5    Q.    Okay.  The statistics that you recite on page 7 of your

6    declaration, would you agree with me those come directly from

7    Judge Moody's order in *Moore v. Martin*?

8    A.    Yes.

9    Q.    Again, those are statistics when the deadline to turn in

10   signatures was earlier than May 1st.

11   A.    Well, there was a while there when the deadline was at the

12   end of May.  For instance, and I was just reviewing the language

13   of the case from 1992.  And that was a victory for the State of

14   Arkansas.  But the federal court upheld the deadline then, which

15   was either May 1st or the date of the primary, whichever is

16   later.  So there was a time there when the independent

17   non-presidential deadline was in late May.

18              MR. MOSLEY:  Okay.  Your Honor, I pass the witness.

19              THE COURT:  Redirect?

20                         REDIRECT EXAMINATION

21   BY MR. LINGER:

22   Q.    Mr. Winger, you were asked in regard to Mr. Fults and Mr.

23   Whitfield about their requirement being less than 1 percent.  Do

24   you remember that?

25   A.    Yes.

1   Q.   Was Mr. Fults' requirement less than 1 percent, or was that

2   -- he was 3 percent of the total vote cast for governor.

3   A.   Right.  I suppose if you worked it out, it's probably 1 1/2

4   percent to one or two-thirds percent of the total number of

5   registered voters.

6   Q.   You were asked about, you know, using like the registered

7   voters.  What's the problem with using the latest figures of the

8   number of registered voters and figuring out what people's

9   interest in election is in petitions?

10  A.   As I said in my report, I used to try to do that.

11  Obviously, you need a fair denominator to make a fair

12  comparison.  And I used to think, well, obviously, the number of

13  registered voters.  But it was very frustrating.  Some states

14  would have election-day registration, and you could never get

15  them to say precisely how many registered voters there were.

16  Furthermore, most states didn't have election-day registration,

17  so I felt that was a little unfair.  Then, as I said, North

18  Dakota doesn't even have voter registration.  And what do you do

19  with that?  So I just thought from now on all my charts are

20  going to be using the denominator the presidential vote, because

21  I think that's fair.

22  Q.   Why is that?

23  A.   Well, because the true number of how many active voters in

24  a state are how many people turn out to vote for president in a

25  general election.  That is always our highest turnout election

Winger - Redirect

1    in this country.

2    Q.    And are registered voters, sometimes they are actually dead

3    by the time elections or petitions come around.

4    A.    That's a very good point.  My own state of California is

5    somewhat famous for having very bloated voter registration

6    rolls.  There's lots of voters on the rolls twice.  You know,

7    women change their name when they get married.  They

8    re-register, and then the original registration doesn't get

9    deleted, things like that.

10   Q.    Counsel asked you about the *McLain v. Meier* case, and

11   you've talked about the one 1980 case and 1988 case.  Was one of

12   the factors there -- do you remember anything there about them

13   looking at past history at how many candidates were successful

14   in petitioning?

15   A.    Well, in the 1980 case, the court noted that the law had

16   been passed in 1939.  In all the years from 1939 to 1980, only

17   one party petition had succeeded.  That was the American Party

18   in 1976.  And I think that's the key fact that led the Eighth

19   Circuit to invalidate the 15,000 signature requirement.

20   Q.    In the 1988 case, was that for an independent candidate for

21   office, or was that for someone who was associated with some

22   political party?

23   A.    Well, that was technically another minor party case.  The

24   party was called Chemical Farming Banned.  It was really kind of

25   a one-person party, but he wanted to be a party.  He thought

1   since he had won the 1980 case against 15,000 signatures due in

2   June, he thought he could win a new case against the new law,

3   which was 7,000 signatures due in April.  But he guessed wrong,

4   and he lost.

5   Q.   In this case, *McLain v. Meier*, did North Dakota, did they

6   limit the petitioning to just 90 days?

7   A.   No.  Well, okay.  It was a one year.

8   Q.   One year.  How many -- by the way, since they brought up

9   that case, how many states actually allow only 90 days to

10  petition for independent candidates?

11  A.   Well, I don't have that right handy.  So I could take a

12  wild guess, but I could also take a second here to root around

13  and find the chart.  Is that okay?

14  Q.   You are talking about -- are you talking about your chart

15  which is Exhibit 5?

16  A.   No.  I have a chart that gives start dates.  And I should

17  pull that out of my file cabinet and look at it if I'm going to

18  be accurate.  It will just take me 15 seconds.

19  Q.   All right.  Go ahead.

20  A.   Okay.  I have a chart here.  It's a little out of date, but

21  I'm going to eyeball it here.  Colorado, Minnesota, New York, I

22  think that's about the only states that have a petitioning

23  period for non-presidential independents that's less than 90

24  days.

25  Q.   Okay.  What do most states allow for a petitioning period?

Winger - Redirect                                    192

1   A.   The majority of states simply never bothered to say how

2   soon can you start.  The majority just don't care.

3   Q.   In the *McLain v. Meier* case, where they talked about the

4   success of previous candidates, how would you characterize then

5   independent candidates in Arkansas, because they asked you about

6   when the deadline was a little bit earlier, at least for a

7   period of time, when it was March 1st, that was declared

8   unconstitutional.  And you used Judge Moody's example of how

9   many independents tried to petition and how many were

10  successful.  How do you compare that in general to what's

11  happening now this year, where it appears only two independent

12  candidates for state representative, where the number of

13  signatures were in the low 200s they had to have, were

14  successful?  How would you characterize that as far as this

15  being something that is complied with by independent candidates

16  in Arkansas?

17  A.   Well, it seems like this year is quite a short draw in the

18  number of independent candidates compared to the numbers in

19  paragraph 8.

20  Q.   Were any independent candidates successful for either

21  non-presidential, statewide, U.S. House of Representatives or

22  even state Senate?

23  A.   No, not this year.

24  Q.   Is that a factor that you think is important that shows the

25  difficulty of the law?

Winger - Redirect                                                193

1    A.    Well, we haven't really talked about the health problem.

2    But I think that the health problem is the main reason why the

3    number is lower this year than in recent other years.

4    Q.    Even though they had an extra couple of months to petition?

5    A.    Well, it's a mixed blessing, like some of the witnesses

6    said.  I mean, they lost some time at the beginning.  I mean,

7    it's been 90 days both before and now.  It's just a different 90

8    days.

9    Q.    All right.  Counsel had asked you about something in your

10   declaration, which is your direct testimony here today, in

11   regard to a number of cases you had cited in there, and

12   particularly about the independent candidates having to do their

13   declaration of candidacy, affidavit of eligibility, political

14   practices pledge back in early November, a year before the

15   election.  Obviously, you were present when they were

16   questioning the two plaintiffs, that they were able to do that

17   back in November.  But what about other candidates, whether they

18   are major party candidates or new party candidates or other

19   independent candidates?  Do you think that limited the number of

20   people who would try because they had to make a decision a year

21   before the election?

22           MR. MOSLEY:  Objection, Your Honor.  It calls for

23   speculation, and it's irrelevant.

24           THE COURT:  Mr. Linger, what's your response?

25           MR. LINGER:  I think it is relevant, Your Honor,

1   because it's one of the reasons and one of the explanations for

2   why the ballot in Arkansas has so few even major party

3   candidates contesting an incumbent, let alone.  Obviously,

4   anybody who filed at that time did so.  But I'm asking Mr.

5   Winger about his view as to why and how that affects other

6   potential candidates.

7            THE COURT:  I'll allow the question to be asked of the

8   expert witness.  You can proceed.

9            THE WITNESS:  The U.S. Supreme Court decision in

10  *Anderson v. Celebrezze* talks a lot about that.  Public events

11  occur, some of them very unexpected.  People's attitudes about

12  political issues change.  New issues come up.  So when the state

13  puts the deadline for any kind of candidates too far before the

14  election, well, that curtails the ability of people to get into

15  the race because they are motivated by issues that came up at

16  the last minute or last few months.

17       I'm going to mention in 2000, the United States State

18  Department filed a human rights complaint against the country of

19  Azerbaijan because there was a new election law which said a

20  party could not be on the ballot unless it had been in existence

21  more than six months before the election.  And we said, our

22  state department, that that was a bad policy and it violated

23  voting rights.  So I tried to mention that in as many articles

24  as I had a chance to write.  I think it's so interesting that

25  the United States criticized Azerbaijan for something that some

Winger - Redirect

1    states in this country do.

2    BY MR. LINGER:

3    Q.    Thank you.  Now, in regard to page 6, paragraph 8, you were

4    questioned about that in your declaration, which is your direct

5    testimony.  And I think it was asked if you had taken a number

6    of statements there at the bottom of page 6, in paragraph 8, and

7    the top of page 7, also in paragraph 8, that you had taken that

8    from Judge Moody's decision in January of 2018 in the *Moore v.*

9    *Martin* case.  Do you remember that question?

10   A.    Yes.  It was simpler to just borrow it rather than going

11   through and figuring it out fresh for myself.

12   Q.    In that regard, at the top of page 7, under what I think

13   was paragraph No. 22 in Judge Moody's decision, did you

14   actually -- and you took that from what he said.  Did you find a

15   mistake in that finding as to the year 2006?

16   A.    Yes.  Just last night I saw that for 2006 it should have

17   said there was an independent candidate for governor, Rod Bryan.

18   Unfortunately, it says here there were none in 2006, so that's a

19   mistake.

20   Q.    Okay.  And that was a mistake in Judge Moody's decision

21   then that you took from him?

22   A.    Yes.

23   Q.    And you noticed that.  All right.  Is the fact in the last

24   40, more than 40 years, there's only been three successful

25   independent candidates other than a president to get on the

Winger - Redirect

1   ballot in Arkansas at 10,000 signatures?

2   A.   Yes.  I think that's one of the key facts in this case.

3   Q.   In regard -- your declaration and your direct testimony was

4   based partly on your review of Ms. Cox's declaration and report

5   and everything.

6   A.   Right.

7   Q.   In that regard, did you find that she had made any mistakes

8   or had failed to mention anything of importance?

9   A.   Well, I wouldn't put it exactly like that.  But I feel some

10  of the points were quite misleading.

11  Q.   What are those, please?

12  A.   Well, her No. 12, on page 3, the report says, "Signatures

13  may be obtained from any," italicized, "any Arkansas voter

14  regardless of partisanship.  This is especially advantageous for

15  independent candidates, as it opens up the pool of registered

16  voters to include any registered voter (not just registered

17  independents)."  But there is no state that tells independent

18  candidates they can only collect signatures from independent

19  voters.

