**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**DAN WHITFIELD and**                                         **PLAINTIFFS
GARY FULTS**

**v.**                   **Case No. 4:20-cv-00466-KGB**

**JOHN THURSTON, in his official capacity
as Secretary of State for the State of Arkansas**              **DEFENDANT**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Dan Whitfield and Gary Fults bring this action against John Thurston, in his official capacity as Secretary of State for the State of Arkansas, seeking declaratory and injunctive relief under 42 U.S.C. § 1983, alleging the violation of rights plaintiffs claim are guaranteed by the First and Fourteenth Amendments to the United States Constitution, to challenge the constitutionality of three provisions of Arkansas law: Arkansas Code Annotated §§ 7-7-101, 7-7-103, and 7-7-203(c)(1) (Dkt. No. 1, ¶¶ 7, 9). Plaintiffs seek declaratory and injunctive relief. Consistent with this Order, the Court denies plaintiffs' request for injunctive relief and enters judgment in favor of Secretary Thurston on the merits of plaintiffs' claims.

### I. Procedural Background

Before the Court is plaintiffs' motion for preliminary injunction (Dkt. No. 8). Secretary Thurston filed a response (Dkt. No. 12), and plaintiffs filed a reply (Dkt. No. 15). All parties agreed, pursuant to Federal Rule of Civil Procedure 65(a)(2), to consolidate the hearing on the motion for preliminary injunction with the trial on the merits. Prior to the hearing, the parties entered into joint stipulations of fact and a second joint stipulation that addressed the admissibility of certain evidence (Dkt. Nos. 11; 19).

The Court conducted a telephonic hearing and consolidated trial on the merits regarding this motion on May 27, 2020 (Dkt. Nos. 20; 25). The following witnesses testified at that hearing:

Mr. Whitfield; Mr. Fults; Sandra Furrer, an independent candidate for State Representative for District 31, who as of the date of the hearing had not satisfied the State's ballot access requirements; Roderick Talley, an independent candidate for State Representative for District 34, who as of the date of the hearing had satisfied the State's ballot access requirements; Lee Jarrod Evans, an individual who runs a political consulting company that does petitioning and fundraising; Richard Winger, expert for plaintiffs in the field of minor political parties, independent candidates, and election and ballot access laws in the United States; and Meghan Cox, expert for defendants in the field of ballot access (Dkt. Nos. 21; 22).

After the trial, Secretary Thurston filed notices of supplemental authority (Dkt. Nos. 23; 26), to which plaintiffs responded (Dkt. Nos. 24; 27).  The parties also informally communicated with the Court regarding a dispute related to the parties' joint stipulations of fact; the Court attaches the electronic mail messages regarding this dispute to this Court's Order as the Court's Exhibits A, B, and C.[1]

## II.    Findings Of Fact

1.    Mr. Whitfield is a resident of Bella Vista, Arkansas; a registered voter in the State of Arkansas; a citizen of the United States; an independent candidate for U.S. Senate from Arkansas for the 2020 general election; and, at the time of filing, was conducting a petition drive

---

[1]  At this stage of the proceeding, the Court is not inclined to rule on this dispute.  The Court acknowledges record evidence before it of alleged discrepancies in Secretary Thurston's informing potential candidates of the numbers of signatures necessary to qualify for ballot access (Ms. Furrer), errors and miscalculations in verifying and counting the number of signatures necessary to qualify for ballot access (Ms. Furrer, Mr. Talley, and the Libertarian Party), and potentially different treatment in the timing and reporting of valid signature counts and qualifications (Ms. Furrer, Mr. Talley, Mr. Whitfield, and Mr. Fults).  While the Court acknowledges such record evidence, the Court takes no position on it with respect to the claims raised by Mr. Whitfield and Mr. Fults.  For other reasons explained in this Order, the Court determines Mr. Whitfield and Mr. Fults do not succeed on their claims.

for ballot access in Arkansas as an independent candidate for U.S. Senate (Dkt. Nos. 1, ¶ 2; 11, ¶ 5).

2.      Mr. Fults is a resident of Hensley, Arkansas; a registered voter in the State of Arkansas; a citizen of the United States; an independent candidate for State Representative for District 27 in Arkansas for the 2020 general election; and, at the time of filing, was conducting a petition drive for ballot access in Arkansas as an independent candidate for State Representative for District 27 (Dkt. Nos. 1, ¶ 3; 11, ¶ 6).

3.      Secretary Thurston, as Arkansas Secretary of State, is statutorily responsible in his official capacity for determining how many valid signatures a petition contains, certifying election results, maintaining State election records, and administering the election and voter registration laws of the State of Arkansas (Dkt. Nos. 1, ¶ 5; 11, ¶ 7).  *See* Ark. Code Ann. § 7-7-103.

4.      At all times relevant to this litigation, Secretary Thurston and his agents were acting under color of state law (Dkt. No. 11, ¶ 7).  Secretary Thurston is sued only in his official capacity (*Id.*).

5.      By the statutory deadline, May 1, 2020, five individuals—including plaintiffs— timely submitted petitions seeking to be included as independent candidates on the November 3, 2020, general election ballot, and Secretary Thurston's office proceeded to verify the validity of the signatures on those petitions and count the valid signatures (Dkt. No. 11, ¶ 8).

6.      On March 11, 2020, Arkansas Governor Asa Hutchinson declared an emergency related to COVID-19 by Executive Order 20-03 (*Id.*, ¶ 9).

7.      Governor Hutchinson announced on March 15, 2020, that schools would be closed (Dkt. No. 12-2, ¶ 22).  Arkansas closed bars, on-site dining, and gyms/fitness centers on March 19, 2020 (*Id.*, ¶ 23).

8.      On March 26, 2020, Governor Hutchinson ordered that gatherings in confined spaces outside a single household or living unit be limited to ten or fewer people (*Id.*, ¶ 24).

9.      The Governor's March 26, 2020, order did not limit gatherings in "unenclosed, outdoor spaces such as parks, trails, athletic fields and courts, parking lots, golf courses and driving ranges where social distancing of at least six (6) feet can be easily achieved" (Dkt. No. 11, ¶ 10).

10.     On May 5, 2020, Governor Hutchinson ordered that "[t]he emergency and declaration shall be extended for an additional forty-five (45) days" (*Id.*, ¶ 11).

11.     Arkansas holds general elections in even numbered years (*Id.*, ¶ 12).  *See* Ark. Code Ann. § 7-5-102.  The next general election and non-partisan runoff election in Arkansas will be held on November 3, 2020 (*Id.*).

12.     For the 2020 election cycle, Arkansas's preferential primary election and non-partisan general election were held on March 3, 2020 (*Id.*, ¶ 13).  *See* Ark. Code Ann. §§ 7-7-203(b), 7-10-102(b).

13.     For the 2020 election cycle, Arkansas's general primary election was held on March 31, 2020 (*Id.*, ¶ 14).  *See* Ark. Code Ann. § 7-7-203(a).

14.     To run for political office in Arkansas, independent candidates must submit a political practices pledge, an affidavit of eligibility, and a notice of candidacy during a one-week party filing period (*Id.*, ¶ 15).  *See* Ark. Code Ann. § 7-7-103(a)(1).  That period begins at noon on the first Monday in November preceding the general primary election and concludes at noon on the seventh day thereafter (*Id.*).  Ark. Code Ann. § 7-7-203(c).

15.     For the 2020 election cycle, that party filing period ran from 12:00 noon on November 4, 2019, through 12:00 noon on November 12, 2019 (*Id.*).

16.     Candidates who wish to be placed upon the ballot as an independent with no political party affiliation in the county, township, or district in which the person is seeking office may do so by filing a petition "signed by not less than three percent (3%) of the qualified electors in the county, township, or district in which the person is seeking office, but in no event shall more than two thousand (2,000) signatures be required for a district, county, or township office."  Ark. Code Ann. § 7-7-103(b)(1)(A).  If the independent candidate is seeking a statewide office or any office for which a statewide race is required, that candidate's petition must either have 10,000 signatures or signatures from 3% of the qualified electors of the state, whichever is lesser.  Ark. Code Ann. § 7-7-103(b)(1)(B).

17.     "In determining the number of qualified electors in any county, township, or district or in the state, the total number of votes cast therein for all candidates in the preceding general election for the office of Governor shall be conclusive of the number of qualified electors therein for the purposes of this section."  Ark. Code Ann. § 7-7-103(b)(4).

18.     To be a qualified elector, an individual must be legally registered to vote at the time he or she signs a ballot-access petition.  *See* Ark. Code Ann. § 7-7-103(b)(2).

19.     As of June 3, 2019, there were 1,732,161 registered voters in Arkansas (Dkt. No. 11, ¶ 17).

20.     Three percent of the total vote cast for Governor of Arkansas in the November 2018 general election was 26,746 votes (*Id.*, ¶ 18).

21.     For the 2020 election cycle, an individual seeking to qualify for inclusion on the ballot as an independent candidate for statewide office must submit at least 10,000 valid signatures, approximately 0.58% of registered Arkansas voters (*Id.*, ¶ 19).

22.     An individual seeking to be included on the ballot as an independent candidate for the Arkansas House of Representatives must submit a ballot-access petition containing signatures equivalent to 3% of the vote cast for Governor in the relevant district during the previous general election (*Id.*, ¶ 20).

23.     To be a qualified elector, an individual must be legally registered to vote and a resident of the relevant district (*Id.*).  *See* Ark. Code Ann. §§ 7-7-103(b)(1)(A), (b)(2), (b)(4).

24.     Under current Arkansas law, "[p]ersons desiring to have their names printed on the ballot as independent candidates for President and Vice President shall file a petition with the Secretary of State by noon on the first Monday of August of the year of the election.  The petition shall contain at the time of filing the names of one thousand (1,000) qualified electors of the state declaring their desire to have printed on the ballot the names of the persons desiring their names to be printed on the ballot as independent candidates for President and Vice President.  The Secretary of State shall verify the sufficiency of the petition within ten (10) days from the filing of the petition.  If the petition is determined to be insufficient, the Secretary of State shall notify in writing the persons desiring to have their names printed on the ballot as independent candidates for President and Vice President at the address or telephone number submitted with the petition and shall set forth his or her reasons for so finding."  Ark. Code Ann. § 7-8-302(6)(A).

25.     For the 2020 election cycle, an individual seeking to be included as an independent candidate for State House District 27 must submit 286 valid signatures (Dkt. No. 11, ¶ 21).

26.     At the time plaintiffs filed the instant motion, Mr. Whitfield had approximately 6,000 petition signatures in hand, and Mr. Fults had approximately 100 petition signatures in hand (Dkt. Nos. 8-1, ¶ 8; 8-2, ¶ 8).

27.     By August 24, 2020, each county's board of elections must hold a draw to determine ballot order for the 2020 general election.  *See* Ark. Code Ann. § 7-5-207(c)(1); *see also* Ark. Code Ann. § 7-1-108 ("If an election law deadline occurs on a Saturday, Sunday, or legal holiday, the deadline shall be the next day which is not a Saturday, Sunday, or legal holiday.").

28.     Under federal and state law, absentee ballots for the 2020 general election must be delivered starting September 18, 2020.  *See* Ark. Code Ann. § 7-5-407(a)(2); *see also* 52 U.S.C. § 20302.

29.     Accordingly, ballots for the November 3, 2020, Arkansas general election have not yet been printed but will be printed in late August or early September 2020 (Dkt. No. 11, ¶ 24).

30.     In an attempt to resolve these issues, plaintiffs attempted to "work out a deal with the Arkansas Secretary of State's office but were referred to Governor Hutchinson" (Dkt. Nos. 8-1, ¶ 9; 8-2, ¶ 9).  In a letter signed on April 6, 2020, six independent candidates for office in Arkansas—including Mr. Whitfield and Mr. Fults—sent a letter to Governor Hutchinson asking him to reduce the number of signatures required due to the amount of time lost because of the coronavirus threat (Dkt. Nos. 8-1, ¶ 9; 8-2, ¶ 9; 15-8, ¶ 8).  Specifically, the independent candidates asked Governor Hutchinson to reduce the number of signatures required by 60% due to the amount of time lost due to social distancing policies because of the coronavirus threat or, in the alternative, to exempt candidates from the petition signature collection process (Dkt. Nos. 8-1, ¶ 9; 8-2, ¶ 9). Based on the record before the Court, Governor Hutchinson responded on April 21, 2020, stating that he had asked his legal counsel to review the letter (*Id.*).  There is no indication in the record before the Court that Governor Hutchinson responded further to this letter.