20  Q.   And how about having any voter can sign?  How many states

21  allow that?

22  A.   Well, there's only one state that excludes lots of

23  registered voters.  And that's Texas, where you can't sign if

24  you voted in the primary.  Then there's a slight number of

25  registered voters who can't sign in New York and Illinois,

1    because in New York and Illinois, if the voter signed a petition

2    to get somebody on a primary ballot, he or she can't sign a

3    general election petition.  But that's typically riding on the

4    one-half of 1 percent of the electorate, because the primary

5    petitions aren't that high in those states.

6    Q.   Now, she had stuff about Republicans petitioning in Utah.

7    Republicans can only be on the ballot if they petition, or is

8    there an alternative in Utah?

9    A.    In Utah, probably a majority of Republican nominees never

10   have to petition, if we're counting all the state legislators,

11   especially.  The majority of them get approved at a party

12   meeting.  People have to be approved by a party meeting.  They

13   don't have to have a majority either.  They just have to have

14   like 35 percent.  They don't need to petition.

15   Q.   Also, while that's about the Republicans, how many

16   signatures does Utah, a state that's a little bit bigger than

17   Arkansas, by about a hundred thousand people or so, how many

18   signatures does an independent candidate have to get on the

19   ballot statewide in Utah?

20   A.   1,000.

21   Q.   1,000.  Just 10 percent of Arkansas.  Finally, there was

22   some comments, I think, about out-of-state circulators.  What is

23   that like in other states, bans on out-of-state circulators?

24   Has anything happened on that recently?

25   A.    Over the past 20 years, there's been many lawsuits striking

1   down laws that prohibit out-of-state circulators.  So we're to

2   the point now where for independent candidates, the only states

3   that still ban out-of-state circulators are New York and South

4   Dakota.  And in New York, a U.S. district court invalidated that

5   in a Libertarian Party case.  Then, a few weeks later, the

6   Libertarian Party got enough votes with the 2018 election to be

7   a qualified party.  Then the state appealed, and the Second

8   Circuit said, well, we're wiping out the district court decision

9   because the issue is moot because they are on the ballot now.

10  So it's a little ambiguous now in New York because, obviously,

11  somebody else can file a new lawsuit.

12  Q.   In regard to -- and you were present in the court and heard

13  the testimony from Mr. Fults and Mr. Talley and also Sandra

14  Furrer in regard to certain problems they had with the secretary

15  of state's office about the way they counted and validated

16  signatures.

17  A.   Right.

18  Q.   I notice you attached the letters to the Libertarian chair

19  that they sent out back in July and December of last year, where

20  they admitted that they had made a mistake of 2,030 valid

21  signatures.  Does that give you a concern about what was raised

22  by these other witnesses, where they talked about problems with

23  the secretary of state's office and the way they did their work

24  and the correctness of it?

25  A.   I'm not willing to say.  I think there's a general problem

Winger - Redirect                                                199

1    with accuracy.  I think that checking signatures is very

2    demanding work.  However, in a very related point, I think it's

3    very strange that a state like Arkansas would make the

4    calculation so difficult, because to figure out 3 percent of the

5    last gubernatorial vote inside a state legislative district is a

6    lot of work.  I mean, somebody has to get the gubernatorial

7    election returns off the shelf and look at all the precinct

8    returns and add them all up to figure out, well, what is

9    3 percent.  It would be so much simpler if the state would just

10   have a raw number.

11   Q.    Considering the combined effect of all of this and the

12   90-day limitation in regard to the effect of bad weather and a

13   deadly disease like the coronavirus, do you see any reason why

14   it should only be limited to 90 days for non-presidential

15   independent candidates when they let presidential independent

16   candidates have as much time as they want to collect signatures?

17   A.    That's right.  And that's the policy in the majority of

18   states.  Apparently, that's the Arkansas policy for initiatives.

19   Q.    For initiative -- for initiatives, there's an unlimited

20   time along with the independent presidential candidate.  Isn't

21   that correct?

22   A.    I believe so.

23   Q.    Do you see any reason why the independent -- all the rest

24   of the independent candidates should have to collect their

25   signatures in only 90 days?

1   A.   No.  I don't really see any rationale for it.

2   Q.   Voter fraud, overcrowded ballot, a modicum of support, does

3   that have any -- can you see a relationship that would justify

4   the state from limiting to only 90 days?

5   A.   No.  I've often thought that petitioning is core First

6   Amendment activity.  And if somebody wants to start really,

7   really early, like with Richard Duncan, the independent

8   presidential candidate in Ohio, who always takes three years,

9   okay.  I don't see any harm in letting people do that if they

10  want to.

11          MR. LINGER:  At this time I have no further questions

12  for the witness.

13          THE COURT:  Okay.

14          MR. MOSLEY:  Brief follow-up.

15                      RECROSS-EXAMINATION

16  BY MR. MOSLEY:

17  Q.   Mr. Winger, you forgot Illinois when you were talking about

18  the 90-day requirement when you were answering Mr. Linger's

19  questions.  They have a 90-day limitation too, don't they?

20  A.   Well, I was thinking of Illinois.  That was in my head.

21  But I thought the question was fewer than 90 days.

22  Q.   So your answer regarded states that have fewer than 90

23  days, not states that have 90 days.  Correct?

24  A.   Right.

25  Q.   Okay.  Then there is no prohibition in Arkansas that you

1  know of that out-of-state circulators can't operate here, is
2  there?
3  A.   No.
4  Q.   And it is true that you can collect signatures from any
5  registered voter in Arkansas.  Right?
6  A.   Yeah.
7            MR. MOSLEY:  Nothing further, Your Honor.
8            MR. LINGER:  Your Honor, may I have permission to ask
9  one more question of Mr. Winger?
10            THE COURT:  You may.  He's your witness.
11                   FURTHER REDIRECT EXAMINATION
12  BY MR. LINGER:
13  Q.   Mr. Winger, speaking of Illinois, the recent case up there
14  I think the Libertarian Party filed, didn't the district judge
15  there in regard to the coronavirus reduce the petitioning
16  requirement to 10 percent of what it normally was?
17  A.   Yes.  He expanded the petitioning time.  So for 2020, the
18  Illinois petitioning period is longer.  It runs from late March
19  to July 20th, so that's about -- it's more like four months this
20  year.
21  Q.   And only 10 percent of the normal requirement now.
22  A.   Right.
23  Q.   All right.  Thank you.
24            MR. LINGER:  May this witness be excused, Your Honor?
25            THE COURT:  He may.

1          THE WITNESS:  Thank you.

2          THE COURT:  Anything further on behalf of plaintiffs?

3          MR. LINGER:  No.  At this time, Your Honor, the

4    plaintiffs rest.

5          THE COURT:  Counsel for defendant, you may call your

6    witness.

7          MR. BRONNI:  Your Honor, this is Nicholas Bronni, if I

8    can interject before we call our next witness.  As I understand,

9    plaintiffs have now closed their case.  And defendant at this

10   point moves for a judgment in its favor under Rule 52 for two

11   primary reasons.  And if the Court will permit, I can briefly

12   explain those.

13         THE COURT:  You may.

14         MR. BRONNI:  First, Your Honor, plaintiffs lack

15   standing.  They haven't demonstrated standing at this point.  To

16   start, they lack standing to challenge the party's filing period

17   because they all said, or both plaintiffs testified that they

18   actually complied with that requirement.  Because they complied

19   with that requirement, they simply haven't shown an injury to

20   it, and they haven't pointed to any injury.  And that means that

21   their claim challenging the party filing period simply fails as

22   a matter of law.

23         Plaintiffs also lack standing to challenge the other

24   provisions that are at issue here.  At best at this point,

25   plaintiffs' evidence has merely shown the pandemic made it more

1    difficult to collect signatures.  In fact, I think Mr. Whitfield
2    testified that due to COVID-19 he wasn't able to meet the
3    requirement.  In fact, I think he actually said that he would
4    have managed to meet the requirements of Arkansas law but for
5    the coronavirus.  In other words, that's but for a pandemic, not
6    but for any actions of the state, he would have actually made
7    the ballot.  Mr. Fults similarly said nothing the state did
8    prevented him in any way from meeting the requirements or making
9    the ballot.  But since the state didn't cause that injury --
10   and, again, they don't point to anything that the state did to
11   cause that injury.  They simply can't show causation, and they
12   lack standing.
13       Second, even if *Anderson-Burdick* applies here, plaintiffs
14   have not presented any evidence that Arkansas's regime imposes
15   an undue burden and is unconstitutional.  It's undisputed that
16   Arkansas's requirements are significantly less demanding than
17   requirements that have been upheld for decades.  And plaintiffs
18   haven't offered any evidence that COVID-19 suddenly rendered
19   those legal requirements severely burdensome.
20       To the contrary, again, the evidence demonstrates that the
21   state did not stop them, that no actions of the state in any way
22   interfered with their collection of signatures, and they could
23   continue to collect signatures even after the pandemic reached
24   Arkansas.
25       In fact, Mr. Talley qualified for the ballot, he said, by

1    going door to door collecting signatures entirely after the

2    pandemic struck.  Thus, plaintiffs simply haven't shown that

3    Arkansas's regime imposes a severe burden whether it's facially

4    or in the context of COVID-19.  And that means that Arkansas's

5    undisputed interest in preventing frivolous candidacies is

6    sufficient to justify the state's ballot access regime, and

7    therefore defendant is entitled to judgment as a matter of law

8    or judgment under Rule 52.

9            THE COURT:  Counsel for plaintiffs, do you wish to

10   respond?

11           MR. LINGER:  Yes, Your Honor.  First off, on standing,

12   this is similar to standing arguments that were made

13   continually, unsuccessfully, in the case of *Moore v. Martin* in

14   the district court.  They lost on standing.  They lost when it

15   went up to the Eighth Circuit in the 2017 *Moore v. Martin* case.

16   When it went back down for Judge Moody for trial, they made the

17   same arguments again, and they lost.  And it went up again in

18   the *Moore v. Thurston* case.  At that point we had the new

19   secretary of state in the office.

20       And what was very significant there is that that court, of

21   course, they found it was moot because they made a change in the

22   law.  But they did allow Judge Moody's decision to stand in the

23   district court.  And they told why it was important,

24   particularly both in the original *Moore v. Martin* Eighth Circuit

25   decision and subsequently talked about the continual pattern in

1    Arkansas of them changing the law after it was declared

2    unconstitutional, then coming back years later, having another

3    one, continually being challenged.  And these plaintiffs have

4    standing not just as candidates that this law is affecting but

5    also as voters, who have a right to cast their vote effectively.