31.     Plaintiffs filed this suit on April 29, 2020 (Dkt. No. 1).

32.     Two independent candidates were successful in submitting a sufficient number of signatures, Christia Jones and Roderick Talley, so as to be included on the Arkansas 2020 ballot (Dkt. Nos. 12-1, at 4-5; 15-8, ¶ 8).  In their letters from Secretary Thurston, neither Ms. Jones nor Mr. Talley were informed of the signature count presented to qualify (*Id.*).

33.     Mr. Talley testified that, when he obtained signatures, he went to the Voter View website maintained by Secretary Thurston to check voter registration information based on name and birthdate (Dkt. No. 25, at 154-55).  After receiving documents from Secretary Thurston regarding the number of signatures submitted by Mr. Talley that Secretary of Thurston verified and counted, Mr. Talley testified that he was able to prove that Secretary Thurston failed to count signatures for individuals who appeared on Voter View as properly registered voters in Mr. Talley's district (*Id.*, at 155-56).

34.     Mr. Talley previously was a candidate in a special election, and by March 2020, he had walked his district and gone door-to-door several times speaking to residents (*Id.*, at 157-59). Mr. Talley does not dispute that he collected the signatures necessary to appear on the November 2020 ballot during a period of approximately 14 days from approximately April 20 to April 30, 2020 (*Id.*, at 164).

35.     Ms. Furrer, who sought to qualify as an independent candidate from Arkansas District 31, submitted a letter on April 3, 2020, with the signatures she collected, explaining that she was told by Mr. Josh Bridges, whom she identified as an employee of the State, that she would need to secure 438 signatures to qualify as a candidate but that her understanding from the House of Representatives website indicated she needed fewer signatures to qualify (See Plaintiffs' Trial

Ex. 13, at 1).[2]  Ms. Furrer also testified that Peyton Murphy, who also is an employee of the State, subsequently told her that she needed 436 signatures to qualify (Dkt. No. 25, at 138).

36.     On May 1, 2020, Ms. Furrer was informed by letter that she failed to qualify because, of the 812 signatures she submitted, only 421 were found to be registered voters within District 31, which was an insufficient number (Plaintiffs' Trial Ex. 13, at 2-3).

37.     According to Ms. Furrer, she submitted her signatures on April 3, 2020, to Secretary Thurston, later learned that the validation process was completed by Secretary Thurston on April 16, 2020, but heard nothing with respect to the results of that validation process from Secretary Thurston until May 1, 2020 (Dkt. No. 25, at 136-38).  Ms. Furrer has been provided with no explanation for the delay (*Id.*).

38.     On May 3, 2020, Ms. Furrer wrote to Governor Hutchinson explaining her situation, stating she felt it "unfair that [she] and other candidates are penalized because we abided by [his] directives to 'stay at home' and avoid public contact," and asking him to "put politics aside and issue an Executive Order to reduce the number of signatures needed for independent candidates or at least extend the period for collecting signatures until July 1, 2020." (Plaintiffs' Trial Ex. 13, at 4).

39.     On May 18, 2020, Ms. Furrer wrote to Secretary Thurston explaining her circumstance, describing how the coronavirus pandemic and Governor Hutchinson's actions impacted signature collection, her difficulty in ascertaining the actual number of signatures needed to qualify as a candidate due to information not being readily available on the Secretary of State's website, her unsuccessful effort to review her original documents and talk with staff about the

---

[2]  The parties did not stipulate as to the admissibility of Plaintiffs' Trial Ex. 13 (Dkt. No. 19, ¶ 4), but the Court admitted Plaintiffs' Trial Ex. 13 at the hearing and trial in this matter with no objection from Secretary Thurston (Dkt. No. 25, at 141).

signatures she submitted and the count of signatures, her review by electronic mail of the documents she submitted and her appeal of the signature count due to errors, and her continued disagreement with the results of the appeal (*Id.*, at 5).

40.     There is record evidence that, with respect to signatures submitted by the Libertarian Party of Arkansas, the Secretary of State erred in counting qualifying signatures; initially, the Libertarian Party of Arkansas was informed by Secretary Thurston that it submitted 12,749 valid signatures but then was informed by Secretary Thurston some four months later that the correct number was 14,779 valid signatures (Dkt. Nos. 15-1, ¶ 10; 15-5; 15-6).

### III.     Standing

Standing is a threshold jurisdictional issue in federal courts, and "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish Article III standing, a plaintiff must establish three elements:  (1) an "injury in fact"—an invasion of a legally protected interest which is both "concrete and particularized" and "actual or imminent;" (2) proof that the injury is "fairly . . . trace[able] to the challenged action of the defendant;" and (3) it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (internal citations omitted).  "[A] litigant must demonstrate . . . a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the 'case or controversy' requirement." *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 79 (1978).  The Supreme Court has long held that plaintiffs may bring suits against state officials seeking prospective relief to end continuing violations of the Constitution or federal law. *See, e.g.*, *Ex Parte Young*, 209 U.S. 123 (1908); *see also Green v. Mansour*, 474 U.S. 64 (1985).

A party invoking federal jurisdiction must support each of the standing requirements with the same kind and degree of evidence at the successive stages of litigation as any other matter on which a plaintiff bears the burden of proof. *Lujan,* 504 U.S. at 561; *Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 420-21 (8th Cir. 2011). Therefore "[a] plaintiff's burden to establish standing depends on the stage of litigation, and 'at the pleading stage, general factual allegations . . . may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Wieland v. U.S. Dep't of Health & Human Servs.*, 793 F.3d 949, 954 (8th Cir. 2015) (quoting *Lujan*, 504 U.S. at 561).

Secretary Thurston argues that plaintiffs lack standing to pursue their claims (Dkt. No. 12, at 7-8). Secretary Thurston attempts to characterize plaintiffs' claims as asserting an inability to comply with Arkansas's signature requirement due to "the effect of the coronavirus" (Dkt. No. 9, at 10). Secretary Thurston asserts that Article III of the United States Constitution does not grant plaintiffs standing to seek an injunction requiring the State to reduce the impact of COVID-19 on plaintiffs' signature-collection efforts because plaintiffs cannot show that Secretary Thurston did anything to injure them (Dkt. No. 12, at 7).

The Court concludes that plaintiffs can demonstrate their standing to pursue declaratory and injunctive relief. Secretary Thurston's continued application of the State's ballot access requirements for independent candidates despite State directives and guidance on COVID-19 that make complying with those ballot access requirements more difficult burdens plaintiffs' First Amendment rights. This alleged injury is fairly traceable to the State in that plaintiffs maintain the State's ballot access requirements prevent plaintiffs from effectively collecting enough signatures while also complying with the social distancing encouraged, and in some cases required, by the State.

Plaintiffs note in their complaint that Governor Hutchinson declared an emergency on March 11, 2020, due to COVID-19, and Governor Hutchinson amended that emergency declaration on March 13, 2020, to notify the citizens of Arkansas to take precautions to prevent the spread of COVID-19, including minimizing person-to-person contact and the avoidance of large gatherings (Dkt. No. 1, ¶ 8). On March 26, 2020, Governor Hutchinson again amended his emergency declaration and declared the entire state of Arkansas an emergency disaster area (*Id.*). On April 4, 2020, Governor Hutchinson again amended his emergency declaration instructing all Arkansas citizens to observe proper social distancing (*Id.*). Although it is clear the parties before the Court dispute the impact of the State's actions in responding to COVID-19 on plaintiffs' ability to comply with ballot access requirements, there can be no dispute that the State took action in responding to COVID-19 and that, to some extent, that action impacted plaintiffs' efforts. Even if Governor Hutchinson did not issue a "shelter-in-place/stay-at-home order" (Dkt. No. 12-2, ¶ 21), through his Executive Orders, actions, and public statements, he restricted schools, businesses, public and private gatherings, and advised Arkansas residents to "'stay at home' and avoid public contact" for some period of time during the 90-day period at issue in this litigation (Plaintiffs' Trial Ex. 13, at 4).

Plaintiffs assert that the State's actions have "greatly and significantly restricted the ability to solicit petition signatures in Arkansas because of restrictions and directives as to where individuals and groups of people can gather and circulate among the public" (Dkt. No. 1, ¶ 8). There is record evidence that, to collect the necessary signatures, the independent candidates placed petitions for signatures at businesses and attended and had plans to attend large public and private gatherings to seek signatures, among other conduct impacted by the State's actions.

Finally, because Secretary Thurston is the official responsible for determining whether plaintiffs have complied with the ballot access requirements and earned a spot on the November ballot, enjoining Secretary Thurston from continued application of the requirements plaintiffs argue are unconstitutional is likely to redress the injuries plaintiffs allege.

The Court concludes that plaintiffs have sufficiently demonstrated their standing to pursue declaratory and injunctive relief.  In reaching this decision, this Court has fully considered the holdings in *Mays v. Thurston*, Case No. 4:20-cv-00341 JM, 2020 WL 1531359 (E.D. Ark. Mar. 30, 2020), a case involving facts different from those presented here, and *Miller v. Thurston*, Case No. 5:20-cv-05070, 2020 WL 2617312 (W.D. Ark. May 25, 2020), *appeal pending*, No. 20-2095 (8th Cir.), a case involving facts similar although not identical to those presented here.

## IV.    Standard For Injunctive Relief

Pursuant to Federal Rule of Civil Procedure 65(a), plaintiffs move "for a preliminary injunction enjoining [Secretary Thurston], his agents, servants, and employees, and all those in active concert or participation with them, from enforcing the provisions of Arkansas Code Annotated §§ 7-7-101, 7-7-103, and 7-7-203(c)(1), as they apply to the Plaintiffs herein for the 2020 Arkansas general election cycle, so as to prevent the Plaintiffs and their supporters from conducting a successful petition drive for independent candidate status for the general election to be held on November 3, 2020, with a reasonable petition signature requirement of no more than 20-30% of the normal, valid petition signature requirement for an independent candidate for U.S. Senate and State House Representative, until a final hearing and determination of the merits in the instant case" (Dkt. No. 8, at 1).  Plaintiffs ask the Court to order Secretary Thurston to accept petition signatures in a minimum total of 2,000 to 3,000 valid petition signatures of registered Arkansas voters for Mr. Whitfield and 57 to 86 valid petition signatures of registered Arkansas

13

voters for Mr. Fults for the purpose of achieving recognition as independent candidates for U.S. Senate and State House Representative, respectively, in the State of Arkansas for the general election to be conducted on November 3, 2020 (*Id.*, at 1-2).  With these signatures submitted, plaintiffs ask the Court to order Secretary Thurston to recognize them as independent candidates for U.S. Senate and State House Representative, respectively, in the State of Arkansas for the general election to be conducted on November 3, 2020 (*Id.*, at 2).

Typically, when determining whether to grant a motion for preliminary injunction, this Court considers:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.,* 640 F.2d 109, 113 (8th Cir. 1981)).  As movants, plaintiffs bear the burden of showing the *Dataphase* factors weigh in their favor before an injunction can issue.  *See Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied."  *Minn. Citizens Concerned for Life v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (citation omitted).

The Eighth Circuit revised the *Dataphase* test when applied to challenges to laws passed through the democratic process.  Those laws are entitled to a "higher degree of deference." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 732 (8th Cir. 2008).  In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. Instead, the appropriate standard, and threshold showing that must be made by the movant, is

"likely to prevail on the merits." *Id.* Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors. *Id.*

"The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)). Since the May 27, 2020, hearing constituted a consolidated trial on the merits, the Court construes plaintiffs' motion as a request for a permanent injunction of the challenged statutes.