6    So for that reason, I think their standing argument is totally

7    frivolous and without merit.

8         In regard to saying they can't challenge the filing period

9    just because they did, in many cases the candidates do their

10   best to try to comply with a law.  But they have to make a

11   decision then, and that's part and parcel to looking at the

12   petitioning time, to looking at the deadline, to looking at the

13   number of signatures required, and then looking at the effects

14   of the coronavirus.

15        Of course, as to Mr. Talley, that goes more to the weight

16   of the evidence and the fact that the Court consider that Mr.

17   Talley is sort of special in some ways because he gained a great

18   deal of notoriety by police -- fighting police corruption.  He

19   became known in the African-American community.  And because of

20   that, he was specifically known, unlike most candidates

21   independents are challenging.  And for that reason, he was able

22   to take a more personal effect, and people were not afraid of

23   him.  They knew him, and he took steps to get it done.  But it's

24   very significant that he only needed I believe it was 234

25   signatures or something like that.  Whatever it was, it was in

1    the low 200s.

2         And it's very interesting that this time, looking at the

3    effect of the law and how it's not necessarily equal protection

4    problems, with the limitation of signatures and the way in this

5    particular year that those 90 days right before the May 1st

6    deadline just happened to be when they were affected by the

7    coronavirus, so effectively that Mr. Talley was able to do it.

8    And he had less signatures required than were required, for

9    example, of Mr. Fults, at 286, or Ms. Furrer, who had to have

10   somewhere well over 400 signatures.  It's interesting that no

11   statewide candidate for independent, no congressional candidate

12   for independent, no state senator, and then, of the state

13   representatives that were unsuccessful, they were all ones that

14   required more signatures than Mr. Talley, and he's particular.

15   So that's something the Court should consider, but it goes to

16   the weight of the evidence.  Therefore, their motion I think is

17   without merit and should be denied.

18             THE COURT:  Mr. Bronni?

19             MR. BRONNI:  May I respond?

20             THE COURT:  It's your motion.  I'll give you the last

21   word.

22             MR. BRONNI:  Briefly, Your Honor.  On the standing

23   point, the case that Mr. Linger was referring to previously, I

24   think one of the differences in that case is that you had

25   candidates who alleged that they would run for office again and

1    therefore could arguably have standing to challenge something

2    like the party filing period.  Here I didn't hear any testimony

3    whatsoever from Mr. Whitfield or Mr. Fults that they were

4    intending to run for office again and therefore would have to

5    comply with the party filing period requirement.  On this

6    record, the only record evidence is that they complied with it

7    and that they weren't harmed by it.  Therefore, as a matter of

8    law, they simply lack standing on that.  As for the remainder, I

9    don't have anything else to add on any of the other points, Your

10    Honor.  I think it was covered in my initial motion.

11          THE COURT:  All right.  At this point I'm not going to

12    rule orally on the Rule 52 motion.  I understand why it was

13    made.  I want to hear all of the evidence in the case,

14    especially because this has been consolidated as a trial on the

15    merits.  I think Rule 52 requires me to make specific factual

16    findings and state separately conclusions of law.  I intend to

17    do that in a written order after the proceeding today.  I'm not

18    prepared to do it from the bench.  So we're going to go ahead

19    and take all of the proof in the case, and then I'll take the

20    issues under advisement.  So I'm not going to comment on the

21    merits of the argument at this point under Rule 52.  To the

22    extent I consider it at all, I'm going to deny it because I want

23    to hear all of the evidence and have all of the evidence in

24    front of me to make a final determination with respect to both

25    the request for injunctive relief and the trial on the merits

1    that we've consolidated the matter into.

2         With that, that's my ruling.  Let's go ahead and hear from

3    our last witness today if the defendants intend to call a

4    witness.  That's your choice.  But I know that we have a witness

5    who is on the list who has not been called.

6              MR. MOSLEY:  Yes, Your Honor, Mike Mosley.  I would

7    submit, like Mr. Linger has, that Ms. Cox, Ms. Meghan Cox, who

8    is our expert witness, we have stipulated to her declaration and

9    exhibits as her direct testimony.  And therefore I turn it over

10   to the plaintiffs for any cross.

11             THE COURT:  All right.  Ms. Cox, I'm going to ask Ms.

12   Washington to administer the oath.

13            **MEGHAN COX, DEFENDANT'S WITNESS, DULY SWORN**

14             THE COURT:  Counsel for plaintiffs, you may proceed

15   with cross.

16             MR. HYMAN:  Thank you.  This is Whitfield Hyman.

17                         CROSS-EXAMINATION

18   BY MR. HYMAN:

19   Q.   Ms. Cox, have you worked for Americans for Clean Coal

20   Electricity?

21   A.   Yes.  That was one of my clients.

22   Q.   Sure.  And what did you do with them?

23   A.   Ran an issue advocacy campaign, educating voters, in I

24   believe 12 states.

25   Q.   Okay.  And you did something similar for Wynn Las Vegas,

1  the Navajo Nation, Philip Morris, British American Tobacco, the

2  National Restaurant Association.  Correct?

3  A.    I've represented a diverse portfolio of candidates,

4  correct.

5  Q.    Okay.  So as far as the candidates, you've represented

6  Governor Schwarzenegger; and then a Republican for Senate in

7  Indiana, Scott Brown; a Republican for Senate in Massachusetts

8  and another Republican in Alaska and another Republican in

9  Missouri and another Republican in South Dakota.  Correct?

10  A.    I have represented a diverse portfolio of candidates and

11  campaigns.

12  Q.    So the answer to my last two questions was yes.  Right?

13  A.    Yes.

14  Q.    So do you know how many states have made it easier to get

15  on the ballot in 2020 due to COVID-19?

16  A.    I haven't thought a lot about that.

17  Q.    Okay.  So you don't know how many states have made it

18  easier to get on the ballot.

19  A.    I do not.

20  Q.    Okay.  Now, in paragraph 12, why did you italicize any

21  voter?

22  A.    My field as an expert in ballot access is qualifying

23  candidates and measures for the ballot in oftentimes very strict

24  time crunch situations and under very difficult deadlines.  So

25  when I evaluate a state and I evaluate how difficult it is to

1    get on the ballot, I look at it as a whole as who is allowed to

2    circulate, who is allowed to sign.  And the reason I italicized

3    in 12 any registered voter can sign is if I were [inaudible] in

4    a campaign, that to me is much easier than in a situation where

5    I could only have a partisan candidate sign or a partisan voter

6    sign.

7    Q.    Okay.  So in which states are you not allowed to sign an

8    independent candidate's petition for ballot access unless you

9    are an independent?

10   A.    By and large, what I would say is an independent, it is

11   much easier to get an independent on the ballot because there's

12   no party restriction.

13   Q.    Okay.  But do you know which states you are allowed to sign

14   an independent candidate's petition for ballot access and you

15   have to be an independent?

16         I'm sorry.  You broke up there.  What was your answer?

17   A.    I said I'm not familiar with that.

18         THE COURT:  I'm sorry.  This is Judge Baker, and I

19   can't pick up the answer, Ms. Cox.  I'm sorry, if you would just

20   repeat your answer.

21         THE WITNESS:  Just to make sure my voice is being

22   heard, no, I'm not familiar with that.

23         THE COURT:  All right.  Thank you.

24   BY MR. HYMAN:

25   Q.    Okay.  Now, you also mentioned that Arkansas allows for

1    out-of-state circulators to be used.

2    A.    Correct.

3    Q.    Okay.  Which states do not allow out-of-state circulators

4    to be used?

5    A.    Specifically for any candidates, the person that I've

6    worked with on candidate campaigns, they would restrict the use

7    of out-of-state circulators.

8    Q.    Via state law?

9    A.    Yes.

10   Q.    Okay.  Which states require that?

11   A.    And this is very specific to my own personal experience

12   with my own candidates.  I would say New York, Connecticut,

13   Colorado are three off the top of my head that I've had

14   experience in.

15   Q.    Okay.  And are you aware that last -- I think two years

16   ago, on May 1st of 2018, that the Colorado ban of out-of-state

17   circulators was held to be unconstitutional?

18   A.    Yes.  In my experience, they did prior to that.

19   Q.    Okay.  And are you aware of the case out of New York where

20   that out-of-state ban was declared to be unconstitutional and

21   was later -- that opinion was mooted?

22   A.    No.  I was not aware of that.

23   Q.    Okay.  You know, you also make a big deal about how

24   Arkansas does not require notaries for ballot access.  Correct?

25   A.    Uh-huh.  Correct.

1    Q.    Okay.  And were you aware that about 38 states do not

2    require notaries?

3    A.    No.  I'm not an expert on notary requirements.

4    Q.    Okay.  And in Utah, are you aware of any other way for

5    someone to get on the ballot other than collecting signatures?

6    A.    I believe, as of two years ago or two cycles ago, Utah law

7    changed from being a convention-only process to allow the use of

8    collection of signatures.  You could choose to do both in order

9    to have an insurance policy.

10   Q.    Okay.  So in Utah, there is another way to get on the

11   ballot other than signatures.  Correct?

12   A.    Correct.

13   Q.    And that is, without getting into the specifics, if you

14   have enough support at the convention, you don't need the

15   signatures.  Right?

16   A.    That would be campaign strategy.

17   Q.    Right.  But I'm just talking about legally.

18   A.    Yes.

19   Q.    Okay.  So legally, if you wanted to roll the dice and

20   thought you had enough support at a primary convention, you

21   would not need the signatures; correct, in Utah?

22   A.    Yes.

23   Q.    Okay.  Have you ever been hired in Utah to petition for an

24   independent candidate?

25   A.    No, I have not.

1    Q.   Okay.  In paragraph 6, you state that many states have more

2    difficult ballot collection requirements for candidates.  Which

3    states make it harder for an independent Senate candidate to be

4    on the ballot than Arkansas as a whole?

5    A.   If you give me a minute, I believe the majority of the

6    states in the United States require signature requirements for

7    independent U.S. Senate candidates to get on the ballot.  That

8    said, there are a number of states that as far as an independent

9    candidate is concerned do have much greater requirements,

10   including Arizona, Delaware, Florida, Indiana, Michigan,

11   Montana, New Mexico.  So that's just from the analysis that I

12   did, although I've not analyzed all 50 states.  And I was

13   analyzing 2018 requirements.