## V.     Analysis

Plaintiffs claim that specific ballot access statutes governing independent candidates in Arkansas unconstitutionally deny them the right to political association, the right to cast their vote effectively, the right to petition for redress of grievances, and equal protection of the laws (Dkt. No. 1, ¶¶ 16-26). Specifically, plaintiffs argue that Arkansas Code Annotated §§ 7-7-101, 7-7-103, and 7-7-203(c)(1) are unconstitutional both facially and as applied to them for the 2020 Arkansas general election and all subsequent general elections in the state of Arkansas (*Id.*, at 11-12). Plaintiffs assert that these provisions set an unconstitutionally early, unnecessary, and vague deadline of May 1, 2020, and an unnecessarily limited 90-day petitioning period during election years for independent candidates, along with the loss and curtailment of the overwhelming majority of petitioning time for the aforesaid 90-day petitioning period in 2020 because of the advent of COVID-19 (*Id.*, ¶ 7). Plaintiffs claim that the 90-day petitioning period is specifically impacted this year—and will be susceptible to being impacted in future election years—by dangerous and deadly diseases such as COVID-19 and/or severe weather conditions (*Id.*).

Plaintiffs allege three counts in their complaint (*Id.*, ¶¶ 16-29).   Count One seeks declaratory relief for infringing upon plaintiffs' right to freedom of political association, right to cast a vote effectively, and right to petition as protected by the First Amendment (*Id.*, ¶¶ 16-21). Count Two seeks declaratory relief for infringing upon plaintiffs' right to equal protection of the laws as protected by the Fourteenth Amendment (*Id.*, ¶¶ 22-26).   Count Three seeks injunctive relief, alleging that plaintiffs have suffered and will continue to suffer irreparable injury by the policy, practice, custom, and usage of defendant's complained of actions in this complaint until Secretary Thurston is enjoined by this Court (*Id.*, ¶¶ 27-29).   For the reasons discussed below, the Court denies plaintiffs' request for injunctive relief.

### A.     The Type Of Challenge

A plaintiff brings a facial challenge "to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question." *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999).   By contrast, "[a]n as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017) (quoting *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004)).   A successful as-applied challenge, then, means "the statute may not be applied to the challenger, but is otherwise enforceable." *Id.* (quoting *Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004).   Plaintiffs' claims have "'characteristics of both' challenges." *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 587 (8th Cir. 2013) (concluding that the court could "consider each challenged . . . requirement in isolation, and, if necessary, apply the 'normal rule that partial, rather than facial, invalidation is the required course.'").

"[T]he 'label is not what matters.'" *Tooker*, 717 F.3d at 587 (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)

("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."). Instead, "[t]he 'important' inquiry is whether the 'claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiffs.'" *Tooker*, 717 F.3d at 587 (quoting *Reed*, 561 U.S. at 194).

### B.   Merits Of Plaintiffs' Claim: Fundamental Rights Under The First Amendment

Plaintiffs first challenge the constitutionality of the ballot access statutes governing non-presidential independent candidates in Arkansas, arguing that those statutes unduly burden their First Amendment fundamental rights, including the right of freedom of political association, the right to cast their votes effectively, and the right to petition for redress of grievances (Dkt. No. 1, ¶¶ 16-21). Although there is no fundamental right to seek elected office, ballot access laws like the ones at issue here burden two kinds of rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). As the Supreme Court has explained, these rights "rank among our most precious freedoms." *Id.* Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which . . . we must live." *Id.* at 31 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). The Supreme Court concluded that "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Id.* (quoting *Wesberry*, 376 U.S. at 17). When it comes to ballot access, "[a] court must determine whether the challenged laws freeze the status quo by effectively barring all candidates other than those of the major parties and provide a realistic means of ballot access." *Manifold v. Blunt*, 863 F.2d 1368, 1374 (8th Cir. 1988) (internal quotations and citations omitted). "It has been recognized . . . that the entire election scheme must

be analyzed to determine whether undue constraints on access to the ballot exist." *Libertarian Party v. Bond*, 764 F.2d 538, 541 (8th Cir. 1985) (citations omitted).

When considering the constitutionality of ballot access laws, courts apply the framework established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and later refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson-Burdick* framework, the Court first considers "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Moore v. Martin*, 854 F.3d 1021, 1025 (8th Cir. 2017) (internal quotations omitted). Next, the Court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule, determining not only the legitimacy and strength of each of those interests but also the extent to which those interests make it necessary to burden the plaintiff[s'] rights." *Id.*; *see also Moore v. Thurston*, 928 F.3d 753, 756 (8th Cir. 2019) ("The test requires the court to first determine whether the challenged statute imposes a burden of some substance on a plaintiff's rights and then to evaluate the State's justification for the statute, determining whether the challenged statute is narrowly drawn to serve the State's compelling interest." (internal quotations and citations omitted)). For independent candidates, this burdensomeness question considers whether "a reasonably diligent independent candidate [could] be expected to satisfy the signature requirements." *Storer v. Brown*, 415 U.S. 724, 742 (1974).

When a state promulgates a regulation which imposes a "severe" burden on individuals' constitutional rights, that regulation will only be upheld if it is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. In those instances, the State of Arkansas bears the burden of showing that the challenged statutes are narrowly drawn to serve the State's compelling interest. *Moore v. Martin*, 854 F.3d at 1026 (citing *Eu v. S.F. Cty. Democratic*

*Cent. Comm.*, 489 U.S. 214, 222 (1989)). "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal quotations and citations omitted); *see also Anderson*, 460 U.S. at 788.

### 1. Prior Challenges To Arkansas's Independent Candidate Ballot Access Statutes

The Court first notes that the Eighth Circuit Court of Appeals and district courts in this district have previously examined and ruled on proposed changes to Arkansas' independent candidate ballot access requirements. In *Lendall v. Bryant*, 387 F. Supp. 397, 400-03 (E.D. Ark. 1975) (per curiam) ("*Lendall I*"), a three-judge panel held unconstitutional the following requirements: (1) a deadline of the first Tuesday in April in the election year for an independent candidate's petition and (2) a signature requirement of 15% of the qualified electors as determined by the last gubernatorial vote. Later, even after the signature requirements were reduced, a three-judge panel held that a filing deadline of the first Tuesday in April before the preferential primary election was unconstitutional. *Lendall v. Jernigan*, No. LR-76-C-184 (E.D. Ark. Aug. 20, 1976), *aff'd mem.*, 433 U.S. 901 (1977) ("*Lendall II*"). A separate district court decision found that the petition requirement of 10% of qualified electors, by itself, was unconstitutional. *Lendall v. Jernigan*, 424 F. Supp. 951, 958 (E.D. Ark. 1977) ("*Lendall III*"). Additionally, another district court held that a one-time January 5 filing deadline accompanying a one-time March 8 date for the preferential primary was unconstitutional. *Lendall v. McCuen*, No. LR-C-88-311 (E.D. Ark. Aug. 16, 1988) ("*Lendall IV*").

In 1994, the Eighth Circuit Court of Appeals did uphold the following ballot access restrictions for independent candidates: (1) a filing deadline 30 days before the primary election; (2) a signature requirement of the lesser of 3% of qualified electors or ten thousand signatures; and

(3) a 60-day period in which to gather signatures.  *Langguth v. McCuen*, 30 F.3d 138 (8th Cir. 1994) (unpublished per curiam table decision).  Notably, however, the ballot access restrictions in that case included deadlines for collecting signatures that ended "30 days before the primary and 186 days before the general election."  *Id*. at *2.

The Eighth Circuit has reviewed Arkansas's ballot access statutes for independent candidates in the recent past.  *Moore v. Martin*, Case No. 4:14-cv-00065 JM, 2015 WL 13343585 (E.D. Ark. Aug. 25, 2015), *aff'd in part, rev'd in part*, *Moore v. Martin*, 854 F.3d at 1023.  At the trial level, plaintiffs—independent candidates for Lieutenant Governor and the state House—argued that "the petition deadline coupled with the signature requirement, lowered public interest, and inconvenient petitioning time [are] unconstitutional."  2015 WL 13343585, at *5.  At that time, the party filing period began one week prior to the first day in March and ended the first day of March.  2015 WL 13343585, at *1.  Furthermore, prospective independent candidates for statewide office had to file a political practices pledge, an affidavit of eligibility, a petition signed by 3% of qualified electors or 10,000 qualified electors, whichever was less, and a notice of candidacy.  *Id*.  Additionally, as is true now, petitions for independent candidates had to "be circulated not earlier than ninety (90) calendar days before the deadline for filing petitions . . . ."  *Id*.  While the district court found that the March 1 deadline was a "burden of some substance," the district court also found that the "increased number of initiative petitions" and "ever increasing litigation over petitions" constituted a compelling state interest.  *Id*. at *6.  Furthermore, the district court concluded that the regulations governing independent candidate petitions—including the signature requirements and petition deadlines—were "narrowly tailored to advance the State's interest in timely certifying independent candidates who wish to be placed on the ballot . . . ."

2015 WL 13343585, at *6.  Accordingly, the district court denied plaintiffs' motion for summary judgment and granted the Arkansas Secretary of State's motion for summary judgment.  *Id*. at *7.

When the first appeal was taken, the Eighth Circuit affirmed in part and reversed in part the district court's decision in *Moore*.  The Eighth Circuit held that "[t]he district court correctly noted that the March 1 filing deadline for independent candidates imposes a burden 'of some substance' on Moore's First and Fourteenth Amendment rights and that Arkansas has a compelling interest in timely certifying independent candidates for inclusion on the general election ballot." 854 F.3d at 1026.  The Eighth Circuit disagreed, however, with the district court's conclusion that there was no genuine issue of material fact regarding whether the March 1 deadline was narrowly drawn to serve that compelling interest.  *Id*. at 1026-27.  Specifically, the Eighth Circuit noted that the record evidence did not show that the burden of verifying petitions for nonpartisan candidates made it necessary to move the independent candidate petition deadline to March 1.  *Id*. Furthermore, while the Eighth Circuit noted that "[s]tronger evidence exists to suggest that the processing of initiative petition signatures might conflict with the processing of independent candidate petition signatures," the Eighth Circuit noted that "a number of other relevant facts are unclear," including when Independent candidate petitions were processed or "the amount of time required to process independent candidate petitions and the feasibility of temporarily hiring additional election workers."  *Id*. at 1028.  Accordingly, the Eighth Circuit remanded the matter back to the district court for further proceedings.  *Id*.[3]

---

[3] Notably, the dissent in *Moore* would not have affirmed the district court's decision, but instead, based upon the State's failure to show that the ballot access laws were narrowly drawn to serve a compelling interest, would have granted judgment as a matter of law for the plaintiffs.  *See* 854 F.3d at 1030 (Smith, J., dissenting)

After the first appeal, the district court issued findings of fact and conclusions of law determining that the plaintiff independent candidate demonstrated that the March 1 filing deadline was a substantial burden on ballot access and voters' rights to support a candidate of their choice; that the State had a compelling interest in timely certifying independent candidates for inclusion on the general election ballot; but that the State "failed to show why a March 1st petition deadline rather than a May 1st petition deadline for independent candidates is necessary to process independent candidate petitions." *Moore v. Martin*, Case No. 4:14-cv-00065 JM, 2018 WL 10320761, at *3 (E.D. Ark. Jan. 31, 2018).  As a result, the district court determined the March 1st deadline was "not narrowly drawn to serve a compelling state interest" and permitted plaintiff to "file his petition to run for office as an independent candidate on or before May 1, 2018." *Id.*

A second appeal was taken.  *Moore v. Thurston*, 928 F.3d at 753.  After Secretary Thurston filed his appeal and the parties submitted their briefs, the Arkansas legislature amended the petition filing deadline for independent candidates to 12:00 p.m. on May 1 of the general election year. *See* Ark. Code Ann. § 7-7-103.  Although the Eighth Circuit determined that plaintiff's claim was rendered moot by statutory amendment, the court did not vacate the district court's judgment in the case.  928 F.3d at 757-78.

The Court is mindful of these prior cases, and the holdings in these cases, as it turns to examine the facts of this matter in the light of controlling law.

### 2.      Burdens Imposed On Plaintiffs

The Court understands plaintiffs to allege separate but interrelated burdens:   an unnecessarily early November deadline for independent candidates to submit a political practices pledge, an affidavit of eligibility, and a notice of candidacy; an unconstitutionally early, unnecessary, and vague petition submission deadline of May 1, 2020; an unnecessarily limited 90-

day petitioning period during election years; and, as it pertains to this election cycle, an unreasonably high threshold for required signatures.  Plaintiffs argue that, taken together, the challenged state statutes create an unconstitutional burden and impose injuries to their constitutional rights that are "substantial and of a fundamental nature" (Dkt. No. 9, at 7).  Secretary Thurston responds that "the burden of complying with Arkansas law . . . is so slight that Arkansas's 'important regulatory interests' suffice to justify it" (Dkt. No. 12, at 9).