14   Q.   Now, when you say -- I'm sorry.

15   A.   Let me clarify.  No. 6 is I have run ballot access drives.

16   So my comparison was also based on my own experience with

17   running candidate campaigns and running ballot access drives,

18   which I've had personal experience in.  So it's two questions

19   you asked.  I just wanted to clarify that what I was stating in

20   No. 6 was my own personal experience.  And you had asked me

21   about independent candidates as a whole.

22   Q.   Okay.  Now, have you personally collected signatures during

23   this COVID pandemic?

24   A.   Yes, I have.

25   Q.   And how many signatures have you collected?

1    A.    I've collected several thousand.

2    Q.    You personally have gone door to door since what date?

3    A.    I have not.  Let me clarify.  I run efforts.  I hire and

4    train volunteers and pay collectors and run the strategies to

5    ensure ballot access.

6    Q.    Okay.  So I'm sorry.  Maybe I should clarify my question.

7    So you have personally never worked as a circulator or a

8    canvasser?

9    A.    In my lifetime, I have, yes.

10   Q.    Okay.  And have you ever canvassed or circulated for an

11   independent candidate?

12   A.    Myself personally?

13   Q.    Yes.

14   A.    No.

15   Q.    Okay.  And have you personally canvassed or circulated for

16   or during this COVID-19 pandemic?

17   A.    I do want to clarify again, because what I'm an expert for

18   is running a large-scale campaign.  I would run the campaigns.

19   I would run the ballot access efforts.  So I have -- I would say

20   right now I have 70 people that work for me right now collecting

21   signatures, if that makes sense.  I just want to clarify that.

22   Q.    Right.  I'm aware --

23   A.    Not directly.  I'm not out knocking on doors.

24   Q.    Okay.  So let's go back to this list that you made of

25   states where it's easier.  Let's start with Arizona.  Why do you

1   believe Arizona is easier than Arkansas?

2   A.   I did not say [inaudible] --

3   Q.   I'm sorry.  Could you repeat the last few words?  I

4   couldn't hear.

5   A.   I said more difficult.  You had asked --

6   Q.   Oh, I'm sorry.  Yes.  Let's go back to Arizona.  Why is

7   Arizona more difficult?

8   A.   Arizona requires 37,526 signatures to get on the ballot.

9   Q.   Okay.  And Arizona is roughly how much larger than

10  Arkansas?

11  A.   I don't have population numbers right in front of me.

12  Q.   Okay.  So when you are defining more difficult, is it based

13  solely on the amount of signatures that someone has to obtain,

14  or is it based on something else?

15  A.   So those are off of a quick Google search.  But my focus,

16  again, is on what I have direct experience when I made my

17  statements in No. 6.

18  Q.   Okay.  And what was based on a quick Google search?  Just

19  those -- what was based on a quick Google search?

20  A.   States that had higher requirements for candidate

21  signatures, for independent candidate signatures.  But question

22  6 really specifically stated, "Many states have more difficult

23  ballot collection requirements for candidates, and I believe

24  that Arkansas's laws are quite easy in comparison to other

25  states in which I have run candidate ballot access drives."

Cox - Cross

1   Q.   Okay.  In which you have run a candidate ballot access

2   drive.  I'm sorry.

3   A.   Right.

4   Q.   And as far as the states you helped run a candidate ballot

5   access drive, which ones are those?  Those six states you

6   listed, are those states you helped run a candidate ballot

7   access drive?

8   A.   No.  You had asked if I wanted to clarify what No. 6 was

9   directing on.  It's personal experience.

10  Q.   Okay.  So in places where you've had personal experiences,

11  which were the states that you thought were more difficult to

12  get ballot access?

13  A.   Absolutely.  Connecticut was by far the most difficult I've

14  had experiences, followed by New York.

15  Q.   Okay.  Now, in New York, they have made it, at least in one

16  case, to where they struck the ban on out-of-state circulators.

17  Right?

18  A.   Uh-huh.

19  Q.   What else was difficult about New York?

20  A.   In New York, in order to work on a partisan drive, with my

21  direct experience with a U.S. Senate candidate, you have to be

22  registered with the party.  So even if -- let's say you are a

23  Republican that wanted to run a Democratic campaign or a

24  Democrat who wanted to run a Republican campaign.  They are not

25  allowed -- it's not allowed to do a party switch.  It requires a

1    30-day hold in order to switch parties to even work on a

2    candidate campaign.  So New York also had a tight time frame, I

3    believe, in order to collect signatures on in order to bypass

4    the convention process.  So that said, at the time I worked in

5    New York, there was a candidate requirement.  Also, at the time

6    in New York, again, with the partisan issue, you could not

7    [inaudible].  So those three things were definitely an impact.

8    You could still qualify, but we had I believe 30 days to collect

9    all of our signatures in.

10   Q.    That was due to partisan --

11   A.    Correct.  That is my direct experience, yes.

12   Q.    Do you know what the rules are for an independent in New

13   York?

14          THE COURT:  Wait just one moment, Ms. Cox.  I'm sorry.

15   You spoke very quickly there, and we didn't hear.

16          THE WITNESS:  [Inaudible].

17          THE COURT:  We still didn't get it.

18          THE WITNESS:  No.  I was specifically citing my own

19   experience.

20          THE COURT:  You were citing your own experience with

21   respect to your testimony related to New York.  Right?

22          THE WITNESS:  Correct, yeah.

23          THE COURT:  You may proceed, Mr. Hyman.

24          MR. HYMAN:  Thank you, Your Honor.

25   BY MR. HYMAN:

1   Q.   And what was more difficult about Connecticut?

2   A.   In Connecticut, the rules are interesting in the fact that

3   not only do you have to be a Connecticut resident and also

4   registered party, similar to that of New York, you only have six

5   weeks to collect your signatures in.  Furthermore, each

6   individual circulator, whether it be volunteer or whether it be

7   paid, has to go before their town clerk.  And outside of a major

8   city, those town clerk hours could be open two days a week,

9   possibly two hours a day, in order to get your signatures

10  stamped prior to submission.  After you circulate your

11  petitions, then you have to appear before a notary.  And then,

12  at the end of the entire collection process, you have to file

13  not with the secretary of state but each individual city and

14  town.

15  Q.   Okay.  And that is with the partisan races.  Correct?

16  A.   Correct.  Again, I'm going again off of my personal

17  experience.

18  Q.   Sure.  And when you have these partisan races that you are

19  helping out with, do you ever get support from the party you are

20  trying to get the person's signature for?

21  A.   Typically not if there are multiple candidates in the race,

22  so the party tends to stay out of it entirely.

23  Q.   But if there are not multiple candidates, the party will

24  help you?

25  A.   In my experience working in primary races, the party does

```
 1    not help.  I don't have much experience where there's not
 2    primary races.
 3    Q.    Okay.  However, the Republicans and Democrats have monthly
 4    committee meetings; right, in these states, in these independent
 5    primary states inside of the counties?
 6    A.    Sure.  Most states, that's correct.
 7    Q.    Okay.  And so nothing would prohibit one of these
 8    candidates from going, hanging out in the parking lot and trying
 9    to get volunteers from that pool.  Correct?
10    A.    Yes.  And that would be similar to Mr. Whitfield's being
11    part of a Democratic meeting as well getting signatures.
12    Q.    Sure.  Do you know how many independent candidates have
13    been successful and been able to gather signatures, the 10,000
14    signature requirement in Arkansas?
15    A.    Thanks to Mr. Whitfield's testimony, the requirement has
16    actually been hit three times:  In 1978 by John Black, in 2006
17    by Rod Bryan, and in 2010 by Trevor Drown, which is proof that
18    it can be done.
19              MR. HYMAN:  Okay.  Thank you, Your Honor.  I believe
20    we can pass the witness.
21              THE COURT:  Any redirect?
22              MR. MOSLEY:  Yes, Your Honor.  This is Mike Mosley.
23                        REDIRECT EXAMINATION
24    BY MR. MOSLEY:
25    Q.    Just a few things.  Ms. Cox, have you worked any type of
```

1   campaign in Arkansas?

2   A.    Yes, I have, sir.

3   Q.    And what was the campaign?

4   A.    In 2016, I worked on the tort reform case -- I'm sorry --

5   ballot initiative.

6   Q.    How many signatures did you obtain in that and what kind of

7   time frame?

8   A.    Give me just a moment.

9   Q.    Sure.

10  A.    We collected 148,611 signatures in 40 days.

11  Q.    Okay.  And any other campaigns you've done work on that

12  come to mind where you've obtained a lot of signatures in a

13  short time frame, like 40 days?

14  A.    As I just mentioned, back to the Connecticut race, we

15  connected 19,000 signatures in less than six weeks.

16  Q.    Let me ask you a question.  Do you -- in your opinion, if

17  Mr. Whitfield had managed his campaign properly, do you think he

18  should have been able to obtain 10,000 signatures in 90 days?

19  A.    Absolutely.

20  Q.    What about Mr. Fults?  Should he have been able to obtain

21  in your opinion 286 signatures in 90 days had he run his

22  campaign properly?

23  A.    Absolutely.

24  Q.    There's been some suggestion in this lawsuit that interest

25  in campaigns and campaign issues is low during the period to

1  obtain signatures in Arkansas for the plaintiff here and may be

2  higher over the summer and fall of 2020.  Do you agree that that

3  is so?

4  A.   I don't believe that's the case at all in my experience.

5  Q.   What do you think -- as far as Mr. Whitfield goes, do you

6  have an opinion about interesting campaigns from, let's say,

7  February 1 to -- interesting campaign issues for Mr. Whitfield

8  from February 1 to May 1 of this year?

9  A.   I believe politics interest is at an all-time high,

10 especially given the rise of social media.  Americans are

11 consuming news more voraciously then they have in years prior,

12 especially given the democratic campaigns carried out, ballot

13 signatures, the campaigns and the elections that have been

14 carried out across the states in democratic campaigns.  You have

15 a high level of interest in who the candidates are.

16 Q.   If a candidate, say, like Mr. Whitfield or Mr. Fults has

17 sufficient funds to hire you to assist in a signature drive,

18 would you turn them away because they are an independent?

19 A.   Absolutely not.

20 Q.   What sort of training efforts with respect to campaign

21 management are involved in using volunteers to obtain signatures

22 in your opinion?

23 A.   So I often have candidates approach me, and oftentimes we

24 might -- and, actually, I would just give advice for free.  They

25 might say, I don't have a big budget.  What could I do with X

1    amount of dollars?  And the first thing I work with them on is

2    how they construct their volunteers to be the most effective for

3    their campaign.  So what I would do is I would organize them

4    regionally.