Below, the Court first analyzes the scope of the burden, if any, imposed upon plaintiffs. Based upon this review, the Court concludes that plaintiffs have not demonstrated that the burden imposed upon them by Arkansas Code Annotated §§ 7-7-101, 7-7-103, and 7-7-203(c)(1), facially and as applied to plaintiffs for the 2019-2020 Arkansas general election cycle and for all subsequent general election cycles in the State of Arkansas, is a severe burden upon their First and Fourteenth Amendment rights.

### a.        Independent Candidates' History In Arkansas

"Past experience will be a helpful, if not always an unerring, guide:  it will be one thing if independent candidates have qualified with some regularity, and quite a different matter if they have not."  *Storer*, 415 U.S. at 742.

With respect to Mr. Whitfield's claims, the record evidence shows that only three independent candidates for statewide office have satisfied the 10,000-signature threshold since it was adopted in 1977:  John Black for U.S. Senate in 1978; Rod Bryan for Governor in 2006; and Trevor Drown for U.S. Senate in 2010 (Dkt. No. 15-1, ¶ 5).

With respect to Mr. Fults's claims, the record evidence shows that Christia Jones and Roderick Talley, two independent candidates for the Arkansas House of Representatives, have

complied with the State's requirements to appear on the general election ballot this cycle (Dkt. Nos. 12-1, at 4-5; 12-2, ¶ 45).

### b.    Deadline For Political Practices Pledge, Affidavit Of Eligibility, And Notice Of Candidacy

Under state law, independent candidates must submit a political practices pledge, an affidavit of eligibility, and a notice of candidacy during a one-week party filing period (Dkt. No. 11, ¶ 15). *See* Ark. Code Ann. § 7-7-103(a)(1). The "party filing period" begins at noon on the First Monday in November preceding the general primary election and concludes at noon on the seventh day thereafter. Ark. Code Ann. § 7-7-203(c). During this period, political parties determine which individuals have chosen to submit themselves to be party candidates in their respective preferential primary elections (Dkt. No. 9, at 8).

Plaintiffs assert that "[t]here is no reason or necessity for Independent candidates in Arkansas to have to decide approximately one year before the general election what office they are going to run for and then petition before the nominees of the political parties are even known" (*Id.*). Plaintiffs also question the "necessity" of this deadline "when many of the political issues for the next election are not yet well formed or known, [and when] new political developments, deadly diseases, and bad weather are constantly occurring" (Dkt. No. 15, at 4). Moreover, as plaintiffs maintain, there is no record evidence that Arkansas has been "plagued by an overcrowded ballot as to Independent candidates or even Republicans, Democrats, or Libertarians." (*Id.*). Secretary Thurston argues that the filings in question "are simple, one-page forms that require no commitments from Independent candidates," and that the fact that all other candidates—including party-affiliated ones—must declare their candidacy during the same timeframe undercuts plaintiffs' claims of injury (Dkt. No. 12, at 18).

On the record before the Court, the Court determines that Arkansas law requiring candidates to submit a political practices pledge, an affidavit of eligibility, and a notice of candidacy during the party filing period burdens to some extent plaintiffs' rights at issue in this litigation.  In reaching this decision, the Court considers the following.

The Supreme Court in *Burdick* gave "little weight" to "'the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status.'"  *Burdick*, 504 U.S. at 436-37 (quoting *Storer*, 415 U.S. at 736).  In *Burdick*, the Supreme Court determined that Hawaii's lack of a provision for write-in voting in its primary or general elections was not a substantial burden where, with three recognized alternatives, the system "provide[d] for easy access to the ballot until the cutoff date for the filing of nominating petitions, two months before the primary."  *Id.* at 436.

Under Arkansas law, individuals hoping to run for office as a party-backed candidate must also declare their candidacy during the party filing period.  *See* Ark. Code Ann. § 7-7-203(c).  Thus, party-backed candidates and independent candidates face the same deadline for such preliminary filings.  *See McLain v. Meier* ("*McLain I*"), 637 F.2d 1159, 1165 (8th Cir. 1980) ("The Constitution requires that the access requirements as to both party-backed and independent candidates be reasonable.").  Under current Arkansas law, those deadlines vary for all candidates, depending on if it is a presidential election year.  *See* Ark. Code Ann. § 7-7-203(c).  During presidential election years, the deadline is from noon on the first Monday in November preceding the general primary election and ending at noon on the seventh day thereafter.  Ark. Code Ann. § 7-7-203(c)(1)(B).  In non-presidential election years, the deadline is noon one week prior to the first day in March and ending at noon on the first day in March of the years of the general election.  Ark. Code Ann. § 7-7-203(c)(1)(A).

The parties do not submit for the Court's consideration robust briefing directed to this specific issue. The Court has reviewed the at-issue forms on the Arkansas Secretary of State's website. The forms are one page each and request only basic information. Plaintiffs complied with the November 12, 2019, deadline for submitting a political practices pledge, an affidavit of eligibility, and a notice of candidacy, and plaintiffs testified that they had no difficulty in meeting this requirement. Still, during presidential election years, independent candidates in Arkansas are required to file these forms nearly one year prior to the election; to file at the same time as major party candidates seeking their parties' nominations or in other words when the major party candidates are not yet known; and when the independent candidate faces no primary opponent.[4] These facts distinguish this case from *Burdick*.

Plaintiffs maintain that, contrary to defendants' assertions, the 2018 district court decision in *Moore v. Martin* "still has precedential value because it further allowed the political practices pledge, affidavit of eligibility, and notice of independent candidacy to be filed on the same day as the petition deadline of May 1," and this is not allowed currently under the challenged laws (Dkt. No. 15, at 6). The Court observes that *Moore* involved a non-presidential election year, which involves different timing requirements. Current Arkansas law imposes different requirements in this regard on all candidates—party-backed and independent—if it is a presidential election year. *See* Ark. Code Ann. § 7-7-203(c). Further, the *Moore* decision plaintiffs cite includes little analysis specific to this point.

For all of these reasons, the Court recognizes the requirement to submit by the November deadline a political practices pledge, an affidavit of eligibility, and a notice of candidacy under

---

[4] Arkansas conducts its preferential primary elections "on the First Tuesday after the first Monday in March" during presidential election years. *See* Arkansas Code Annotated § 7-7-203(b)(2).

current Arkansas law in presidential election years burdens to some extent plaintiffs' rights at issue in this litigation.

### c.   The Signature Requirement, The 90-Day Window, And The May 1 Deadline

Plaintiffs complain of "the excessively high and unnecessary number of petition signatures required this year because of the effect of the coronavirus, the unnecessarily early petition signature deadline, the limitation as to petitioning time, the relationship of the aforesaid requirements to the time period in which the major political parties are selecting their candidates, and the date of the general election, as well as the particular facts in the instant case" (Dkt. No. 9, at 10). Plaintiffs argue that that "there is harm just in having a petition drive well before the general election in Arkansas. Many of the political issues for the next election are not yet well formed or well known. Not only are new political developments constantly occurring, but there is no necessity to have Independent candidate's [*sic*] petitions so early in the political season and collected during a 90-day period." (*Id.*, at 12). Plaintiffs also assert that "[t]here is no reason or necessity for Independent candidates in Arkansas to have to . . . petition before the nominees of political parties are even known" (*Id.*, at 8). Plaintiffs argue that "[t]he unique effect of the coronavirus on petitioning this year is made worse by the 90-day petitioning period" (*Id.*, at 10).

Secretary Thurston responds that Arkansas's signature requirements "impose only slight burdens—particularly on candidates who, like [Mr.] Whitfield, seek statewide office" (Dkt. No. 12, at 15). Secretary Thurston asserts that plaintiffs, as independent candidates in Arkansas, "have an easy task compared to candidates in other States," particularly because "Arkansas law allows any registered voter to sign a ballot-access petition, to sign multiple petitions, to do so regardless of whether they previously voted in a partisan primary, and to do so without committing to anything" (Dkt. Nos. 11, ¶¶ 16, 20; 12, at 15-16; 12-2, ¶¶ 12-17). Secretary Thurston highlights

that an independent candidate seeking statewide office in Arkansas for the 2020 election cycle must collect signatures from approximately 0.58% of registered Arkansas voters and argues that the Supreme Court and various courts across the country "have upheld signature requirements many times more burdensome than the half-a-percent requirement at issue here" (Dkt. Nos. 11, ¶ 19; 12, at 16).  *See Norman v. Reed*, 502 U.S. 279, 295 (1992); *Jenness v. Fortson*, 403 U.S. 431, 431 (1971); *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 696 (8th Cir. 2011); *Green Party of Ark. v. Martin*, 649 F.3d 675, 686-87 (8th Cir. 2011).  Additionally, Secretary Thurston argues that "[t]he 90-day signature-collection period similarly does not impose severe burdens" (Dkt. No. 12, at 18).

Secretary Thurston notes that plaintiffs declared their candidacy during the November 2019 party filing period and maintains that, as a result, they "had ample time to prepare for their 90-day signature-collection window" (*Id.*).  Secretary Thurston asserts that "[t]here is no question that, absent a pandemic, a reasonably diligent candidate could be expected to obtain 10,000 signatures in the 90-day period leading up to May 1 before a general election and obtain ballot access" (*Id.*, at 19).  Citing *Libertarian Party of Arkansas v. Thurston*, 394 F. Supp. 3d 882, 920-22 (E.D. Ark. 2019), *aff'd*, No. 19-2503, 2020 WL 3273239 (8th Cir. June 18, 2020), Secretary Thurston also argues that this Court "has previously concluded that collecting 10,000 signatures for statewide ballot access over a 90-day period in the year before an elections poses no constitutional problems" (*Id.*).

Plaintiffs also argue that "[t]here is no reason or necessity" for the May 1, 2020, deadline for submitting their petitions for candidacy "before the nominees of political parties are even known" (Dkt. No. 9, at 8).  Plaintiffs argue that this petition deadline is "unnecessarily early" as "[m]any of the political issues for the next election are not yet well formed or known" (Dkt. No.

9, at 11-12).  Plaintiffs also question the necessity of this May 1 deadline given that "they will not appear on the general election ballot until the November general election and ballots are not even printed until late August or early September 2020" (Dkt. No. 15, at 2).  In response, Secretary Thurston maintains that the May 1, 2020, deadline "is well within the mainstream" and "do[es] not severely burden Plaintiffs" (Dkt. No. 12, at 21).  *See McLain v. Meier* ("*McLain II*"), 851 F.2d 1045, 1049 (8th Cir. 1988).

The May 1 deadline appears to have been adopted by the State of Arkansas, at least in part, in response to a 2018 district court decision finding that Arkansas's then-existing March 1 deadline constituted "a substantial burden on an independent candidate's right to ballot access and a voter's right to support a candidate of their choice," declaring this deadline "unconstitutional as a violation of the First and Fourteenth Amendments," and ordering that the plaintiff could file his petition to run for office as an independent candidate on or before May 1, 2018.  *See Moore v. Martin*, 2018 WL 10320761, at *3.  The State of Arkansas amended its election laws to reflect this Order "by allowing independent candidates to file their petition by noon on May 1 of general election years." *Moore v. Thurston*, 928 F.3d at 757.  The Eighth Circuit stated that this change "addresse[d] the [then-]current—and soon obsolete—statute's infirmity" and found no constitutional violation with the May 1 deadline.  *Id.*

Additionally, the *McLain I* court noted that "it is important that voters be permitted to express their support for independent and new party candidates during the time of the major parties' campaigning and for some time after the selection of candidates by party primary."  637 F.2d at 1164 (citing *Am. Party of Tex. v. White*, 415 U.S. 767, 784 (1974); *Jenness*, 403 U.S. at 433-34; *Rock v. Bryant*, 459 F. Supp. 64, 66 (E.D. Ark. 1978)).  Since Arkansas conducts its preferential primary elections "on the First Tuesday after the first Monday in March" during

presidential election years, *see* Arkansas Code Annotated § 7-7-203(b)(2), Arkansas's May 1 deadline leaves ample time for independent candidates to marshal support during the time of the major parties' campaigning and for some time after the selection of candidates by party primary.