5         In the case of Mr. Whitfield, he has a large state to

6    cover.  So volunteers, I would be leading up -- he would file in

7    November.  He knows there's no Democratic nominee.  And I would

8    be pounding down the doors of the labor union.  I would be

9    pounding down the doors of the various Democratic groups asking

10   for volunteers, making my pitch, making my plea, looking at Tom

11   Cotton's approval numbers and disapproval numbers and saying,

12   Look, I'm the only one out here that can be an effective

13   challenger.  [Inaudible.]  I can be an effective challenger to

14   Senator Tom Cotton, who is a U.S. sitting senator.  And then I

15   would have organized them by region.  From there, what are the

16   most important things once you have your [inaudible], you have

17   to have a commitment of follow-through.  None of this takes

18   money, but it does take time.  It takes organization.

19        So one thing I always view with every single ballot

20   initiative and every single ballot petition that we see is we

21   create a sample.  And if I'm mailing out petitions to

22   volunteers, we give them a sample of how to fill out a petition

23   properly and how to fill -- what's the correct way and what's

24   the not correct way.  And that would prevent explaining things

25   and what's happening, for example, someone putting the birth

1    date in the wrong place or the date, because petitions -- every

2    single state in the nation has a lot of legal requirements that

3    go into them.

4         I also do webinars and train virtually.  You have to reach

5    across the state and organize very quickly and very effectively.

6    Again, none of this costs money, but it's the time.  It's the

7    organization.

8         Lastly, I would chase volunteers, the ones that are in your

9    database.  I would consistently follow up with them.  Where are

10   you at in your signatures?  Can you get them in this week?  We

11   need to validate them, putting an effective chase mechanism to

12   chase them [inaudible].

13   Q.   You said, you know, it doesn't necessarily take money, but

14   you are going to have to work.  If you do spend money on a

15   canvassing company or a consulting company, you can get

16   signatures quicker.  Correct?

17   A.   Yes.

18   Q.   On Mr. Fults, did you hear his testimony today?

19   A.   I did.

20   Q.   Did you hear him say that he mailed -- he mails out

21   petitions sort -- I don't want to mischaracterize it -- but

22   blindly?

23   A.   That's how it sounded to me in his testimony as well, yes.

24   Q.   Could he have done something to have maximized the amount

25   of money, that $900, before mailing those out in your opinion?

1    A.   I would have first sat down, and I know he had illness in

2    February.  I would have, even prior to February -- again, he

3    knew he was on the ballot in November.  I would have taken that

4    list that he mailed to, and I would have called each and every

5    one of those voters and explained, I'm the independent candidate

6    running for office, and asked them if they would carry his

7    petition and say it's really important that I'm on the ballot.

8    Would you please support me.  And I would first gather support,

9    and then I would mail.  That way I'm not wasting dollars

10   extraneously on a mailing that may or may not pan out.  He only

11   had 62 signatures, I believe, returned from that entire mailing

12   that he did.  There's a better use of dollars and resources in

13   my opinion.

14   Q.   Well, had he called them first and figured out whether he

15   should even spend the money to mail to a particular person?

16   A.   Absolutely.  And he could have also introduced himself as a

17   candidate and did some good old-fashioned campaigning, and

18   potentially they are going to pick up more people.  You know

19   what?  You sound like a pleasant person.  Yes.  I'll carry a

20   petition for you.  And he would have had a much better response

21   than blindly mailing out petitions.

22   Q.   The last question I have for you is do you remember Mr.

23   Whitfield talking about an app called VAN?

24   A.   Yes.

25   Q.   Well, I've never heard of it.  Can you tell the Court what

1    that is?

2    A.    So VAN is actually -- I believe they charge -- they do

3    charge quite a large fee.  But they typically -- it's a

4    canvassing app and a canvassing database for Democratic

5    candidates.  That said, I have worked with them on several of my

6    candidates' campaigns.  I've also worked with many apps that

7    have access to voter files that are not a political party.

8    There's one called Crowd Scout that used to be called Voter

9    Library.  It used to be only Democrats several years ago.  Now

10   it sells to any single person, any candidate that's willing to

11   pay them.  There's many applications like that.  There's

12   canvassing apps that make it very effective to manage a campaign

13   remotely and ensure a high quality control.

14           MR. MOSLEY:  Thank you, Ms. Cox.

15      Your Honor, nothing further.

16           THE COURT:  Anything further for this witness, Mr.

17   Hyman?

18           MR. HYMAN:  No, Your Honor.  Thank you.

19           THE COURT:  All right.  Thank you.

20           MR. MOSLEY:  Your Honor -- I'm sorry, Your Honor.

21           THE COURT:  Yes.  You may proceed, Mr. Mosley.

22           MR. MOSLEY:  May she be excused?

23           THE COURT:  She may.

24           MR. MOSLEY:  Your Honor, the defense rests.

25           THE COURT:  All right.  Just so that I'm clear, I know

1    on the witness list there's a declaration of Peyton Murphy.

2    It's Exhibits 1A and 1B.  And it may be addressed in an email or

3    in a filing sent by the parties, but I think we've talked about

4    everything else that's come in on the record.  And are those

5    documents also part of this record for the Court's

6    consideration?

7              MR. MOSLEY:  Yes, Your Honor.  It's stipulated, the

8    documents and the declaration.

9              THE COURT:  All right.  Do counsel wish to make

10   closing arguments, counsel for plaintiffs?

11             MR. LINGER:  Yes, Your Honor.  I was just turning off

12   my mute.  This is Mr. Linger.

13             THE COURT:  Let me gage how long you anticipate that

14   lasting.  Our court reporter has been going for a while, and

15   it's the same court reporter who has been here with us for the

16   day.  So I may wish to give her a short break before we do

17   closing if it's going to take longer than about ten minutes.

18             MR. LINGER:  I would suggest, Your Honor, that each

19   party be limited to ten-minute closing argument.

20             THE COURT:  Why don't we take just a short break, give

21   our court reporter a short break.  Then we will come back for

22   closing arguments.  I generally -- I haven't had anybody on the

23   clock all day today.  I think everybody has handled their case

24   well, so I'm not going to limit everybody on time.  We are going

25   to take about a ten-minute break, and we'll come back in here at

1   5:25.

2        I'm going to say a few things for our folks who are here in

3   the gallery observing.  The courthouse itself closes at five.

4   If you walk out of security, it's going to be difficult to get

5   back into the courthouse.  You are welcome to use the rest room,

6   get a drink of water.  But if you feel the need to leave the

7   building, it might be difficult to get back in through security

8   downstairs.  Before you leave, if that's your intent, take Mr.

9   Lax's telephone number.  And if you have trouble getting back in

10  the building, then call Mr. Lax in the back.  We'll wait to get

11  back on the line with everyone until all of you are back in the

12  building if it's your intent to leave the building.  All right?

13  This is a public proceeding.  You have the right to be here.  I

14  want to make sure everybody does.  But having run proceedings

15  after five, sometimes security is shut down and it's difficult

16  to get back in.  But if you want to step outside, if you need to

17  step outside, I want you to be able to do that and get back in.

18       We're going to take a recess.  We'll be back in at 5:25.

19  We're in recess for ten minutes.

20       (Recess from 5:15 p.m. until 5:28 p.m.)

21       THE COURT:  We're back on the record.  This is Judge

22  Baker.  I'm going to ask for the roll to see who is on the line.

23       Mr. Linger.

24       MR. LINGER:  I am here, Your Honor.

25       THE COURT:  Mr. Hyman.

```
 1              MR. HYMAN:  I'm here.

 2              THE COURT:  Mr. Whitfield.

 3              MR. WHITFIELD:  I'm present, Your Honor.

 4              THE COURT:  Mr. Fults.

 5              MR. FULTS:  I'm here, Your Honor.

 6              THE COURT:  I don't know if our other witnesses are

 7    here.  They are welcome to be, but they don't need to be.

 8         Mr. Bronni.

 9              MR. BRONNI:  Here, Your Honor.

10              THE COURT:  Mr. Jacobs.

11              MR. JACOBS:  Here, Your Honor.

12              THE COURT:  Mr. Wagner.

13              MR. WAGNER:  Here, Your Honor.

14              THE COURT:  Mr. Mosley.

15              MR. MOSLEY:  I'm here, Your Honor.

16              THE COURT:  The same, Ms. Cox is welcome to be on the

17    line, but she does not need to be.

18         We had some folks who were in the gallery who left the

19    building who are making their way back up to the courtroom.  So

20    we're going to wait for just a moment until they come back into

21    the courtroom, and then we'll get started.

22         All right.  We're going to go ahead and start.

23         Mr. Linger, you may proceed with closing.

24              MR. LINGER:  May it please the Court.  We've heard a

25    lot of testimony here.  Of course, a significant portion of it
```

1    was in agreed exhibits and declarations.  I think what is very

2    clear, though, is that the plaintiffs do have standing.  They

3    have standing under the decisions of the United States Court of

4    Appeals, particularly in the Eighth Circuit in the most recent

5    independent ballot access cases in Arkansas, Moore v. Martin in

6    2017 and Moore v. Thurston in 2019 as well as the district court

7    decision after remand in 2018 by Judge Moody in what was then

8    Moore v. Martin.

9        These laws, even on their face, before we get to the as

10   applied in this instance, are challengeable under the district

11   court decision of Moore v. Martin let stand by the Eighth

12   Circuit in Moore v. Thurston because the court there found that

13   not only would have made one deadline be better, the point of

14   the matter is in the old March 1 deadline -- the point of the

15   matter is there was no conflict with counting signatures,

16   putting ballots or anything on the previous deadline of

17   May 29th.  And, in fact, up until July the 6th, there would be

18   no conflict with the verification of other petition signatures.

19       So when we see something that has the effect of what this

20   law has had, combining it with the political party deadline that

21   has to be complied with also by independent candidates filing

22   their notice of candidacy, their affidavit of eligibility and

23   political practice pledge in November, and then putting in with

24   the number of signatures required, which Mr. Winger said made

25   Arkansas the 14th hardest state in the country for independent

1    candidates for a statewide office, other -- not even considering

2    the 90-day period.  And when you put that together and look at

3    the history here, I think the law would have been -- could have

4    been challenged under the still standing precedent of *Moore v.*

5    *Martin*, as approved by the Eighth Circuit, even if we had not

6    had the coronavirus hit us.

7         It is the 90-day period that particularly makes the law and

8    its application herein unconstitutional.  And that has been

9    something recognized by numerous courts that we've put in our

10   briefs.