The Court also considers the amount of time between the May 1 deadline and the date of the general election.  By the Court's count, there are 186 days between the May 1, 2020, deadline and the November 3, 2020, general election.  The Supreme Court in *Anderson* held that a filing deadline 229 days in advance of the general election was unconstitutional, 460 U.S. at 780, and the Eighth Circuit has found "most troubling" a third-party filing deadline "more than 200 days before the November election," *McLain II*, 851 F.2d 1045.  Though plaintiffs contend that the May 1, 2020, deadline is "unnecessarily early," the Court notes that the duration between that deadline and the general election date is somewhat shorter than the durations at issue before the Supreme Court in *Anderson* or the Eighth Circuit in *McLain II*.  A state's imposition of a petitioning deadline will always be "to some extent 'necessarily arbitrary,'" and "[a] litigant could always point to a day slightly later that would not significantly alter a state's interests until the point at which primary elections" or compliance deadlines would cease to exist.  *McClain II*, 851 F.2d at 1050 (quoting *Am. Party of Tex.*, 415 U.S. at 783).

Plaintiffs correctly note that the district court in *Moore v. Martin* stated that "Independent candidate petitions have been timely processed when the independent petition deadline was either May 1st or May 29th of the election year, . . . [and,] [a]t the state level, there are no conflicting petition filing deadlines between May 1 and July 6."  2018 WL 10320761, at *2.  However, the district court's conclusion in *Moore v. Martin* that independent candidate petitions could be timely processed with a deadline of May 29 or even July 6 does not automatically render a May 1 deadline

unconstitutional.  Thus, the Court is not convinced on this record evidence that the State's noon May 1 deadline imposes a severe burden on plaintiffs during normal times.

Again, the Court recognizes that these are not normal times, and it remains "important that voters be permitted to express their support for independent and new party candidates during the time of the major parties' campaigning and for some time after the selection of candidates by party primary." *Mclain I*, 637 F.2d at 1164 (citing *Am. Party of Tex.*, 415 U.S. at 784; *Jenness*, 403 U.S. at 433-34; *Rock*, 459 F. Supp. at 66).   To that end, the preferential primary elections in Arkansas occurred on March 3, 2020.  Ark. Code Ann. § 7-7-203(b)(2).  Governor Hutchinson declared a state of emergency in Arkansas on March 11, 2020, meaning plaintiffs in this case had only eight days between the conclusion of the party primary and the announcement of a state of emergency in Arkansas (Dkt. No. 11, ¶¶ 9-10).  Thus, the Court must consider the May 1 deadline through the prism of COVID-19.

Mr. Winger further contextualized on behalf of plaintiffs the burden of the signature requirement and petitioning window with his expert testimony (Dkt. No. 15-1).  As a general matter, Mr. Winger testified that between 1891 and 1955, independent candidates for statewide office in Arkansas needed only 50 signatures and were required to submit those signatures at least 20 days before the State's general election (*Id.*, ¶ 5).  Since 1977, when Arkansas set its non-presidential statewide petition signature requirement at 10,000 signatures, only three independent candidates have conducted successful petition drives for non-presidential statewide office:  John Black in 1978 for U.S. Senate; Rod Bryan in 2006 for Governor; and Trevor Drown in 2010 for U.S. Senate (*Id.*).  By contrast, presidential independent candidates only need 1,000 signatures due by noon on the first Monday in August of the general election year (*Id.*).

As to the signature requirement, Mr. Winger testified that it was not easy for independent candidates to comply with Arkansas's ballot access laws compared to other states (*Id.*, ¶ 7). Mr. Winger testified that Arkansas is the fourteenth-hardest state by percentage for independent candidates to achieve ballot access, and Mr. Winger testified that this percentage-based conclusion does not take into consideration that the 90-day petitioning period is a relatively small petitioning period compared to most other states or the reduction of effective petitioning time that can be caused by bad weather or diseases like COVID-19 (*Id.*). In a previous case before the Ninth Circuit, Mr. Winger testified that a signature requirement of 5,000 signatures was sufficient to guarantee against ballot overcrowding, regardless of what percentage of the electorate that raw number equals, and Mr. Winger reiterated that testimony here (Dkt. No. 25, at 186-87). Mr. Winger invoked Utah, a state with a similar population as Arkansas, as a comparator and noted that a statewide independent candidate in Utah must only collect 1,000 signatures for ballot access (*Id.*, at 197).

As to the petitioning window, Mr. Winger testified that though Arkansas sets a 90-day petitioning window for the collection of signatures, most states do not set a limit on when a petition can start to be circulated (Dkt. No. 15-1, ¶ 9). Mr. Winger testified that Colorado, Minnesota, and New York were the only states that he thought had petitioning periods for non-presidential independent candidates of less than 90 days, and Mr. Winger noted that Illinois typically has a 90-day petitioning window but has expanded that window this year to approximately four months (Dkt. No. 25, at 191, 200-01). Mr. Winger testified that the majority of states do not set a start date for independent candidates to collect signatures (*Id.*, at 192). Mr. Winger also testified that Arkansas does not set a limit on when a presidential independent petition can start to circulate, and

he testified that he saw no reason why the independent petition for non-presidential candidates could not be anywhere from 150 days to longer than a year (Dkt. No. 15-1, ¶ 9).

Ms. Cox also presented expert testimony on behalf of Secretary Thurston further contextualizing the burdens imposed on independent candidates by the signature requirement and petitioning window (Dkt. No. 12-2).  Ms. Cox testified that Arkansas's ballot access requirements are "fairly straightforward" and "quite easy" in comparison to other states (*Id.*, ¶ 6).  Ms. Cox notes that signatures may be obtained from any registered Arkansas voter regardless of partisanship, that there is no requirement or restriction on where a circulator is from, and that there is no notary requirement for circulators to have their candidate petition to be sworn in front of a notary outside of the initial filing affidavit (*Id.*, ¶¶ 12, 14-15).  Ms. Cox also testified that "Arkansas's response to COVID-19 did not interfere with independent candidates' ability to collect signatures because of the lack of a shelter-in-place/stay-at-home order" (*Id.*, ¶ 18).

The Supreme Court has held that "[t]he State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Anderson*, 460 U.S. at 788 n.9; *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) ("States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office.").  The Supreme Court in *Jenness* upheld Georgia's ballot access laws requiring signatures of at least 5% of the number of registered voters at the last general election for the office in question.  403 U.S. at 432, 438.  Additionally, the Supreme Court in *Norman* upheld Illinois's ballot access law requiring signatures of slightly more than 2% of suburban voters for suburban-district commissioner seats.  502 U.S. at 295 (noting that Illinois's 2% signature-collection requirement was "a considerably more lenient restriction" than the one upheld in *Jenness*).  The Supreme Court

also upheld a 1% petition signature requirement in *American Party of Texas*.  415 U.S. at 779-80.

In *Jaeger*, the Eighth Circuit upheld North Dakota's ballot access law requiring a nonparty

candidate for the state legislature seeking access on a primary ballot to "file a petition containing

the signatures of 1% of the general population of the relevant legislative area or 300 signatures,

whichever is less," and characterized *Jenness*'s 5% signature requirement as "the upper threshold

of reasonable under Supreme Court precedent."  659 F.3d at 696, 698.

   To the extent Secretary Thurston cites *Libertarian Party of Arkansas v. Thurston* to assert

that this Court "has previously concluded that collecting 10,000 signatures for statewide ballot

access over a 90-day period in the year before an election poses no constitutional problems," the

Court rejects Secretary Thurston's legal argument on this point as overly simplistic (Dkt. No. 12,

at 19).  Instead, the Court determines that a requirement may be constitutional as applied to a

political party—with likely vaster resources, membership, and levels of experience and a rolling

as opposed to fixed 90-day window for collection—and unconstitutional as applied to an individual

and independent candidate—with fewer resources, membership, and experience, and a fixed as

opposed to rolling 90-day window for collection.  Further, the Court examines this requirement in

the context of the entire election scheme for independent candidates in Arkansas consistent with

the requirements of existing precedent.  *Bond*, 764 F.2d at 541 ("It has been recognized . . . that

the entire election scheme must be analyzed to determine whether undue constraints on access to

the ballot exist.").

   The number of signatures required for Mr. Whitfield and Mr. Fults, respectively, must be

analyzed in tandem with the signature-collection window and the May 1 deadline.  For example,

the Supreme Court in *Jenness* did uphold a 5% signature requirement for a regular general election,

but the statutory scheme in *Jenness* afforded the plaintiff 180 days to collect those signatures and

imposed a June filing deadline.   403 U.S. at 433.   The Court notes that several courts have

considered signature-collection windows and petition filing deadlines in tandem with statutory

signature requirements and come to differing conclusions.   *See, e.g.*, *Am. Party of Tex.*, 415 U.S.

at 788-89 (finding constitutional Texas's 55-day collection window and June 30 filing deadline

for independent candidate for United States House of Representatives to obtain signatures equaling

3% of the previous cycle's vote for governor in the congressional district in which he desired to

run and for independent candidate for state representative to obtain signatures equaling 5% of the

same, though neither candidate was required to file more than 500 signatures); *Tripp v. Scholz*,

872 F.3d 857, 861, 871-72 (7th Cir. 2017) (holding that Illinois's 5% signature requirement for

new parties and 90-day petitioning window did not violate the First or Fourteenth Amendments);

*Stone v. Bd. of Election Comm'rs for City of Chicago*, 750 F.3d 678, 684 (7th Cir. 2014)

(concluding that "[90] days does not strike us as an excessively short time to collect 12,500

signatures"); *Swanson v. Worley*, 490 F.3d 894, 903-10 (11th Cir. 2007) (finding constitutional

Alabama's requirement that independent candidates obtain signatures from 3% of actual voters in

Alabama during an unlimited petitioning window and submit those signatures by the first Tuesday

in June); *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 762 (9th Cir. 1994) (upholding

Washington statute requiring minor-party candidates to obtain 200 signatures for statewide office

by July 4 of the election year), *overruled on other grounds by Public Integrity Alliance, Inc. v.*

*City of Tuscon*, 836 F.3d 1019 (9th Cir. 2016); *Graveline v. Benson*, 430 F. Supp. 3d 297, 297

(E.D. Mich. 2019) (finding unconstitutional the "severe burden" imposed on independent

candidates for statewide office and voters who wish to support them by Michigan's requirement

that such candidates obtain 30,000 signatures during a 180-day petitioning window to meet a July

19 deadline, permanently enjoining those requirements, and temporarily reducing to 12,000 the

required number of signatures from qualified and registered electors); *Breck v. Stapleton*, 259 F.

Supp. 3d 1126, 1134 (D. Mont. 2017) (characterizing as severe the burden imposed by a Montana

law requiring independent candidates running in special election for the United States House of

Representatives to obtain signatures totaling at least 5% of the votes cast for the last successful

candidate for the office at issue—14,268 signatures, in that case—during a 46-day petitioning

window and striking down that requirement due to its lack of narrow tailoring); *Green Party of

Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1360 (N.D. Ga. 2016) (invalidating Georgia law requiring

independent and minor-party candidates to procure signatures of 1% of the registered voters

eligible to vote in the last election as applied to presidential candidates), *aff'd*, *Green Party of Ga.

v. Kemp*, 674 Fed. App'x 974 (Mem) (11th Cir. 2017); *Libertarian Party of Okla. v. Okla. State

Election Bd.*, 593 F. Supp. 118, 122 (W.D. Okla. 1984) (finding "constitutionally infirm"

Oklahoma's requirement that groups seeking to form new political parties obtain the signatures of

5% of the number of voters eligible to vote in the last election during a 90-day petitioning window

to gain access to the ballot due to "[t]he combination of the short time allowed for petitioning, the

large number of signature required, the prevention of the party's effective solicitation of signatures,

and the unusually inclement weather during the petitioning period").  Though Mr. Whitfield and

Mr. Fults face different signature thresholds, both candidates face the same fixed 90-day

petitioning window and May 1 deadline.