11        In that regard, they questioned the standing in regard to

12   the early November filing of notice, which the two plaintiffs

13   did do.  They did that because they had to.  But what happened?

14   While the Republicans and Democrats who filed could then start

15   working on their primary election, trying to get their party's

16   nomination, while the Libertarian candidates could start working

17   on their nominating convention, this law did not let these

18   independent candidates start petitioning in November, December

19   or January.  Oddly enough, while that's farther away, at least

20   they wouldn't have been hurt by the coronavirus.

21        There's a question.  Why is that necessary?  Why could not

22   there be a longer time?  There was at one time when there was at

23   least 150 days or, like there is for independent presidential

24   candidates, who have no time limit for petitioning, or for

25   initiative petitions, that have no time limit for petitioning.

1    Why is that necessary here, and is there an equal protection

2    problem?  I don't think the state has met their burden to show

3    that that is necessary, particularly under the standards of

4    review that are set forth in the most recent independent

5    petitioning cases in the Eighth Circuit and in the district

6    court as let stand.

7         So the November deadline impacts our plaintiffs because

8    they had to comply.  They had to make their choice then, and

9    they didn't see what was coming with the coronavirus or

10   political developments.  But then they couldn't even petition

11   for about the first three months.  And that is the direct result

12   of this 90-day period that is February, March and April, right

13   before the May 1 deadline.  And that's not necessary.

14        We have heard no evidence, and I think the evidence is

15   overwhelming that there is no problem with ballot overcrowding

16   in Arkansas.  There is no problem with having different laws as

17   to fraud or even a modicum of support.  We see what has happened

18   in the past from independent candidates.  And, in fact, at the

19   time Judge Moody, as reflected in Mr. Winger's declaration,

20   showed the number of independent candidates who tried to get on

21   the ballot in the last ten or 14 years.  There have been very

22   few independents try even when the deadline was earlier.  And

23   that's significant, because if there were that many who tried

24   when the deadline was March 1st, now with a May 1st deadline, we

25   actually have evidence that there's even fewer independents that

1    were able to successfully do anything this time because, it

2    appears, of the coronavirus.  It is significant that the ones

3    that appear to have been unsuccessful were a statewide

4    independent candidate.  There were no successful congressional

5    candidates for the U.S. House of Representatives.  There was

6    nobody that appears to have even tried for state Senate, which

7    are larger than the state Houses.  And the only two successful

8    appear to be state representatives, independent candidates who

9    had the lowest number of signatures required from their

10   districts, in the low 200s, while Mr. Fults, who had 286, and

11   Ms. Furrer, who had to have more than 400, were unsuccessful.

12   That I think is something that shows the effect of the

13   coronavirus.  And, in fact, Mr. Talley showed that he was sort

14   of a special sort of candidate because he had such notoriety and

15   achieved recognition and trust in the African-American community

16   where he is running that he was able to actually overcome

17   people's fear that they would come out and he would be able to

18   work something.  But the one thing that is very clear -- it is

19   unrefuted from the testimony presented on behalf of Mr.

20   Whitfield and Mr. Fults is they were very clear, and I don't

21   think anything was shown different than this, that but for the

22   coronavirus, they would have been successful.  The law as it is

23   I say could be challenged on its face.  But our case here is and

24   will be a decision based on the application of the law to this

25   particular situation, wherein the amount of time was reduced.

1    As Ms. Furrer talked about, there was terrible weather, rainy

2    effect, had an effect in February, when the coronavirus effect

3    was not as great.  But then we had the coronavirus effect, and

4    this basically hurt significantly the petitioning efforts of the

5    independent candidates.  So it appears right now that two

6    independent candidates in state representative districts that

7    require -- it looks like the least required number of signatures

8    are the only two independents that will be successful if the law

9    is upheld in its application to this election.

10         Now, Mr. Whitfield and Mr. Fults said they want to run in

11   future elections.  They are still trying to run in this

12   election.  But the point is the party filing deadline made them

13   decide early.  The limitation to 90 days cut out about half the

14   petitioning time.  The bad weather and then the coronavirus

15   further affected them.

16         And there's no reason, for example, like was done in the

17   Illinois case, the Libertarian Party of Illinois v. Pritzer,

18   which is cited in our brief, where the judge there decided that

19   in Illinois he would reduce the normal requirement down to

20   10 percent of what was and give additional time for petitioning.

21   Both are options that are available to this Court here, and

22   different courts have analyzed it differently.

23         But I did notice that one of the significant instances --

24   and I'm sure this will be something Ms. Cox will appreciate --

25   is to the extent that Mr. Evans was approached about getting a

1    thousand signatures, his people, because of what had happened,

2    were only able to collect 129, which is 12.9 percent.  And that,

3    as you notice, is a little bit more than the 10 percent required

4    by the Illinois judge.  So it could be said that the effect

5    there from a professional petitioner, who is being paid, and was

6    given half the money, he couldn't even get what he had been paid

7    for, the 500 signatures, out of the total of a thousand they

8    wanted.  He only got 129, 12.9 percent.  And that might be

9    something the Court might consider as to what would be

10   reasonable, although we previously said we thought 20 to

11   30 percent under the circumstance.

12        There's no reason that independent candidates couldn't be

13   allowed more time to petition, although they still would have

14   some of the coronavirus effect this year.  There's no reason

15   that there would have to be, under these circumstances, so many

16   signatures required.  This is the direct result of this 90-day

17   period and the bad luck this year, because they couldn't start

18   earlier, of falling at the height of the coronavirus problems.

19        This Court heard testimony previously, last year, in the

20   Libertarian case about the effect of bad weather.  And they made

21   some light of us in their brief about citing a case out of

22   Oklahoma where weather was considered.  But, of course, as we

23   pointed out, that was cited by the U.S. District Court for the

24   Eastern District of Arkansas.  And that's been recognized by

25   other states and courts, that that is a factor.  But anybody I

1    think would say that the weather effect on petitioning in a

2    short period, like 90 days, pales to insignificance compared to

3    what can happen when a deadly disease -- and several of the

4    witnesses talked about it's not just whether they listen to what

5    the governor said they can and can't do.  It's also the national

6    media and the fear and the constant harping on this that way.

7    People were scared.  They are worried.

8         One of our exhibits, I think our Exhibit 12, is an

9    administrative order of this Court, one of many.  The fact that

10   this Court has taken steps on this hearing shows that even now

11   we are being careful, and it's not as easy to do this, as some

12   people say, like Ms. Cox, who admitted she's never petitioned

13   for an independent candidate.  She will do it if you have the

14   money.  But I was impressed by both Mr. Whitfield and Mr. Fults

15   when they talked about their volunteers and what they tried to

16   do and how they had people helping them and organizing.  Mr.

17   Whitfield particularly said that -- I think in his declaration

18   he said he was very proud.  He reiterated it twice.  Over

19   98 percent of his signatures were done by volunteers.  That's my

20   idea of democracy and what our country is supposed to be like

21   and the way our political system should operate.  And it's not

22   let's just buy petitions.  Let's find someone.  If you have the

23   money, I have the time to help you.  I would much more think

24   that when we look at this and the importance of political

25   dialogue and having elections that we have volunteers, people

1    who are idealists, people who have issues they want to bring up,

2    people who want to have political discussion.  And for that

3    reason, I think the state hasn't even said that these two

4    plaintiffs are frivolous candidates.  They are very sincere.

5    People will say they are idealistic, what they are trying to do.

6    But I think that's more of what the founding fathers had, an

7    ideal about what our country should be rather than what it's

8    evolved into, where money seems to get action done.

9        So, therefore, we're talking about independent candidates

10   here.  They are not going to be on the ballot until November.

11   The state does not have the right to regulate them as much as

12   political party candidates because of the way they are chosen.

13   And I think they have shown a modicum of support of what they

14   have done and made a good-faith effort to try to comply with the

15   laws and this crisis that could be expected.  We could have

16   disease in the future.  We can have bad weather.  This has been

17   recognized as something that I think the Court should consider

18   here and look at what other courts have done and craft an

19   appropriate remedy that I think should substantially reduce the

20   number of signatures that should be required for this year.  In

21   applying the law in application to these plaintiffs for this

22   year, it should be reduced, reflecting the problem caused by the

23   law that is enforced by the state, in which they tried to do

24   other things besides a lawsuit to get a remedy for.  This is

25   through no fault of their own.  It is through no fault of the

1    secretary of state that we had a crisis with the weather or with

2    the coronavirus.  But the law has made it easy for this to have

3    an adverse effect on rights that are fundamental.  And

4    therefore, as I set forth in my reply brief, I had about five

5    questions on what was necessary.  And I think -- I won't repeat

6    them right now, but it's simply not necessary.

7        The state has not shown that they have used the least

8    drastic means.  They have not had narrow requirements here.  And

9    this law is susceptible to just this sort of situation here.

10   This has been recognized by other courts, and therefore we ask

11   Your Honor that you declare the laws as applied to these

12   plaintiffs unconstitutional and craft a remedy that will take

13   into effect what the coronavirus has done to the petitioning

14   requirements this year for non-presidential independent

15   candidates.

16       If the 90 days was so necessary, for whatever reason, why

17   would it not apply to either initiative petitions or, more

18   importantly, to independent presidential candidates?

19       Thank you, Your Honor.

20           THE COURT:  Thank you, Mr. Linger.

21       Counsel for defendant.

22           MR. BRONNI:  Your Honor, this is Nicholas Bronni.  As

23   a preliminary matter, Your Honor, we renew our motion for

24   judgment under Rule 52 for the reasons previously stated.

25       Your Honor, Arkansas's independent candidate ballot access

1    regime is plainly constitutional.  And Arkansas is not required

2    to prevent plaintiffs from those constitutional requirements.

3    Defendant is therefore entitled to a judgment in its favor on

4    plaintiffs' claim.  And that's particularly true for four

5    separate reasons.

6          First, as I mentioned earlier, plaintiffs lack standing to

7    challenge Arkansas's ballot access regime.  They lack standing,

8    again, to challenge the party filing period because they

9    complied with that requirement and didn't show it injured them.

10   In fact, as I heard Mr. Whitfield testify, he first announced

11   his candidacy in 2016.  He certainly wasn't injured in any way

12   by the party filing period.  Plaintiffs, likewise, lack standing

13   to challenge the May 1st deadline, the 90-day collection period,

14   and the signature threshold, because they haven't offered any

15   proof that its requirements are generally or facially

16   unconstitutional.