Given the realities on the ground due to the COVID-19 pandemic, the Court considers

whether Arkansas's signature requirements, fixed petition window, and May 1 deadline impose a

unique burden upon plaintiffs as applied to the current election cycle.  There is record evidence

before the Court that plaintiffs believe that they would have obtained the requisite number of

signatures within the fixed 90-day petitioning window by the May 1 deadline, absent the advent

of the COVID-19 pandemic and the accompanying restrictions on approaching Arkansas registered voters to sign petitions, including but not limited to restrictions on large numbers of people gathering and coming within six feet of people (Dkt. Nos. 8-1, ¶ 5; 8-2, ¶ 5; 15-7, ¶ 5; 15-8, ¶ 4).  The COVID-19 pandemic and the social distancing measures the State has deployed in response have unquestionably affected plaintiffs' ability to collect signatures; the remaining question is to what degree.

On this point, the Court finds instructive the federal courts that have heard challenges to various state ballot access laws or election regulations in the light of the COVID-19 pandemic. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020) (staying district court order to the extent that it had extended the deadline for absentee ballots to be submitted in Wisconsin election); *Thompson v. DeWine*, 959 F.3d 804, 811 (6th Cir. 2020) (staying district court's injunction of Ohio's signature requirements for local initiatives and constitutional amendments pending appeal, in part, because Ohio specifically exempted protected First Amendment activity from its COVID-19-related response measures and concluding that Ohio's "compelling and well-established interests in administering its ballot initiative regulations outweigh[ed] the intermediate burden those regulations place[d] on Plaintiffs"); *Esshaki w. Whitmer*, — Fed. App'x —, 2020 WL 2185553, at *10 (6th Cir. May 5, 2020) (upholding, in part, district court's injunction of ballot access law requiring congressional candidate to obtain 1,000 valid signatures from registered voters and instructing the State of Michigan to "reduce the burden on ballot access, narrow the restrictions to align with its interest, and thereby render the application of the ballot-access provisions constitutional under the circumstances"); *Acosta v. Wolf*, No. 20-2528, 2020 WL 3077098, at *6 (E.D. Pa. June 10, 2020) (upholding Pennsylvania's 1,000-signature requirement and August 3, 2020, deadline for independent candidate for the U.S. House

of Representatives and dismissing plaintiff's claim that ballot access scheme violated the Equal

Protection Clause of the Fourteenth Amendment and the Americans with Disabilities Act of 1990);

*Gottlieb v. Lamont*, — F. Supp. 3d — , 2020 WL 3046205, at *5-7 (D. Conn. June 8, 2020)

(upholding requirement that plaintiffs obtain signatures of 3.5% of the enrolled party members in

their district during a 16-day petitioning window to meet a June 11 filing deadline due, in part, to

"important modifications" made to Connecticut's petitioning process and election laws as a

response to the challenges of COVID-19, including reducing the number of signatures required by

30%, extending the collection window and filing deadline by two days, and eliminating the in-

person signature requirement); *Fair Maps Nev. v. Cegavske*, No. 3:20-cv-00271-MMD-WGC,

2020 WL 2798018, at *11-17 (D. Nev. May 29, 2020) (finding unconstitutional Nevada's ballot

initiative scheme as applied to plaintiffs' proposed initiative due to COVID-19 and the State's

response to it); *Miller v. Thurston*, 2020 WL 2617312, at *4-13 (enjoining, in part, Arkansas

Secretary of State from enforcing Arkansas's initiative petition requirements regarding

handwritten signatures, in-person signatures, sworn affidavits, and dependent requirements but

denying injunction as to State's number of signatures and deadline requirements); *Murray v.

Cuomo*, No. 1:20-cv-03571-MKV, 2020 WL 2521449, at *10-13 (S.D.N.Y. May 18, 2020)

(finding plaintiff unlikely to succeed on the merits of her challenge to New York's ballot access

laws as a candidate for the U.S. House of Representatives due, in part, to the State's changes to its

ballot access scheme in the light of COVID-19); *Garcia v. Griswold*, No. 20-cv-1268-WJM, 2020

WL 2505888, at *2 (D. Colo. May 7, 2020) (finding plaintiffs unlikely to succeed on their ballot

access claim, in part, because "the only timeframe in which the currently ongoing COVID-19

pandemic significantly limited their ability to obtain signatures was roughly the last week before

the March 17, 2020 submission deadline, subsequent to Governor Jared Polis's state of emergency

declaration on March 10, 2020" and due to the "different effects of COVID-19" in Colorado as opposed to other jurisdictions); *Garbett v. Herbert*, — F. Supp. 3d — , 2020 WL 2064101, at *17 (D. Utah Apr. 29, 2020) (finding unconstitutional Utah's 28,000-signature requirement for plaintiff to run for governor due to the burden imposed by COVID-19 and enjoining that requirement on a pro rata basis, despite the lack of a stay-at-home order from state government); *Libertarian Party of Ill. v. Pritzker*, — F. Supp. 3d — , 2020 WL 1951687, at *4-5 (N.D. Ill. Apr. 23, 2020) (adopting a joint proposed order that reduced the required number of signatures to 10% of the statutory requirement, permitted candidates to submit physical or electronic copies of petitions, and extended the signature gathering deadline for new party and independent candidates due to COVID-19 due to "[t]he combined effect of the restrictions on public gatherings imposed by Illinois' stay-at-home order and the usual in-person signature requirements in the Illinois Election Code"); *Arizonans for Fair Elections v. Hobbs*, — F. Supp. 3d — , 2020 WL 1905747, at *11-14 (D. Ariz. Apr. 17, 2020) (finding plaintiffs unlikely to succeed on the merits of their claim and concluding that "reasonably diligent" parties could have complied with state laws during COVID-19 pandemic to secure ballot initiative's placement on the November 2020 ballot). Additionally, the Court notes that some states have taken legislative or executive action to reduce the number of signatures required for a candidate to be placed on the ballot. *See, e.g.*, N.Y. Exec. Order No. 202.2 (Mar. 14, 2020) (reducing the statutory signature requirement to 30% of normal requirement); H. 681, 2019–2020 Gen. Assemb., Adjourned Sess. (Vt. 2020) (suspending the statutory signature requirement entirely). The Court has also considered how federal courts have handled challenges to election voting restrictions, not specifically ballot access, in the aftermath of natural disasters. *See, e.g.*, *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016) (requiring the State of Florida to extend voter registration deadline in the face of Hurricane

Matthew); *Ga. Coalition for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344 (S.D. Ga. 2016) (same).

Independent candidates for statewide office in Arkansas like Mr. Whitfield must collect signatures from the lesser of 3% of the State's registered voters or 10,000 of the State's registered voters, with 10,000 registered voters being the lesser number for this cycle (Dkt. No. 11, ¶¶ 18-19).   Ark. Code Ann. § 7-7-103(b)(1)(B).   The parties stipulate that for the 2020 election cycle 10,000 valid signatures equates to approximately 0.58% of registered Arkansas voters (Dkt. No. 11, ¶ 19).   Based on record evidence, three independent statewide candidates have satisfied this numeric requirement since 1977.   *Cf. Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008) (finding Arizona ballot access laws a severe burden and unconstitutional "where history showed that no independent candidate had appeared on the ballot since 1993"); *Graveline*, 430 F. Supp. 3d at 311 (finding that, as applied to plaintiffs, combination of ballot access requirements was unconstitutional where "no independent candidate for statewide office ha[d] ever satisfied Michigan's current statutory scheme to qualify for the ballot" over the preceding 30 years); *Delaney v. Bartlett*, 370 F. Supp. 2d 373, 377-78 (M.D.N.C. 2004) (finding that North Carolina's ballot access laws "severely disadvantage[d]" independent candidates where "only one unaffiliated candidate has been placed on the ballot as a contender for statewide office" over the preceding 20 years and that laws were unconstitutional as challenged).

The record evidence reflects that Mr. Whitfield had at least 600 private volunteers and 27 publicly identified volunteers throughout the state, had placed petitions in at least 12 businesses for people to sign which were directly affected by COVID-19, had 150 members in his Facebook group for volunteers, and received petition signatures in the mail as late as May 1, 2020 (Dkt. No.

15-7, ¶ 4).  Mr. Whitfield offered a video on how his volunteers could collect signatures, including strategies, places to go, and how petitions should be filled out (Dkt. No. 25, at 52-53).

Personally, Mr. Whitfield drove more than 10,000 miles around the state campaigning and attended multiple county meetings (Dkt. No. 25, at 51-52).  Mr. Whitfield attended large events including an Elizabeth Warren rally in North Little Rock where he received more than 519 signatures in just a few hours; a Mike Bloomberg meeting in Bentonville where he collected signatures from many attendees; the Little Rock marathon, though many of the marathon runners were not from Arkansas and thus could not sign his petition; a Mike Bloomberg visit in Little Rock that included Little Rock Mayor Frank Scott, Jr., though the signatures that he collected from that visit were ultimately misplaced; the Garland County Farm Bureau meeting, where he met many people and collected signatures; and a signature drive, climate change protest, and kickoff meet and greet in Eureka Springs (*Id.*, at 33-36, 49-50).

The last large event that Mr. Whitfield attended was a union firefighters meeting in Pulaski County on March 12, 2020, and Mr. Whitfield did not attend in-person any large events after this date before the May 1 deadline due to Governor Hutchinson's issuance of a state of emergency (*Id.*, at 33).  Mr. Whitfield did meet virtually with the Garland County Democrats after the declaration of a state of emergency and received signatures from that virtual meeting in the mail (*Id.*, at 36).  Mr. Whitfield was in the process of scheduling a meet and greet at a local gun range in Crittenden County but cancelled that event due to the state of emergency (*Id.*).

Additionally, Mr. Whitfield's wife made an in-kind donation to his campaign of paying $2,500.00 to Mr. Evans' consulting firm to collect 1,000 signatures (*Id.*, at 58).  Ms. Whitfield paid Mr. Evans $1,250.00 up front for 500 signatures, but Mr. Evans testified that he was only able to collect 129 signatures before his company had to stop signature collection efforts due to the

pandemic (*Id.*, at 58-59).   The Court heard testimony from Mr. Evans regarding these circumstances.   Many of Mr. Whitfield's volunteers ceased going door-to-door to collect signatures as the pandemic worsened, and Mr. Whitfield asked his volunteers to stop collecting signatures if they did not feel they could do so safely on March 12, 2020 (*Id.*, at 39-40).

Independent candidates for the Arkansas House of Representatives like Mr. Fults must collect signatures from 3% of the qualified electors in the county, township, or district in which the person is seeking office, but in no event shall the requirement be more than 2,000 signatures for a district, county, or township office.   Ark Code Ann. § 7-7-103(b)(1)(A).   This requirement equates to 286 valid signatures from registered voters who are residents of State House District 27 in Mr. Fults's case (Dkt. No. 11, ¶¶ 20-21).   Ark. Code Ann. § 7-7-103(b)(1)(A).   Though independent candidates for non-statewide office must collect a higher percentage of signatures, Mr. Winger testified that over 30 candidates have satisfied this threshold during recent election cycles (Dkt. No. 15-1, ¶ 8).[5]   Further, there is record evidence that Ms. Jones and Mr. Talley satisfied their respective signature requirements this year (Dkt. Nos. 12-1, at 4-5).

Mr. Fults avers that "[i]t has been particularly difficult in conducting a petition drive in the months of February, March, and April, 2020, because of the advent of the coronavirus and the resulting negative impact on trying to approach Arkansas registered voters to sign petitions." (Dkt. No. 8-2, ¶ 5).   Mr. Fults testified that he did not obtain any signatures in February due to a personal upper respiratory infection and his wife being ill, and Mr. Fults testified that he did not collect any

---

[5]   Citing *Moore v. Martin*, 2018 WL 10320761, at *2-3, Mr. Winger testified that the number of independent candidates who filed non-statewide petitions to run for office and had those petitions processed over recent election cycles were as follows:   six candidates for the 2006 election cycle; six candidates for the 2008 election cycle; nine candidates for the 2010 election cycle; eight candidates for the 2012 election cycle; one candidate for the 2014 election cycle; and two candidates for the 2016 election cycle (Dkt. No. 15-1, ¶ 8).

signatures in March, though he did not specify why (Dkt. No. 25, at 94, 112).  Mr. Fults did give

one volunteer petitions to gather signatures on his behalf during the month of February, though

Mr. Fults testified that he did not know whether that volunteer gathered any signatures (*Id.*, at 112-

13).