17         Instead, as today's testimony underscores, plaintiffs'

18   claim is really that the pandemic made it harder to meet those

19   requirements.  For instance, Mr. Whitfield, as Mr. Winger just

20   repeated, said that but for the pandemic he could have met

21   Arkansas's otherwise constitutional requirements.  Again, they

22   haven't pointed to any actions by the state that made it more

23   difficult to comply with Arkansas's requirements.  And that

24   really distinguishes this case, frankly, from all the cases that

25   exist in other states that have been cited by the plaintiffs

1    here.  So, again, the secretary of Arkansas didn't cause the

2    injury.  There's simply no causation.  And plaintiffs lack

3    standing, and their claim fails as a matter of law.

4         Second, plaintiffs haven't demonstrated Arkansas's ballot

5    access regime is facially invalid.  Under *Anderson-Burdick*

6    courts apply a sliding scale analysis to determine the

7    constitutionality of ballot access laws.  Where the laws impose

8    only modest burdens, constitutionality is resolved using a test

9    that's really akin to rational basis.  By contrast, the laws

10   that have severe burdens, the state must assert a greater

11   interest and explain how its interests or how its means is

12   tailored toward that end.

13        Applying that test, Arkansas's regime doesn't impose a

14   severe burden and is constitutional.  Thus, whether something is

15   a severe burden or not really depends, the case law explains to

16   us, on whether or not a reasonably diligent candidate could meet

17   it, not, as plaintiffs claim, or as I heard Mr. Linger just

18   claim, whether or not a particular candidate happened to meet

19   it.  Indeed, if the test were "I didn't meet it, therefore it's

20   a severe burden, and it shouldn't keep me off the ballot," that

21   would essentially collapse the entire inquiry.  But it's

22   important to bear in mind really the test is whether or not a

23   reasonably diligent candidate, not any candidate or not anybody

24   that did anything, can meet that standard.

25        So applying that standard, Arkansas's signature thresholds

1   are well within the mainstream and aren't particularly

2   demanding.  Indeed, plaintiffs do not point to a single case

3   invalidating the requirement that statewide independent

4   candidates demonstrate support by collecting signatures equal to

5   just half a percent of registered voters.  To the contrary, as

6   the First Circuit has held, quote, Neither the Supreme Court nor

7   any circuit court has struck down a statewide ballot access

8   regime on the grounds that a signature requirement of 5 percent

9   or less is too much."  Plaintiffs, likewise, haven't shown that

10  collecting such a small number of signatures in 90 days is a

11  significant ask.  Rather, courts have consistently upheld

12  similar or, frankly, even shorter collection periods with more

13  demanding signature requirements.

14       For instance, in *Tripp*, the Seventh Circuit upheld a

15  requirement that candidates collect signatures equal to

16  5 percent of the votes cast in the previous election in 90 days.

17       In *American Party v. White*, the Supreme Court rejected a

18  challenge to its 55-day collection period that was paired with a

19  1 percent signature requirement.

20       Now, plaintiffs disagree that 90 days should be the

21  required period.  Mr. Winger disagreed that that ought to be the

22  required period.  But their disagreement with Arkansas law

23  doesn't demonstrate that it's unconstitutional.  Again, the

24  question is whether a reasonably diligent candidate could meet

25  that requirement, not whether these plaintiffs disagree to the

1    time period selected by the democratically elected legislature

2    in the State of Arkansas.

3           The May 1st deadline is also well within the mainstream and

4    was adopted in response to an order from Judge Moody.  Moreover,

5    far from imposing a burden, plaintiffs admitted that May 1st

6    deadline made their job easier because it allowed them to

7    collect signatures during a highly competitive Democratic

8    presidential primary.  For instance, Mr. Whitfield conceded that

9    he was able to collect signatures during an Elizabeth Warren

10   presidential rally and was able to collect additional signatures

11   at a Mike Bloomberg rally.  Mrs. Furrer similarly testified that

12   she was able to collect signatures at early voting locations.

13   In other words, the May 1st deadline paired with a 90-day

14   requirement actually made their job easier because it allowed

15   them to collect signatures during that highly competitive

16   primary process.

17          Lastly, again, plaintiffs haven't pointed to any burden

18   whatsoever from the party filing period or justified why they

19   believe they are entitled to file to run for office at a

20   different time from every other candidate.  Thus, plaintiffs'

21   claim that Arkansas's ballot access regime imposes a severe

22   burden and is otherwise unconstitutional fails.

23          Third, plaintiffs' argument that COVID-19 rendered

24   Arkansas's regime unconstitutional -- and this is really the

25   heart of their case -- likewise fails.  To start, states are not

1    required to create exigent circumstances exemptions to otherwise

2    valid ballot access laws.  Neither the Supreme Court nor the

3    Eighth Circuit has ever suggested that *Anderson-Burdick* empowers

4    federal courts to impose such exemptions, nor would such a

5    requirement be consistent with established justice ability

6    principles since there is no standard for determining what

7    circumstances would warrant exemption.  And today's testimony

8    really illustrates that point.

9         For instance, Mr. Whitfield testified that he lost a

10   clipboard with signatures.  Should that entitle him to an

11   exemption or an exigent circumstances special consideration?

12   Mr. Whitfield also testified that he began the collection

13   process by handing out petitions and collecting signatures in

14   December and in January, before he realized that he wasn't

15   actually allowed to collect signatures during that period.

16   Should that allow him to take advantage of some type of exigent

17   circumstances exemption?  Mr. Fults testified that he was sick

18   for a portion of the collection period.  Is that a circumstance

19   that would warrant exemptions?  And Mr. Winger has told us

20   repeatedly about weather, how weather should lead to a special

21   circumstance consideration.  How courts are supposed to go about

22   determining what warrants a special exemption and what does not

23   Mr. Winger has never dealt with.  The plaintiffs offer no basis

24   for determining in which cases something is entitled to a

25   special circumstances exemption and which cases they are not.

1      Next, even if *Anderson-Burdick* applies here -- and, again,

2    it simply doesn't -- plaintiffs' claims fail because a

3    reasonably diligent candidate could meet Arkansas's requirements

4    even in the context of COVID-19.  Again, Arkansas's signature

5    thresholds are significantly less demanding than what has been

6    upheld by other courts for decades.

7      For instance, the half a percent figure required for

8    statewide candidates to qualify for the ballot is eight times

9    less demanding than the 5 percent requirement that the United

10   States Supreme Court upheld in *Janus*.  Thus, in every sense that

11   requirement is already so low that it accounts for unusual

12   circumstances.  And plaintiffs have made absolutely no effort to

13   grapple with that fact.  They simply haven't dealt with the fact

14   that Arkansas's signature requirement is so far below the

15   constitutional maximum that it already takes into consideration

16   things like weather or other unusual circumstances.

17     Furthermore, to the extent the case law fails to resolve

18   this case -- and, again, frankly, we believe that it does --

19   today's testimony establishes that Arkansas's regime, again even

20   in the context of COVID-19, isn't severely burdensome.

21     For example, Roderick Talley's testimony demonstrates

22   plaintiffs could have gone door to door collecting signatures in

23   April.  And Mr. Talley's testimony certainly establishes that

24   Mr. Fults could have collected sufficient signatures even in one

25   month.  In fact, the signatures that Mr. Fults collected, he

1    testified he collected in April.  And most of those signatures

2    were gathered at the end of April, showing, again, that it was

3    possible to collect signatures in April.

4          Similarly, Mrs. Cox explained how candidates in other

5    states have and how plaintiffs here could have collected

6    signatures to meet Arkansas's requirement.  Yet, plaintiffs

7    simply didn't do what a reasonably diligent candidate would do.

8          Indeed, Whitfield's testimony establishes that he made a

9    campaign decision not to dedicate resources or, frankly, his own

10   time to collecting signatures.  But, instead, he decided to

11   focus on this lawsuit.  For instance, Mr. Whitfield conceded

12   that he never before or after the pandemic went door to door to

13   collect signatures.  He said he was just too busy with life.

14   Instead, he only ever went to the DMV to collect signatures, and

15   he never made any effort to re-evaluate that strategy.

16   Whitfield also conceded that he never made any effort whatsoever

17   to organize volunteers, something that even his own expert,

18   Richard Winger, testified was necessary to make the ballot and

19   something that Ms. Cox gave detailed testimony about why it

20   needed to be done to meet a ballot access requirement and why

21   candidates do it all the time.  Again, Mr. Whitfield's excuse

22   was he was just too busy with life.  Instead, he relied on

23   people to download forms from his website, collect signatures

24   and mail them back to him.  But he couldn't even say where those

25   people -- he called them volunteers who downloaded those forms

1  -- were.  He didn't know where in the state they were.  He
2  couldn't say where they went to collect signatures.  He couldn't
3  say how many signatures they collected.  He just said some
4  number, and he changed his testimony about that number of people
5  collecting signatures, in the middle of his testimony,
6  downloading the form and collecting a signature or two.

7        Pandemic or not, Your Honor, that is not reasonably
8  diligent.  And his poor decision-making or other life
9  obligations, which we all have, don't entitle him to ballot
10 access.  Indeed, it goes without saying that if he cannot make
11 time to go door to door or to organize volunteers, he also can't
12 run a viable campaign.  Even Richard Winger said that.  And if
13 his campaign isn't viable, he isn't entitled to ballot access.

14       Mr. Whitfield also testified that he told however many
15 volunteers he had to simply stop collecting on March 12th.
16 Nothing required him to do that.  Indeed, as Whitfield conceded,
17 Arkansas is one of only four states that didn't order people to
18 stay home and respond to COVID-19.  Consequently, there's no
19 dispute that he and however many volunteers he had could have
20 collected signatures after that date.

21       Indeed, again, Mr. Fults testified that he didn't even
22 begin collecting signatures until April and that the vast
23 majority of his signatures came in the last couple of weeks in
24 April.  Likewise, again, Roderick Talley obtained all of his
25 signatures in April by going door to door.  Now, Mr. Linger

1    concentrated on the fact that Mr. Talley was better known.  But

2    there's no reason that a candidate like Mr. Whitfield running

3    for statewide office wouldn't have made an effort to become

4    better known as part of his signature-gathering effort.

5        In fact, if he had done what Mr. Talley did, running door

6    to door, he could have both campaigned and collected signatures

7    at the same time.  Indeed, Ms. Cox testified, by Mr. Whitfield's

8    testimony, that he was able to convert people into his

9    supporters.  He could have convinced people while going door to

10   door to help him gather signatures, but he simply decided that

11   wasn't worth his time.  Life interfered.  He didn't have enough

12   time to do it.