Mr. Fults began collecting signatures as early as April 1, 2020, with the help of three

volunteers, and he submitted 128 signatures to Secretary Thurston on May 1, 2020, of which he

believed at least 108 signatures were valid (*Id.*, at 93-94, 98, 110).  Mr. Fults testified that he

obtained almost all of his signatures during the last two weeks of April (*Id.*, at 99).  Mr. Fults also

testified that he spent $900.00 mailing out petitions to 820 addresses, resulting in 62 signatures,

and that with more campaign funds he believed that he could have acquired all 286 signatures that

he needed from sending mailers alone (*Id.*, at 100-01).  Thus, the record evidence demonstrates

that Mr. Fults did not collect signatures prior to the COVID-19 pandemic's manifestation in

Arkansas but that he did collect signatures well after.

Further, the Court reiterates that Ms. Jones and Mr. Talley satisfied the State's signature

requirements as independent candidates for their respective State Representative districts this year.

Mr. Talley began collecting signatures during mid- to late-April 2020 and obtained about 350

signatures by May 1, 2020, with 239 of these signatures deemed valid (*Id.*, at 154, 157, 164-65).

Ms. Furrer collected 812 signatures between February 1, 2020, and March 12, 2020, relying on

her efforts and the efforts of her husband, a number of family members, and one member of the

volunteer fire department, with 421 of these signatures deemed valid (*Id.*, at 133-34, 138).  There

is no record evidence as to how or when Ms. Jones gathered signatures.

Taking the record evidence as a whole, the Court determines that the pandemic and the

State's response to it hindered Mr. Whitfield and Mr. Fults's efforts to collect successfully all

qualifying signatures during the 90-day window prior to May 1, despite each candidate's efforts. In so finding, the Court does not second-guess the State of Arkansas's response to or handling of the COVID-19 pandemic; instead, the Court considers how that response, coupled with the State's ballot access scheme, interacts with plaintiffs' constitutional rights.

Governor Hutchinson's March 11, 2020, declaration of a state of emergency occurred a mere 40 days into the fixed 90-day petitioning window. Most large public events throughout the state were postponed or cancelled as the pandemic worsened. Shortly thereafter, Governor Hutchinson ordered that gatherings in confined spaces outside a single household or living unit be limited to ten or fewer people and instructed people to stay six feet away from one another. Though Arkansas did not issue a stay-at-home order of the sort seen in other states, other courts have used the declaration of a state of emergency or directives from state governments asking—but not ordering—people to stay home and limit social interaction as lines of demarcation in considering ballot access claims in the light of COVID-19. *See, e.g.*, *Garcia*, 2020 WL 2505888, at *2; *Garbett*, 2020 WL 2064101, at *3-17. Further, the State's response and directives remained in effect through the end of the 90-day petitioning period. On May 5, 2020, Governor Hutchinson ordered a 45-day extension of the emergency and declaration, and the State did not enact Phase 1 limited reopening until after the operative May 1 deadline plaintiffs challenge here. In the light of the onset of an unprecedented global pandemic; wide-scale cancellation of public events, closure of business, restaurants, and other gathering places; guidance for people to stay home and avoid social contact; and the combined impact of these related occurrences, independent candidates were burdened in their efforts to collect the required signatures.

However, the Court declines to characterize this burden as substantial based on all record evidence before it. The record evidence before the Court demonstrates that Mr. Fults did not

collect signatures during February or March; that Mr. Fults successfully collected almost all of his signatures during the last two weeks of April; that Mr. Fults believes that he would have met the signature requirements by soliciting signatures only by mail with more than $900.00 in campaign funds; and that other independent candidates for state representative complied with the signature requirements over this same period.  Mr. Talley began collecting signatures during mid- to late-April 2020 and obtained about 350 signatures by May 1, 2020, with 239 of these signatures deemed valid.  Ms. Furrer collected 812 signatures between February 1, 2020, and March 12, 2020, relying on her efforts and the efforts of her husband, a number of family members, and one member of the volunteer fire department, with 421 of these signatures deemed valid.

In citing these figures, the Court recognizes the testimony from Mr. Evans regarding his past experience in collecting signatures and his current experience in endeavoring to collect signatures on behalf of Mr. Whitfield.  His testimony about efforts made, and the timing of those efforts, did not sway the Court sufficiently to find a severe burden under the circumstances.  As other courts have recognized, even under these circumstances, "[t]here's no reason that Plaintiffs can't advertise their [candidacies] within the bounds of our current situation, such as through social or traditional media inviting interested electors to contact them and bring the petitions to the electors' homes to sign.  Or Plaintiffs could bring their petitions to the public by speaking with electors and witnessing the signatures from a safe distance, and sterilizing writing instruments between signatures."  *Thompson*, 959 F.3d at 810.  This is especially so on the record evidence presented here regarding other candidates.

Moreover, even though most large public events throughout the state were postponed or cancelled as the pandemic worsened and even though Governor Hutchinson ordered that gatherings in confined spaces outside a single household or living unit be limited to ten or fewer

people and instructed people to stay six feet away from one another, Mr. Whitfield acknowledges that he met virtually with the Garland County Democrats after the declaration of a state of emergency and received signatures from that virtual meeting in the mail (Dkt. No. 25, at 36).  The signature collection process was able to continue, albeit in a different manner.

Accordingly, the Court concludes that the State's ballot access requirements, coupled with the State's response to the COVID-19 pandemic, as applied to Mr. Whitfield and Mr. Fults during this election cycle, burdened Mr. Whitfield and Mr. Fults's rights at issue in this litigation. However, on the record evidence before it, the Court determines that, although not trivial, this burden cannot be characterized as severe.

Considering all burdens identified by Mr. Whitfield and Mr. Fults, and recognizing that the entire election scheme must be analyzed to determine whether undue constraints on access to the ballot exist, the Court overall declines to find a severe burden imposed on Mr. Whitfield and Mr. Fults's rights based on the record evidence before the Court.  *See Bond*, 764 F.2d at 541.

### 3. Asserted State Interests And Arkansas's Protection Of Such Interests

Secretary Thurston states that "Arkansas's 'important regulatory interests' in managing 'election procedures' are sufficient to justify its ballot-access requirements for independent candidates," and that "[t]hose interests include Arkansas's 'significant' regulatory interests in preventing 'frivolous candidacies' by ensuring candidates enjoy a modicum of support and reducing 'voter confusion.'"  (Dkt. No. 12, at 20-21).  *See Green Party of Ark.*, 649 F.3d at 686. Further, Secretary Thurston maintains that "[t]he 90-day collection window and the May 1 deadline likewise further Arkansas's interest—indeed, its duty—to 'ensure elections are fair, honest, and orderly'" (*Id.*, at 21).  *See Jaeger*, 659 F.3d at 693.  Secretary Thurston states that "[t]he 90-day collection window keeps the petitioning process honest" and makes "fraudulent

activity" easier to police (*Id.*).   Secretary Thurston argues that these interests justify the State's election regulations whether the Court requires a showing to justify minor burdens imposed on plaintiffs or a showing of a narrowly-tailored compelling interest to justify severe burdens imposed on plaintiffs (*Id.*, at 15-23).

In response, plaintiffs acknowledge that "Arkansas does have a right to properly supervise elections" (Dkt. No. 9, at 7).   However, plaintiffs argue that "Arkansas has never been plagued by an overcrowded ballot—particularly as to Independent candidates" (*Id.*, at 12).   Plaintiffs maintain that Secretary Thurston "has failed to show that there is a compelling state interest that would be served by a ballot access law that is both narrowly drawn and necessary" (Dkt. No. 15, at 3).

The Court determines that Arkansas's ballot access laws constitute a non-severe burden as-applied to Mr. Whitfield and Mr. Fults.   Therefore, Arkansas's "asserted regulatory interests need only be 'sufficiently weighty to justify the limitation' imposed on the party's rights." *Timmons*, 520 U.S. at 364 (quoting *Norman*, 502 U.S. at 288-89).   As significant regulatory interests, Secretary Thurston asserts that the State's ballot access laws prevent frivolous candidacies by ensuring candidates enjoy a modicum of support, reduce voter confusion, and ensure elections are fair, honest, and orderly (Dkt. No. 12, at 20-21).   The Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194-95.   Because Arkansas's ballot access scheme does not impose a severe burden as-applied to plaintiffs during this election cycle based on the record evidence before the Court, the Court considers these regulatory interests sufficient to justify a non-severe burden.   Therefore, the Court declines to grant Mr. Whitfield and Mr. Fults relief on their first claim.

### C.       Merits Of Plaintiffs' Claim:  Equal Protection

In their complaint, plaintiffs allege that "Arkansas's statutory scheme involving an unnecessarily early petition deadline and a limited 90-day petitioning period, unequally and unfairly impacts in a discriminatory manner the right of Independent candidates and their supporters in Arkansas who seek petition signatures for ballot access for Independent candidates in Arkansas" (Dkt. No. 1, ¶ 24).  Plaintiffs assert that "Arkansas's discriminatory statutory scheme for ballot access for Independent candidates and their supporters violates Plaintiffs' right to equal protection of the laws, is arbitrary and capricious, serves no compelling State interest, and is unconstitutional on both its face and as applied to the 2020 general election in Arkansas" (*Id.*, ¶ 25).  At the hearing, plaintiffs maintained that the equal protection argument was "particularly important" and questioned the necessity of "such an early deadline" and the fixed 90-day petitioning window "when there isn't a 90-day petitioning period applied to, for example, independent presidential candidates" (Dkt. No. 25, at 15).  Plaintiffs seem to allege that they are denied equal protection of the law as compared to party-backed candidates for office or independent candidates for President of the United States due to the different ballot access schemes applicable to each type of candidate, but their claims are not well-developed.  Defendants do not appear to address this claim in their briefing (Dkt. No. 12).

"[N]o State can pass a law regulating elections that violates the Fourteenth Amendment's command that 'No State shall . . . deny to any person . . . the equal protection of the laws.'" *Williams*, 393 U.S. at 29.  The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection clause undoubtably protects the right "to participate in elections on an equal basis with other citizens in the jurisdiction."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  "[O]nce the

48

franchise [to vote] is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966).

Accordingly, although states may "as a practical matter, [engage in] substantial regulation of elections" in order to ensure they remain "fair and honest," *Storer*, 415 U.S. at 730, such authority is "always subject to the limitation that [it] must not be exercised in a way that violates other specific provisions of the Constitution," *Williams*, 393 U.S. at 29; *see also Sangmeister v. Woodard*, 565 F.2d 460, 465 (7th Cir. 1977) ("It has become well established that the power of the state to regulate elections must be exercised consistent with the dictates of the equal protection clause of the Fourteenth Amendment." (citations omitted)).

The Court examines plaintiffs' equal protection challenges to Arkansas's ballot access scheme using the same *Anderson-Burdick* balancing framework as it applied to their First Amendment claims. *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. "To determine whether or not a statute violates the Equal Protection Clause, [courts] consider 'the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.'" *Jaeger*, 659 F.3d at 702 (quoting *Williams*, 393 U.S. at 30). Under equal protection jurisprudence, States may create classifications or procedures that are different for different classes of candidates, but which do not deny equal protection; it is only "'invidious discrimination' which offends the Constitution." *Am. Party of Tex.*, 415 U.S. at 780 (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 732 (1963)). In the context of statutory differences in what is required of different types of candidates to gain access to the ballot, a candidate alleging "invidious treatment" must demonstrate that what is demanded of one type of candidate is "so excessive or impractical as to be in reality a mere device to always, or almost

always, exclude [political] parties [or independent candidates] with significant support from the ballot." *Id.* at 783.

To the extent plaintiffs assert an equal protection claim based on a difference between independent and partisan candidates, independent and partisan candidates are not similarly situated. *See Jenness*, 403 U.S. at 440-41; *see also Jolivette v. Husted*, 694 F.3d 760, 771 (6th Cir. 2012); *Curry v. Buescher*, 394 Fed. App'x 438, 447 (10th Cir. 2010); *Van Susteren v. Jones*, 331 F.3d 1024, 1026-27 (9th Cir. 2003). Because of the differences between the pathways to the ballot of partisan versus independent candidates in Arkansas and plaintiffs' failure to demonstrate invidious discrimination on behalf of Secretary Thurston, the Court declines to find in plaintiffs' favor on their equal protection claim to the extent it is based on a claimed difference between independent and partisan candidates.