13       And Ms. Cox testified about how plaintiffs could have

14   collected signatures in March and April and how they would have

15   had to organize in order to do that.  Thus, Whitfield's

16   stand-down order to his volunteers, however many volunteers

17   there were, simply wasn't reasonable.  It's not what a

18   reasonably diligent candidate would do.  And to the extent that

19   it prevented him from meeting the requirements, his failure,

20   Your Honor, was self-inflicted.  And, therefore, by definition

21   he certainly is not entitled to injunctive relief.

22       But perhaps the best illustration of the fact is that

23   Whitfield was anything but diligent and simply decided that

24   signature gathering was a poor use of his resources and hiring a

25   professional canvasser was a poor use of resources.  Essentially

1    that's the problem.  He just decided it wasn't worth the money.

2    He said he didn't think petitioning was the best move for the

3    $13,000 that he had raised.  He didn't really evaluate whether

4    petitioning was worth it or not or whether it might improve his

5    odds either before the pandemic or after the pandemic of making

6    the ballot.  He just decided it wasn't the best way to spend

7    campaign money.  Instead, he decided that the better way to

8    spend money was on Facebook ads or a campaign that hadn't even

9    begun.  And he decided to spend $5,000 for this lawsuit, nearly

10   half of his campaign revenue.  Arkansas, Your Honor, didn't make

11   that decision for him.  It was his decision.  And it's not what

12   a reasonably diligent candidate who hadn't yet made the ballot

13   would do.

14        Finally, just to wrap up Mr. Whitfield's testimony, I think

15   it's worth discussing what Mr. Whitfield called his tour of

16   Arkansas.  In December and January, Whitfield testified that he

17   drove around the state dropping off petitions and apparently

18   collecting signatures.  And then, because he had gotten the

19   petition deadlines wrong, realized he couldn't actually collect

20   signatures until February.  But when the time for collection

21   actually came around in February, he did not repeat those

22   efforts.  And I think that uniquely illustrates how Whitfield

23   didn't even do the things that he himself recognized were

24   valuable and that a reasonably diligent candidate needed to do

25   to meet Arkansas's requirements.  And, as such, he simply hasn't

1   shown that Arkansas's ballot access regime created a severe

2   burden.  He's merely shown that his own lack of diligence and

3   mistakes created a burden on him.

4        With respect to Mr. Fults, he only needed to collect 286

5   signatures.  He didn't start collecting until April.  That's not

6   reasonable.  And as such, he simply hasn't shown a severe

7   burden.

8        Given that the plaintiffs failed to demonstrate a severe

9   burden, Arkansas's important interest in managing its election

10  procedures is sufficient to justify ballot access regime.  But

11  even if Arkansas's requirements imposed a severe burden or some

12  burden in between, as *Anderson-Burdick* is a sliding scale, those

13  requirements would, likewise, tailor to achieve compelling

14  interests, and they would pass.

15       For instance, Arkansas has a compelling interest in

16  preventing frivolous candidacies.  A potential U.S. Senate

17  candidate who cannot convince half a percent of eligible voters

18  to sign a petition is, undoubtedly, a frivolous candidate, a

19  candidate who never bothered to go door to door to collect

20  signatures, again, because he was just too busy with life.  I

21  understand that we all have responsibilities.  But there's

22  simply no entitlement to ballot access, and no case holds that

23  plaintiffs are entitled to that access.

24       Additionally, Arkansas's undisputed interest -- and this

25  interest is well defined in case law -- in ensuring fair, honest

1    and orderly elections justified the timing provisions that are

2    at issue.  In particular, the 90-day requirement is a reasonable

3    snapshot in time that helps prevent fraud.  And the May 1st

4    deadline ensures there is sufficient time to count signatures

5    and potentially resolve any disputes.  In fact, the testimony

6    here today highlighted that point.

7         Mr. Whitfield, for instance, testified about the need for

8    potential judicial resolution over whether signatures turned in

9    on one type of paper as opposed to another are valid.  Ms.

10   Furrer described the back and forth she's currently having with

11   the secretary of state about what signatures are valid and what

12   signatures are not.  Even Mr. Talley, who made the ballot,

13   talked about disagreements with the secretary of state's

14   determinations about the validity of particular signatures.

15   Resolving those kinds of disputes when you have a candidate this

16   close to the line takes time.  You have to go to state court.

17   State court has to be given the opportunity to render a

18   judgment.  As a result of that, the May 1st deadline makes

19   sense.  Additionally, that May 1st deadline makes sense because

20   it gives the secretary time to begin counting candidate

21   petitions prior to when referenda petitions are turned in.  We

22   heard some testimony about referenda petitions today.  And

23   those, frankly, involve significantly larger numbers of

24   signatures.  And they are submitted on July 3rd.  For the

25   Court's reference, those submissions are governed by Article 5,

1    Section 1, of the Arkansas Constitution.  And they are, of

2    course, discussed at length in Judge Moody's order in *Moore v.*

3    *Martin* that selected the May 1st date that's at issue here.

4         And, lastly, Arkansas certainly has an interest in ensuring

5    that all candidates, independent or partisan, are treated

6    equally by being required to file to run for office at the same

7    time.  And, frankly, plaintiffs haven't shown any reason why

8    they ought to be entitled to a special filing period.

9         Fourth, even if plaintiffs could prevail on the merits,

10   they are not entitled to injunctive relief.  As the Sixth

11   Circuit recently held in vacating an injunction imposing a

12   signature reduction, like plaintiffs seek here, courts, quote:

13   Have no authority, end quote, to impose such changes on a state.

14   Instead, as the Sixth Circuit held in that case, any limit must

15   be designed by the state, not a court.  And barring Arkansas

16   from designing its own limiting would run afoul of the Eighth

17   Circuit's mandamus order holding that the states, not courts,

18   determine how best to respond to a pandemic.

19        Moreover, even if injunctive relief were appropriate,

20   plaintiffs would not be entitled to the relief that they seek.

21   Under *Missouri v. Jenkins*, this Court's power to award

22   injunctive relief is very limited.  It cannot grant more relief

23   than is necessary to remedy an alleged constitutional violation.

24   Applying that standard, even if the pandemic made Arkansas's

25   regime problematic, plaintiffs would not be entitled to

1    automatic access.

2         Indeed, ordering plaintiffs' inclusion on the ballot

3    reduces regard for Arkansas's undisputed interest in barring

4    frivolous candidacies and ensuring a modicum of support, nor

5    would plaintiffs be entitled to a 70 to 80 percent reduction in

6    signature threshold.  Plaintiffs, frankly, have provided

7    absolutely no basis whatsoever for that reduction figure.

8    Instead, at most, plaintiffs might be entitled to a per capita

9    reduction based on state-imposed restrictions with impaired

10   signature collection.  But, again, there are no state

11   restrictions here, and they haven't pointed to any.

12        Again, to emphasize, Mr. Whitfield testified that Arkansas

13   is one of four states that did not issue a stay-at-home order.

14   And he also testified that despite the governor's state of

15   emergency declaration, he was still traveling to meet people on

16   March 12th.

17        Indeed, the only potentially relevant objection that anyone

18   has identified here is Governor Hutchinson's March 26th order

19   limiting large gatherings, where signatures might have been

20   collected.  But that order, as we explained in our briefing,

21   occurred 54 days into the 90-day collection period.  Thus, even

22   assuming that order somehow interfered with plaintiffs'

23   petition, they would not be entitled to a 60 percent reduction.

24   And even that figure, Your Honor, would represent a significant

25   windfall if the secretary were required to consider signatures

1    collected after March 26th.  And that's an important point of

2    emphasis here is that they want to limit or a reduction pegged

3    to some theoretical date, but they also still want to count the

4    signatures after that date.  It really doesn't make sense, and

5    it doesn't seem equitable that they are allowed to continue

6    collecting signatures if you clamp down on a specific date.

7         So, accordingly, Your Honor, this Court should render

8    judgment for the defendants on plaintiffs' claim or, at a

9    minimum, deny plaintiffs' request for injunctive relief.  Thank

10   you, Your Honor.

11         THE COURT:  Thank you, counsel.

12         Mr. Linger, do you have anything further that you want to

13   say?  You are the plaintiff, so I'll give you the first and last

14   word if you want it.

15         MR. LINGER:  I would like to thank you, Your Honor.

16   COVID-19 makes all the difference.  The state didn't cause that.

17   But just like has been recognized in other states' decisions

18   with the weather, the state didn't cause the bad weather.  It is

19   the law as it is that had this effect, which I think was very

20   significant.  For that reason, these other cases that they have

21   cited did not concern either weather, bad weather, or a deadly

22   disease which had an effect.  Whenever governors say -- when

23   news media -- and we had plenty of testimony here that this

24   definitely had an effect.  These are serious candidates.  And I

25   think they made an effort that they thought could be successful

1    but for this and the effect that the law had as applied to them.

2    So we ask for judgment for the plaintiffs and the appropriate

3    relief as was granted in other federal and state cases where

4    they have recognized the effect of the COVID-19 on petitions.

5              THE COURT:  All right.  I appreciate everyone's time

6    and attention today.  I have this matter under advisement.  As I

7    said, with respect to the Rule 52 motion when it was made, I

8    intend to issue a written ruling that makes findings of fact and

9    conclusions of law, and I will do so expeditiously.

10         Remind me, counsel.  I think the briefing is closed.  I

11   don't think anybody requested post-hearing briefing.

12         Is that right, counsel for plaintiffs?

13              MR. LINGER:  Yes, Your Honor.

14              THE COURT:  Do you agree with that, counsel for

15   defendant?

16              MR. BRONNI:  Yes, Your Honor.

17              THE COURT:  So I have everything before me that I need

18   to consider with respect to arguments and proof.  I have it all

19   under advisement, and I will issue a written ruling.  If there

20   are any further issues, you can certainly reach out to Mr. Lax.

21   I think the parties have made me aware of the timing of certain

22   events, so I will keep that in mind as we consider the matters.

23         Anything further that we need to take up today, counsel for

24   plaintiffs?

25              MR. LINGER:  No, Your Honor.

1          THE COURT:  Counsel for defendant?

2          MR. BRONNI:  No, Your Honor.

3          THE COURT:  All right.  With that, then we are

4    adjourned.  Everyone have a good evening.  I appreciate your

5    time and attention.

6          (Proceedings concluded at 6:14 p.m.)

7                      REPORTER'S CERTIFICATE

8       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

9

10   /s/Elaine Hinson, RMR, CRR, CCR      Date:  June 4, 2020
     United States Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25