To the extent plaintiffs assert an equal protection claim based on a difference in treatment between independent candidates for President of the United States, Ark. Code Ann. § 7-8-302(6)(A), and independent candidates "who wish to be placed upon the ballot as an independent with no political party affiliation in the county, township, or district in which the person is seeking office," see Ark. Code Ann. § 7-7-103(b)(1)(A), or are "seeking a statewide office or any office for which a statewide race is required," Ark. Code Ann. § 7-7-103(b)(1)(B), there is a difference in qualifying requirements under Arkansas law. The argument that candidates for these offices are similarly situated is not well developed in the record evidence or briefing submitted by Mr. Whitfield or Mr. Fults, nor is it addressed by Secretary Thurston.

Assuming without deciding that Mr. Whitfield and Mr. Fults are able to state an actionable equal protection claim on this basis, the Court determines that the *Anderson*/*Burdick* test applies to evaluate such a claim. To the extent Mr. Whitfield and Mr. Fults argue that they are unequally

or unduly burdened in seeking ballot access, those claims have already been addressed in the Court's *Anderson-Burdick* analysis.   The *Anderson-Burdick* framework considers "the character and magnitude of the asserted injury to the rights protected by the First and *Fourteenth* Amendments that the plaintiff seeks to vindicate." *Moore v. Martin*, 854 F.3d at 1025 (emphasis added) (internal quotations omitted).   Thus, the Court has already considered how Arkansas's ballot access scheme impacts Mr. Whitfield and Mr. Fults's Fourteenth Amendment rights, including the right to the equal protection of the laws.   For the reasons explained in this Order, the Court denies Mr. Whitfield and Mr. Fults relief on their equal protection claims.

### D.   Remaining Factors

Given the Court's determination regarding the merits of plaintiffs' claims, the Court determines that neither irreparable harm, the balance of the equities, nor the public interest weigh in favor of granting Mr. Whitfield or Mr. Fults the injunctive relief they seek on the facts presented.

### VI.   Conclusion

For the above reasons, the Court denies plaintiffs Mr. Whitfield and Mr. Fults's motion for preliminary injunction and request for injunctive relief.   The Court enters judgment in favor of defendant Secretary Thurston and denies the relief requested.

So ordered this 24th day of June, 2020.

_____
Kristine G. Baker
United States District Judge

# Exhibit A

| | |
|---|---|
| **From:** | Law Office |
| **To:** | Jared Lax |
| **Cc:** | nicholas.bronni_arkansasag.gov; vincent.wagner_arkansasag.gov; "Dylan Jacobs"; michael.mosley@arkansasag.gov; "William Whitfield Hyman"; "Whitfield Hyman" |
| **Subject:** | Whitfield and Fults v. Thurston (Case No. 4:20-cv-00466--KGB) |
| **Date:** | Tuesday, June 2, 2020 2:40:52 PM |
| **Attachments:** | doc01619220200602142523.pdf |

Dear Mr. Lax:

      Transmitted is an email letter with two attachments which relate to paragraph no. 8 of the Joint Stipulations of Fact filed in the case on May 11, 2020 (Dkt. No. 11).  I have discussed this matter with Mr. Wagner yesterday as per my email letter attached hereto and have chosen at this time to give this informal notice to the Court and parties since I was unsure at this time what the Court might wish to be done.

Yours truly,

James C. Linger

James C. Linger, Attorney
1710 South Boston Avenue
Tulsa, Oklahoma 74119-4810
918-585-2797 Telephone
918-583-8283 Facsimile

Jared Lax
Law Clerk to Judge Kristine G. Baker:

Dear Mr. Lax:

    Transmitted are letters to Dan Whitfield and Gary Fults which were emailed to them late Friday afternoon, May 29, 2020, from Secretary of State John Thurston.  After receiving the letter to Mr. Whitfield, I sent a copy of Mr. Whitfield's letter and an email letter to Nicholas Bronni, Vincent Wagner, Dylan Jacobs, and Michael Mosley on Friday evening and asked them to contact me on Monday to discuss this matter.  Thereafter, I received a copy of the transmitted letter to Gary Fults.  I consider the letters transmitted herein to not be in compliance with the requirements placed on Secretary Thurston by the last sentence in paragraph no. 8, page 2 of the Joint Stipulations of Fact filed in the case on May 11, 2020 (Dkt. No. 11).  Paragraph no. 8 reads as follows: "By the statutory deadline, May 1, 2020, five individuals—including Plaintiffs—timely submitted petitions seeking to be included as independent candidates on the November 3, 2020 general election ballot. The Secretary's office is proceeding to verify the validity of the signatures on those petitions and count the valid signatures."  As per the evidence at the hearing on May 27, 2020, of the aforesaid five individuals, Sandra Furrer turned in her signatures in early April and the Secretary of State had verified them a couple of weeks early, but did not inform Ms. Furrer until May 1, 2020,  in a letter that had specificity as to numbers, that of the 812 signatures she submitted, only 421 were found to be registered voters in District 31 (Plaintiffs' Exhibit "13"), while Christia Jones and Roderick Talley were informed that they had sufficient signatures in letters dated May 13, 2020 (Defendant's Exhibits "1A" and "1B.").  Despite the stipulation in paragraph no. 8 above, the Secretary sent out letters that lacked specificity as to numbers because they did not indicate the number of signatures turned in by the Plaintiffs, nor the number of valid signatures counted by the Secretary of State.

    Yesterday, I heard back in the morning and afternoon from Vincent Wagner, Deputy Solicitor General.  After two phone conversations, we were not able to resolve this matter and I informed him I would be contacting the Court today if Defendant did not change his responses regarding the above two letters.  The Secretary of State was supposed to report back as to the number of valid petition signatures submitted by the Plaintiffs.  This he has not done.  The letters that he sent out late on May 29, 2020, could have been sent out on the afternoon of May 1, 2020.  The whole purpose of paragraph no. 8 of the stipulation was so we could know how many valid signatures were submitted.  I find it strange that the Secretary waited until late in the afternoon of two days after the hearing to send out the letters to Plaintiffs, but was able to have Sandy Furrer's 812 signatures checked for validity a couple of weeks before May 1—although he did not inform her that she was some signatures short until the afternoon of May 1, as well as having the signatures of Ms. Jones and Mr. Talley validated by May 13, 2020.  Sixteen additional days thereafter when no other signatures were being validated seems unnecessarily extended when one considers that Judge Moody in the Moore v. Martin decision in January of 2018, noted that the Secretary of State could have a trained worker to validate 4-5 petition signatures per minute.  In other words, Mr. Fults's signatures could have been validated by a single worker in approximately half an hour while Mr. Whitfield's signatures could have been validated by a single worker in no more than 27 hours or considerably less if several workers were assigned to the matter. In any event, Plaintiffs believe that the foregoing letters are not what was required of the Secretary of State in the aforesaid stipulation paragraph no. 8.  Copies of this email letter are sent to all counsel so they may make a response.

        Yours truly,

        /s/ James C. Linger





# JOHN THURSTON

## ARKANSAS SECRETARY OF STATE

May 29, 2020

Dan Whitfield
31 Allonby Cir.
Bella Vista, AR 72714

Mr. Whitfield,

The Secretary of State's Office has reviewed the petition that you submitted seeking to be listed on the November 2020 General Election ballot as a candidate for United States Senate. Unfortunately, your petition contained an insufficient number of signatures. Because of this insufficiency, we are unable to approve your petition.

This letter serves as confirmation that our office will not be able to certify your name to the respective election commissions for the 2020 General Election.

If we can be of any further service, please to not hesitate to contact us at 501-682-5070.

Sincerely,

John Thurston
Arkansas Secretary of State





## ARKANSAS SECRETARY OF STATE

May 29, 2020

Gary Fults
1314 E. Woodson Lateral
Hensley, AR 72065


Mr. Fults,

The Secretary of State's Office has reviewed the petition that you submitted seeking to be listed on the November 2020 General Election ballot as a candidate for State Representative, District 27. Unfortunately, your petition contained an insufficient number of signatures. Because of this insufficiency, we are unable to approve your petition.

This letter serves as confirmation that our office will not be able to certify your name to the respective election commissions for the 2020 General Election.

If we can be of any further service, please to not hesitate to contact us at 501-682-5070.


Sincerely,

John Thurston
Arkansas Secretary of State

# Exhibit B

| From: | Nicholas Bronni |
|---|---|
| To: | "Law Office"; Jared Lax |
| Cc: | vincent.wagner_arkansasag.gov; Dylan Jacobs; Michael Mosley; "William Whitfield Hyman"; "Whitfield Hyman" |
| Subject: | RE: Whitfield and Fults v. Thurston (Case No. 4:20-cv-00466--KGB) |
| Date: | Wednesday, June 3, 2020 10:02:48 AM |

Mr. Lax-

Defendant isn't exactly sure what Plaintiffs are requesting.  As best we can discern, Plaintiffs appear to want the Court to modify the stipulations and allow them to conduct post-trial, extra-record discovery.  In any event, we'd ask that Plaintiffs file any such request in the form of a motion, so that Defendant can respond on the record.

Nicholas Bronni

**Nicholas J. Bronni**
Solicitor General
Office of Arkansas Attorney General Leslie Rutledge

323 Center Street, Suite 200
Little Rock, Arkansas 72201
501.682.6302 | 501.682.2000
Nicholas.bronni@arkansasag.gov | ArkansasAG.gov

**From:** Law Office [mailto:bostonbarristers@tulsacoxmail.com]
**Sent:** Tuesday, June 2, 2020 2:40 PM
**To:** 'Jared Lax'
**Cc:** Nicholas Bronni; Vincent Wagner; Dylan Jacobs; Michael Mosley; 'William Whitfield Hyman'; 'Whitfield Hyman'
**Subject:** Whitfield and Fults v. Thurston (Case No. 4:20-cv-00466--KGB)

Dear Mr. Lax:

Transmitted is an email letter with two attachments which relate to paragraph no. 8 of the Joint Stipulations of Fact filed in the case on May 11, 2020 (Dkt. No. 11).  I have discussed this matter with Mr. Wagner yesterday as per my email letter attached hereto and have chosen at this time to give this informal notice to the Court and parties since I was unsure at this time what the Court might wish to be done.

Yours truly,

James C. Linger

James C. Linger, Attorney
1710 South Boston Avenue
Tulsa, Oklahoma 74119-4810
918-585-2797 Telephone

918-583-8283 Facsimile

# Exhibit C

| | |
|---|---|
| **From:** | Law Office |
| **To:** | Jared Lax |
| **Cc:** | nicholas.bronni_arkansasag.gov; vincent.wagner_arkansasag.gov; michael.mosley@arkansasag.gov; "Dylan Jacobs"; "William Whitfield Hyman"; "Whitfield Hyman" |
| **Subject:** | Whitfield and Fults v. Thurston (Case No. 4:20-cv-00466--KGB) |
| **Date:** | Wednesday, June 3, 2020 10:49:43 AM |

Dear Mr. Lax:

   As per Mr. Bronni's email letter to you of today at 10:01 a.m., Plaintiffs are not asking the Court to modify the stipulations and allow them to conduct post-trial extra record discovery.  However, the trial was conducted partly on the basis of the stipulations and we believe the requirement of paragraph no. 8 of the stipulations filed on May 11, 2018 (Dkt. No. 11) is clear and the Secretary of State has not complied with it.  The solution would be simple if the Secretary of State would comply with the stipulation.  Note that in doing so they would be doing the exact same thing they did as to Sandra Furrer in their letter to her dated May 1, 2020, which is one of the pages in Plaintiffs' admitted exhibit 13 of the hearing on May 27, 2020.  I sought to have this taken care of in a simple manner, but can file a motion if necessary.

James C. Linger

James C. Linger, Attorney
1710 South Boston Avenue
Tulsa, Oklahoma 74119-4810
918-585-2797 Telephone
918-583-8283 Facsimile